UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF MARIA PEROVICH,
VICTOR GOJCAJ,
      **Plaintiffs,**

-vs-                                           Case No: 2:09-CV-12192

STERLING HEIGHTS POLICE OFFICER        Hon. Patrick Duggan
ANTOINETTE FETT,
STERLING HEIGHTS POLICE SERGEANT
DAVID CATTANEO, STERLING HEIGHTS POLICE
OFFICER AARON BURGESS AND CLINTON TOWNSHIP
POLICE DETECTIVE LEO MELISE,
      **Defendants.**

---

**PATRICK J. Mc QUEENEY (P45797)**      **MARC D. KASZUBSKI (P60333)**
Attorney for Plaintiff                 Attorney for Defendants
33830 Harper Avenue               Cattaneo, Burgess and Fett
Clinton Township, Michigan 48035     Sterling Town Center
(586) 774-6363                   12900 Hall Road/Ste. 350
patrickjmcqueeney@yahoo.com       Sterling Heights, Michigan 48313
                                      (586) 726-1000

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS FETT, CATTANEO AND & BURGESS'
MOTION FOR SUMMARY JUDGMENT**

      Defendants in this 42 USC 1983 lawsuit with supplemental state law claims arising from

the heinous treatment of an unarmed, elderly disable woman seeks summary judgment pursuant

to FRCP 56.  For the reasons fully set forth in the accompanying Response Brief, depositions,

documentary and other exhibits, Defendants' motion must be denied and the case should proceed

to final settlement conference of to a jury trial before the constitutional fact finder.

Respectfully submitted,

/s/Patrick J. McQueeney_____
Patrick J. McQueeney (P45797)
33830 Harper Avenue
Clinton Township, Michigan 48035
(586) 774-6363
patrickjmcqueeney@yahoo.com

Dated:  September 13, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF MARIA PEROVICH,
VICTOR GOJCAJ,
      **Plaintiffs,**

-vs-                                 Case No: 2:09-CV-12192

STERLING HEIGHTS POLICE OFFICER           Hon. Patrick Duggan
ANTOINETTE FETT,
STERLING HEIGHTS POLICE SERGEANT
DAVID CATTANEO, STERLING HEIGHTS POLICE
OFFICER AARON BURGESS AND CLINTON TOWNSHIP
POLICE DETECTIVE LEO MELISE,
      **Defendants.**

_____

| **PATRICK J. Mc QUEENEY (P45797)** | **MARC D. KASZUBSKI (P60333)** |
|---|---|
| Attorney for Plaintiff | Attorney for Defendants |
| 33830 Harper Avenue | Cattaneo, Burgess and Fett |
| Clinton Township, Michigan 48035 | Sterling Town Center |
| (586) 774-6363 | 12900 Hall Road/Ste. 350 |
| patrickjmcqueeney@yahoo.com | Sterling Heights, Michigan 48313 |
| | (586) 726-1000 |

_____

**BRIEF IN SUPPORT PLAINTIFF'S RESPONSE TO DEFENDANTS FETT,
CATTANEO AND & BURGESS' MOTION FOR SUMMARY JUDGMENT**
_____

## TABLE OF CONTENTS

**INDEX OF AUTHORITIES**                                                    ii

**STATEMENT OF QUESTIONS PRESENTED**                         iv

**STATEMENT OF FACTS**                                                    1

**ARGUMENTS**

    I.    DEFENDANTS STERLING HEIGHTS POLICE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO PLAINTIFF'S FEDERAL AND STATE LAW CLAIMS.    13

        A.  Law Applicable to Qualified Immunity Defense.    13

        B.  Defendants misinterpret Plaintiff's Complaint suggesting that she has made a 42 USC 1983 claim for false arrest for the offense of Attempted Resisting and Obstructing Arrest.    13

        C.  Defendants are not entitled to Qualified Immunity on Plaintiff's Unlawful Entry Claim    14

        D.  Plaintiff's rights under the fourth Amendment were violated by Defendant Sterling Heights Police Officers and therefore, Defendants' Motion for Summary Judgment as it pertains to Plaintiff's Excessive Force Claim Must Fail.    17

**CONCLUSION**                                                            21

## <u>INDEX OF AUTHORITIES</u>

<u>**CASE LAW:**</u>

*.Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)…………………………………………………………………………………*13

*Dominque v Telb, 831 F2d 673, 676 (6th Cir. 1987)……………………………*18

*Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)…………………………13

*Fox v DeSoto 489 F.3d 227, 236 (6th Cir. 2007)……………………………....*18

*Gardenhisr v Schubert*, 205 F3d 303, 315 (6th Cir. 2000)……………………..14

*Graham v. Connor, 490 U.S. 386, 395-96, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)……………………………………………………………*18

 *Lockett v. Suardini*, 526 F.3d. 866, 872 (6th Cir. 2008)……………………13, 14, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)…………………………………………………………………*12

*People v Roger Dillard, 115 Mich App 640, (1982)………………………………*15

*Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)…………………………………………………………………*13

*Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006)……………*18

<u>**STATUTE:**</u>

*42 U.S.C. § 1983.*                                                                       18

<u>**CONSTITUTIONS:**</u>

Fourth Amendment                                                             21

<u>**COURT RULE**</u>
F. R. C. P. 56                                                                          12

## STATEMENT OF QUESTIONS PRESENTED

1. WHETHER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BASED UPON FACTS AND CIRCUMSTANCES WHICH COULD LEAD JURORS TO CONCLUDE THAT THE ACTIONS OF DEFENDANTS HEREIN WERE NOT OBJECTIVELY REASONABLE?

    Defendants Answer:  Yes.

    Plaintiffs' Answer: No.

2. WHETHER PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW?

    Defendants Answer:  Yes.

    Plaintiffs' Answer: No.

# I.  COUNTER-STATEMENT OF FACTS

### A.  Introduction

On October 30, 2007, Mr. Victor Gojcaj and the late, Maria Perovich, were residing peacefully in Ms. Perovich's residence in Sterling Heights, Michigan.  Leo Melise, a Clinton Township Police Detective, investigating a misdemeanor complaint of defrauding an innkeeper, an alleged "dine and dash" went to the Sterling Heights residence to speak to Plaintiff Gojcaj.  Melise pounded at the door for an extended period of time, prompting Ms. Perovich to call the Sterling Heights Police Department.  Sterling Heights officers responded to the scene and Ms. Perovich came to the front door to speak to them.

Melise insisted that Gojcaj, Perovich's son, come to the door.  Perovich inquired as to why he wanted to speak to her son and when she did not produce her son, Melise threatened to take her vehicle.  Perovich became frustrated when Melise threatened to take her vehicle and when Melise unnecessarily caused Perovich further agitation by rhetorically stating: "what are you going to do about it," Ms. Perovich's stated prompted that she would get her gun and remove him from the premises.

Thereafter, Cattaneo, and the other law enforcement officers forcefully entered the residence without a warrant and Perovich was brought to the floor, and she is heard screaming on the videotape.  The events of October 30, 2007, were captured on a video surveillance tape, a copy is attached hereto as exhibit A, which gives rise to this action.

Following Ms. Perovich being taken to the floor, she was forcefully being handcuffed by Defendant Cattaneo and Officer Fett.  Fett was observed to have her knee on Ms.

1

Perovich's head and Sergeant Cattaneo had his knee in Ms. Perovich's back.  Ms. Perovich was screaming during the whole ordeal and eventually was transported to the hospital when Gojcaj insisted that she be brought to the hospital.  The medical records demonstrate that Ms. Perovich had an abnormal ECG on October 30, 2007 and that she had an inferior infarction.

Ms. Perovich suffered the abuse of Defendant's Cattaneo and Officer Fett, who claimed that Ms. Perovich was resisting arrest.  Ms. Perovich, an elderly, obese, disabled woman could not have resisted arrest. Nevertheless, she was only charged with that offense as a means to protect the officers from scrutiny for their inappropriate behavior.

Defendants have testified that Perovich assaulted Cattaneo, but the videotape does not demonstrate an assault occurred.  Further, that allegation defies common sense as Perovich called the police  and why would she push a police officer in that instance.  Perovich an elderly disabled woman did not push Cattaneo and did not plead guilty to any such offense.

### B.   Counter-Statement of Facts

On October 30, 2007 at approximately 9:45AM, Clinton Township Detective Leo Melise, appeared at Maria Perovich's home, in Sterling Heights. Melise was there to investigate Ms. Perovich's son, Victor Gojcaj, not paying his restaurant bill from the evening before.

Gojcaj had been a patron at the P.F. Changs Restaurant on October 29, 2007 and believed that his friend, Paul Lutori was going to pay his dinner tab.  (Exhibit B, 15).  Gojcaj told the waiter that he had forgotten his wallet, but did not explain to the waiter that Lutori, was going to pay the tab, as he was in a hurry to leave the restaurant, because he had observed the "Notos" of which he has been a past victim of physical abuse at the hands of Jerry Noto.  (Exhibit B, 16-19).

2

At the time that  Melise was at the residence and pounding on the door, Gojcaj was watching on a closed circuit television in his  bedroom as to what was transpiring at the front door.  (Exhibit B,  20).  Gojcaj would have come to the front door and talked to Melise, if Melise had advised his mother that he was there to inquire as to the nonpayment of a dinner tab.  (Exhibit B, 22).  Melise was pounding at the front door which is why the late Maria Perovich called the Sterling Heights Police Department.  (Exhibit B,  25).  Melise had been in street clothes and Perovich did not believe Melise was a police officer.  Id.  Ms. Perovich called the Sterling Heights Police Department and they came right away.  Id.

Gojcaj overheard his mother state, after becoming agitated, that she was going to get her gun and chase Melise off her premises.  (Exhibit B, 25-26).  Perovich did not threaten to shoot any of the officers, as has been repeatedly suggested.  Indeed, the videotape demonstrates that the police officers had no fear of  any such "threat".  (Exhibit A).

Gojcaj  came out of his bedroom, when he heard his mother screaming and she was on the floor when he came out of his bedroom.  (Exhibit B, 28).   Mr. Gojcaj observed Defendant Cattaneo with his knee jabbed into his mother's back and that she was not resisting Detective Cattaneo from handcuffing her.  (Exhibit B, 29 & Exhibit C).   Mr. Gojcaj did not observe his mother struggling with the police officers and Ms. Perovich as a weak disabled woman could not prevent  the officers from doing anything to her.  Id.

Gojcaj told the officers she had a back injury, and to get off of her and call an ambulance.  (Exhibit B, 29-30).   Mr. Gojcaj testified that the officers were on top of her like she was an animal.  Id.

3

Ms. Perovich was transported to Troy Beaumont.  (Exhibit B, 30).   Mr. Gojcaj testified that the Doctor told him that the ECG report showed that his mother had a heart attack.  Id.

 Perovich pled no contest to the offense of attempted resisting and obstructing arrest, which was taken under advisement and later dismissed.  (Exhibit B, 44).  \The case against Perovich was ultimately dismissed when she completed six month of non reporting probation.

The videotape attached as exhibit A was initially seized by the Sterling Heights Police officers at the scene.  Thereafter, Mr. Gojcaj, retrieved the tape from the police department, but then was advised to return the same following a phone call he received from the Sterling Heights Police Department.  (Exhibit B, 96).

At the time of the incident, there were three vehicles at Ms. Perovich's residence and each was registered in Perovich's name, as they were not owned by Gojcaj,  (Exhibit B, 107).

Detective Melise woke up Mr. Gojcaj, when he was pounding at the front door for approximately a half hour.  (Exhibit B, 125).  Perovich did not believe that Melise was a police officer because he was not in uniform and was not driving a marked vehicle.  (Exhibit B, 126).  Ms. Gojcaj's mother did not want her son to go to the front door, as she believed that the people at the door wanted to cause him trouble.  (Exhibit B, 127).

Mr. Gojcaj testified that his mother said she was going to get her gun, because she had been influenced by the verbal abuse.  (Exhibit B, 132).  Ms. Perovich, however, did not have a gun and never has owned a gun.  Id.  Mr. Gojcaj did not witness how his mother ended up on the floor of the house.  (Exhibit B, 135).  The videotape, however, clearly demonstrates that Ms. Perovich is screaming only moments after the officers entered her residence without a warrant.  Further, Mr. Gojcaj was advised by his mother that the police officers had forced her to the floor.

4

(Exhibit B, 141).  Mr. Gojcaj estimates that it was approximately a second when the police entered the residence and he came out and saw his mother on the floor.  (Exhibit B, 145).  Ms. Gojcaj told her son while they were at the hospital that she was forced to the floor.  Id.

Mr. Gojcaj reviewed the videotape and heard Detective Melise say that he was going to tow Ms. Perovich's vehicle.  (Exhibit B, 147).  Perovich has used a cane/walker for approximately 20 years.  (Exhibit B, 147-48).  Mr. Gojcaj was advised by his mother at the hospital that her back and her head were hurt.  (Exhibit B, 148).

Antoinette Fett was one of the officers dispatched to the residence.  Fett met Clinton Township Police Detective Leo Melise, who was dressed in street clothes.  Fett and the other officers, who were responding to a call from Ms. Perovich were actually there to assist Melise.  (Exhibit D, 17).  However, Fett also claimed that the Sterling Heights Police Department was standing by for both parties.  (Exhibit D, 19).

Perovich opened the "regular" door and Fett could not see that Perovich was using a cane or walker, however she did observe a cane upon her entry into Perovich's residence.  (Exhibit D, 22).  Fett observed Ms. Perovich with the cane.  Id.  Fett observed Ms. Perovich open the screen door and saw that Ms. Perovich had extended her hands on the porch.  (Exhibit D, 25).  Fett believed that Ms. Perovich was agitated and appeared to be visibly upset.  Id.

Fett believed that Perovich was upset because Detective Melise wanted to speak to Perovich' son, Victor.  (Exhibit D, 26).  Fett did not have any knowledge whether Victor was home, but she was advised that a truck which was registered to Perovich was in the driveway and it was the same truck used in the alleged "dine and dash" at the restaurant.  (Exhibit D, 26,27).

5

Ms. Perovich told Melise that he should make an appointment to speak to her son.  The Sterling Heights Officers did not advise Melise to contact Victor at a later date.  (Exhibit D, 27, 28).

Fett claims in her report that Perovich stated I am going to get my gun and shoot you. (Exhibit D, 43).  Fett believes the statement made by Perovich was directed to all of the police officers.  Fett then acknowledged that in her answers to interrogatories, particularly question number nine, that there was no reference in the answer that Perovich was going to shoot someone.  (Exhibit D, 48, 49).  While reviewing a videotape at her deposition, Fett testified that she heard Perovich state "I am going to get my gun" and that Perovich was ranting and raving and that it was hard to hear all the content.  (Exhibit D, 57).  Fett  heard Perovich claim that she was going to get her "freakin" gun, but did not see Perovich push Cattaneo on the video. (Exhibit D, 58).   Fett believed that an elderly woman with a cane would be able to spring back into the home and then return to the front door and shoot the officers.  (Exhibit D, 64).  Fett then testified that as police officers they were going into a known danger, when she heard a credible threat and that officers gone into known dangers every day.  (Exhibit D, 65).

The videotape of the incident was seized as evidence of an assault, however, she also testified that there was no assault on the videotape.  (Exhibit D, 70, 71).  Fett did not see the storm door to Ms. Perovich's residence close and she did not see Sergeant Cattaneo open the screen door.  (Exhibit D, 78).   Fett claimed that Ms. Perovich dropped dead weight into a foyer area of the home and that she had a cane with her, as the officers entered the residence.  (Exhibit D, 84).  Perovich landed on her left arm after she fell dead weight on the floor.  (Exhibit D, 85).

Fett handcuffed Perovich's right arm, while Cattaneo was holding her wrist and Ms. Perovich is screaming the entire time while flailing around.  (Exhibit D, 88)   Perovich did not

claim any other injuries other than to hear back, but Fett did notice bruising to Perovich's arm, when viewing a photograph during her deposition.  (Exhibit D, 91).  Fett observed a bruise on Perovich's arm and discoloration of Perovich's left hand when presented photographs at her deposition.  (Exhibit D, 93).  The discoloration on Perovich's hand could possibly be a bruise. (Exhibit D, 94).  Ms. Perovich was breathing very heavily due to her agitated state and that is why the Sterling Heights Officers called for medical personnel.  (Exhibit D, 95).   Fett observed Victor running around a corner from a hallway and asking his mother if she was okay, while she was on the floor with Fett and Cattaneo.  (Exhibit D, 96).

Leo Melise observed the elderly woman to have opened the screen door and threatened that she was going to get a gun and shoot the officers.  (Exhibit E,  27).  Melise and the other officers then looked at each other in amazement.  Id.  Perovich never got a gun and in fact she never did anything else in terms of an aggressive act when said that she was going to get her gun. Melise estimates that it might have been a minute and a half or less when the officers entered the residence after the woman said she was going to get her gun.  (Exhibit E,  29).

Melise and the other three officers entered the Perovich residence without a search or arrest warrant and they were entering the residence after they were allegedly threatened for their safety.  (Exhibit E,  30).  Melise admitted the officers could have left and there was nothing preventing them from leaving.  (Exhibit E,  31). Melise testified that the reason why the police entered was the threat.  Id.

The officers did not have their firearms drawn when they entered the residence.  (Exhibit E,  34).  Melise observed that the woman was on the ground and she was on her side yelling at the officers.  Id.  Gojcaj come around in a split second, while his mother was on the floor.

7

(Exhibit E,  35).  Melise stood there when Gojcaj came out from around a wall and a Sterling Heights officer then pulled out his taser and said get down, at which time Gojcaj complied.  Id.

The elderly woman did not give the Sterling Heights officer permission to enter the residence.  (Exhibit E,  37).  Melise did not see how the elderly woman ended up on the floor. Id.  The elderly woman was on the floor the entire time until Melise left the residence with Gojcaj.  (Exhibit E,  38).  The elderly woman eventually left the residence with the assistance of an ambulance.  Id.  Melise did not hear the elderly woman complaining of any injuries, but that all he heard was the woman screaming.  (Exhibit E,  39).

Melise testified that none of the officers did a search of the house and he did not observe any of the officers complete a search of the house.  (Exhibit E,  42).  Further, there was no search of the house when Mr. Gojcaj re-entered the home.  Id.

Melise testified after reviewing the videotape state that he could not see the two assaults which he had testified to earlier.  (Exhibit E,  48).   Melise did not hear the woman on the videotape say that she was going to get her gun and shoot the officers.  However, he viewed her actions as a threat.  Id.  Melise did not know if the woman had the capability of carrying out the threat.  Id.  Melise then admitted that he could have stepped back and left the premises.  (Exhibit E,  50).  Melise also admitted that he was using the threat of towing Ms. Perovich's vehicle to get her to produce her son.  (Exhibit E,  51).  Melise did not perform a protective sweep of the  area when he went into the residence, nor did he observe any of the officers perform a protective sweep for any weapons.  (Exhibit E,  55).  Melise admitted that the officers could have moved to the side if the woman got a gun.  Further, he agreed that the officers could have done a lot of things including calling a swat team, if the woman threatened them with a gun, but they did not

8

undertake any of these other alternatives.   Melise called the threat made by an elderly woman a credible threat and yet he no protective sweep was undertaken by any of the officers in Ms. Perovich's residence.  (Exhibit E,  62).

Sergeant Burgess overheard a run to an address on Penny Street in Sterling Heights on October 30, 2007 and showed up as a back-up officer.  Burgess observed Sergeant Cattaneo approach the residence and knock on the door and a female answered the door.

The woman who answered the door was yelling and screaming profanities, but Burgess could not tell exactly what she was saying.  (Exhibit F,  16).  Burgess had learned that Ms. Perovich had called the Sterling Heights Police Department and had wanted the police out there. (Exhibit F,  18).   Burgess observed that the residence had two (2) doors, a screen door and the door wall itself.  Burgess observed the woman to open the screen door with her right hand and prop it open.  (Exhibit F,  19).    Melise threatened to tow Perovich's vehicle, and Burgess believed that her hostility escalated "quite a bit" .  (Exhibit F,  21).

Burgess observed that the elderly woman had one foot and most of her body out of the house and was vigorously pointing and shaking her hand into Sergeant Cattaneo's face.  (Exhibit F,  22,23).  Exhibit A clearly demonstrates that Perovich at no time had her body out of her residence and only an arm can be observed.   Burgess described Ms. Perovich's statements as "she was just on a rant".  Id.  No officers drew their firearms when Ms. Perovich was on her rant. (Exhibit F,  24).   None of the officers took a defensive posture when Ms. Perovich was on her rant and they had no knowledge as to whether or not there were guns in the house.  Id.

Sergeant Burgess described the woman he saw at the residence as being a large woman. (Exhibit F,  31).  (Exhibit L).  Despite the fact that Ms. Perovich is a large woman, she was able

to see her "spin around and make a break for the house".  Id.  Burgess claimed that after the large woman attempted to go into the house, she again turned and saw her push Cattaneo.  At this point the large woman spun to the left and proceeded into the house.  (Exhibit F,  34,35).

Burgess testified that Perovich just dropped and fell to the floor, like she was throwing a temper tantrum.  (Exhibit F,  35).  Burgess claims that there is a step up into the living room of the Perovich home, however, there is no such step into the home.  (Exhibit M).

The officers did not perform a protective sweep or search of the entire house.  (Exhibit F, 51).  Burgess testified that he would be putting himself in harm's way by retreating from a residence, rather than entering a residence and not knowing if the elderly woman had a gun in the immediate vicinity.  (Exhibit F,  52).  Burgess noted after reviewing the transcribed portion (Exhibit H) of the videotape (Exhibit A) that the woman stated I'm going to get my gun and get you off my premises, in response to Melise's question what are you going to do about it. (Exhibit F,  59).  Burgess agreed that audio portion of the videotape was different than what he described in his police report.  Id.

Burgess after having an opportunity to view the videotape during his deposition admitted that he did not observe a push on the videotape.  (Exhibit F,  67).  Burgess agreed that he did not see any pushes on the videotape.  (Exhibit F,  69).  Burgess admitted that he could hear the woman screaming on the video, when the officers had entered the residence.  Id.  The screaming appears to be simultaneous with the police officers entrance into the residence.  (Exhibit A).

Sergeant Cattaneo went to the Perovich residence and knocked on the door to make contact with the owner and advise such person as to why Detective Melise was there.  (Exhibit

G, 11). Perovich came to the door and was still on the phone with dispatch and the officers to tried to get Ms. Perovich to hang up the phone and talk to them.

Pervovich partially opened the main door and then opened the door all the way. (Exhibit G, 15). Perovich, after opening the wooden door, then opened the screen door with her right hand. (Exhibit G, 16). Cattaneo heard Melise threaten that he was going to tow the vehicle. (Exhibit G, 17). Cattaneo prior to his arrival, believed he was going to the Penny address to assist a resident in her home. Id.

Cattaneo testified that Perovich stated that she was going to get her gun and shoot their ass in response to Detective Melise threatening to tow her vehicle. (Exhibit G, 20). The videotape certainly is in conflict with Cattaneo's testimony.

Cattaneo had received seven (7) years SWAT team training and he agreed that he could have called the SWAT team in this instance, but did not do so. (Exhibit G, 31). Cattaneo was making the situation safer by going into a residence without knowledge as to where the firearm was. Id. Cattaneo did not have his firearm or taser drawn at the time that he entered the residence and believed he was going to be shot. (Exhibit G, 32, 33). Perovich purportedly pushed Cattaneo with her right hand. (Exhibit G, 33). Perovich then made a break for the house and Cattaneo tried to detain her, by putting his arm on her arm and it was at this time that Perovich pushed Cattaneo away. (Exhibit G, 34). Cattaneo's answers to his interrogatories are devoid of any reference, regarding Perovich threatening to shoot anybody. (Exhibit G, 38).

After the incident Sergeant Cattaneo confiscated the videotape from Ms. Perovich's residence without her permission. (Exhibit G, 44). When viewing the videotape, Cattaneo testified that the push occurred when Perovich turned and attempted to enter the house. (Exhibit

11

G, 48).   Cattaneo was moving pretty slow when he entered the residence.  (Exhibit G, 49).

Perovich did not plead guilty to any assault, but rather pled no contest to a mystical offense, of

attempted resisting and obstructing arrest.  (Exhibit G, 51).

Cattaneo recognized Perovich as an obese woman and acknowledged that one of the

pictures depicted bruising on Ms. Perovich's right arm, which was consistent with the spot where

he had grabbed Ms. Perovich.  (Exhibit G, 65).   Cattaneo only heard Ms. Perovich complain of

injuries to her back.  Cattaneo said that Ms. Perovich was screaming for a period of time and was

not certain as to whether she heard his commands.  (Exhibit G, 72).

Each of the officers in this involved in this incident have through their reports and/or

through discovery  suggested that the woman threatened to get her gun and shoot them, but

exhibits A and F, clearly point out that Perovich did not state that she was going to shoot anyone.

Defendants have all suggested that Ms. Perovich's statement was a legitimate threat,

however, Defendant, Cattaneo and former Defendant Melise were observed to on a videotape

to not be affected by Ms. Perovich's statement that she was going to get a gun.

## II.  **STANDARD OF REVIEW**

"Summary judgment is proper where no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In considering a motion for

summary judgment, the district court must construe all reasonable inferences in favor of the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.

Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The central issue is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*" *Lockett v. Suardini*, 526 F.3d. 866 (6th Cir. 2008).

"At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* . . . the reasonableness of [the defendant's] actions . . . is a pure question of law." *Id.; see also Marvin, 509 F.3d at 244.*" *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008).

### III. DEFENDANTS STERLING HEIGHTS POLICE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO PLAINTIFF'S CLAIMS

A.  Law Applicable To The Qualified Immunity Defense

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that the requisites of a qualified immunity defense are to be analyzed in a distinct two-step process. The initial inquiry should be whether the facts alleged showed that the officer's conduct violated a constitutional right. If the answer to that question is in the affirmative based on a plaintiff-favorable view of the evidence, then the second inquiry is whether the right at issue was clearly established. If the right is clearly established, then summary judgment based on qualified immunity must be denied. Properly analyzed here, reasonable jurors could find a constitutional violation of clearly established law.

B.  Defendants misinterpret Plaintiff's Complaint suggesting that she has made a 42 USC 1983 claim for false arrest for the offense of Attempted Resisting and Obstructing Arrest.

Plaintiff seeks claims for relief is based upon the unlawful entry into Defendant's residence, as well as the excessive force used against Ms. Maria Perovich, and various state law claims.  Therefore, Defendants argument that Plaintiff is estopped from re-litigating a false arrest

13

claim is without merit.  Plaintiffs would respectfully request that this Honorable Court consider any purported resisting and obstructing arrest by Ms Maria Perovich, in conjunction with the police using excessive force to subdue Ms. Perovich.  *Lockett,* supra.

### C. Defendants are not entitled to Qualified Immunity on Plaintiff's Unlawful Entry Claim

At the outset Defendants posit two (2) theories as to their justification for entering Ms. Perovich's residence on October 30, 2010.  First of all, Defendants suggest that as Sergeant Cattaneo was pushed by Ms. Perovich, then he could enter the residence to effectuate an arrest of Ms. Perovich for assault and battery.  Secondly, Defendants suggest that they could enter the residence, due to the fact that they were threatened with being shot by Ms. Perovich.

"In general, the existence of probable cause in a 1983 action presents a jury question unless there is only one reasonable determination possible."  *Gardenhisr v Schubert*, 205 F3d 303, 315 (6th Cir. 2000) (Citations omitted).  Probable cause exists when police officers have "reasonably trustworthy" information to warrant a "prudent man" in believing that a person has committed a criminal offense.  Id.  (Citations omitted).

The fact that Plaintiff, Perovich did not plead to an assault and the fact that she has denied ever assaulting any of the officers is a question for the trier of fact.  The videotape as provided to Defendants and reviewed by them during their depositions demonstrates that Perovich did not push the officer as has been suggested.  Defendants suggest in their self serving testimony,  that the assault occurred off camera, wherein Plaintiff Perovich suggests no assault occurred whatsoever.  This is a question of fact and summary judgment should be denied.

14

Defendants also suggest that as the officers were threatened there were exigent circumstances to permit entry into the Perovich residence without a warrant.

In *People v Roger Dillard*, 115 Mich App 640 NW2d 757 (1982), the Michigan Court of Appeals held that the warrantless arrest of the defendant in his home was illegal.  The Court of Appeals  also held that the defenda0nt had a right to defend himself in resisting an unlawful arrest, provided the force was reasonably necessary.  Id @ 641 (citations omitted).   The court of appeals likewise noted that the Defendant's actions did not involve any actual use of force and there was no harm or injury done to the parties involved.  Id @642.

In *Dillard,* the  Battle Creek Police Department received information that the Defendant was a wanted suspect for a felonious assault offense which was to have been committed in Flint approximately five hours earlier.  Two Battle Creek Police Officers went to the Defendant's home without a warrant and knocked on the door. Defendant then opened his inner door and was told that he was under arrest, wherein Defendant refused to go with the officers as they did not have a warrant.  Defendant then closed the door and the officers responded that they would use force to enter the residence to effectuate an arrest.  Defendant did not respond and the officers forcibly entered Defendant's residence where they encountered the Defendant with a shotgun, pointed at the officers and told them to leave.  The officers left and shortly thereafter surrendered.  Defendant's conviction for felonious assault was reversed.

Here, Defendants suggest that they entered as they were threatened with being shot and Perovich unlike Dillard was unarmed.  Further, Sergeant Cattaneo and Detective Melise admitted in their deposition testimony that other means could have been employed before forcibly entering Ms. Perovich's residence.   The old adage that a picture is worth a thousand words and

15

both Cattaneo and Melise are seen on camera as not so much as even flinching, when Perovich suggests that she is going to get a gun.  No defensive posture is undertaken and none of the officers draw their firearms.  Indeed, Cattaneo is overheard entering the residence telling Ms. Perovich to go get your son and where is your son at, rather than immediately announce that he was arresting her for threatening a police officer.   Additionally, a careful review of such tape reveals that nearly 20 seconds elapse before the officers even attempt to enter the residence. Certainly, if the officers feared for their safety, there would be no undue delay in entering the residence and apprehending Ms. Perovich.  Cattaneo testified that his entry into the residence was real slow, and if he reasonably believed Perovich was going to spin around and make a break into the house to get a gun, then his pace would be swift, as to prevent such occurrence.

Defendants cite to their expert's affidavit in support of their motion, to justify dismissal of this cause of action.   At the outset, Plaintiff objects to the untimely tendering of the affidavit in support of the motion and respectfully requests that this Honorable Court not consider the same.  The affidavit was not tendered in advance of the filing of the instant motion and further, the attachments were not included with the motion, prompting Counsel to request a copy last week and Counsel received the same on September 15, 2010, certainly without an opportunity to question such expert and to retain an expert to compile a report in opposition to the same.

In the event that this Honorable Court decides to consider said affidavit, then Plaintiff suggests that the affidavit invades the province of the jury and offers opinions as to questions of fact.  Defendant's expert offers his opinion that there were exigent circumstances which allowed entry into Perovich's home.  This is a question of fact as to whether there were exigent

circumstances to enter said residence.  As pointed out above, Plaintiff has demonstrated that there were no exigent circumstances in which to enter the residence.

Further, a review of Defendants' expert's affidavit demonstrates that such expert has not undertaken a thorough examination of the facts.  As an example in paragraph 7(j) the expert incorrectly concludes that the "only record evidence shows that Perovich dropped to the floor on her own actions".   Mr. Gojcaj's testimony demonstrates that his mother was forced to the floor. Exhibit B-1, 141, 145).  Likewise, Exhibit A which was produced in each of the Defendants' depositions demonstrates that Perovich based upon her reaction was immediately forced to the floor by Sergeant Cattaneo.  Mr. Gojcaj's deposition also demonstrates that his mother was forced to the floor.

As another example, Defendants' expert suggests that "the undisputable audio of the incident" demonstrates Perovich was actively resisting arrest.  The expert fails to consider  the entire audio portion of the videotape, wherein Ms. Perovich suggests that she was pushed by Sergeant Cattaneo.  Exhibit  H.

Based on the law, the depositions and the affidavits, the individual Defendants are not entitled to qualified immunity on the § 1983 claim. Reasonable jurors will also almost certainly conclude that the unlawful entry into Plaintiff's residence was not objectively reasonable, and in the circumstances presented, Defendants clearly violated Ms.Perovich's Fourth Amendment right to be free from an unconstitutional seizure.

D.  <u>Plaintiff's Fourth Amendment rights were violated by  Defendants and therefore, Defendants' motion, as it pertains to Plaintiff's Excessive Force Claim Must Fail.</u>

<u>The Constitutional Standard For Excessive Force Claims</u>

17

*Section 1983* provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *42 U.S.C. § 1983*. "To state a claim under *42 U.S.C. § 1983*, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006)* (citations omitted*)*.

> "In determining whether a constitutional violation based on excessive force has occurred, we apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto, 489 F.3d 227, 236 (6th Cir. 2007)* (citing *Graham v. Connor, 490 U.S. 386, 395-96, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989))*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham, 490 U.S. at 396-97*. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox, 489 F.3d at 236* (quoting *Graham, 490 U.S. at 396*)." *Dunn, supra* at pp.353-354.

A court must inquire whether "any officer in the Defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct. *Dominque v Telb, 831 F2d 673, 676 (6th Cir. 1987)*.

A jury could reasonably conclude that a reasonable officer in the Defendant Sterling Heights Police Officers position was never in any danger. Plaintiff without repeating some of the arguments above suggest that the facts demonstrate that the officers were not in any danger. The officers put themselves in harm's way, as Sergeant Cattaneo

18

testified that a SWAT team could be called, and Melise testified the officers could have left or done other things rather than enter the residence.  The police were investigating a misdemeanor not committed in their presence and later when Plaintiff Perovich makes a statement wherein the officers believe she is ranting and raving they enter the house and force a disabled woman to the floor.

Thereafter, in the presence of Mr. Victor Gojcaj, the officers drive their knee into the back and head of Perovich.  Plaintiff was physically unable to fight off the officers and nor was she able to flee her own home to evade arrest.  The actions of the Defendants herein were not reasonable under the circumstances and therefore, Defendant's motion must fail.

Plaintiff for purposes of judicial economy will not repeat the arguments pertaining to the Defense Expert, however, Plaintiff submits that the expert's suggestion that the officers acted reasonable in the use of force fails to take into account the fact that Plaintiff Perovich is a disabled woman.

Further it is possible for a finding that a person was resisting arrest to coexist with a finding that the police used excessive force to subdue him.  *See Lockett v. Suardini*, 526 F.3d. 866, 873 (6th Cir. 2008).

Defendants have argued that Plaintiff has not provided any medical documents showing that Ms. Perovich treated for injuries to her head and back and consequently, Plaintiff's case must be dismissed.  Here, Plaintiff has tendered a number of medical records following her assault on October 30, 2007.  Ms. Perovich was treated on the same day in which she was assaulted, as well as November 6. 2007, November 25, 2007, and December 20, 2007.  The

hospital visits are all related to the assault dating back to October 30, 2007.  (Exhibits I, J & K).

Further, on December 6, 2007 Ms. Perovich did treat with Dr. Aleida Rivera, due to a muscle

strain in her back, which is only five weeks from the time in which she had been victimized by

Defendants herein.  (Exhibit K).  Additionally, Perovich had an abnormal ECG when she was

treated at the hospital on October 30, 2007.  (Exhibit J).  Likewise, the ECG of October 30, 2007

displays an inferior infarct and on December 21, 2007, the ECG was abnormal and an anterior

infarct could not be ruled out.  The Beaumont Hospital visits are directly attributable to the

October 30, 2007.   Mr. Gojcaj, was advised by the Doctor who examined the ECG on October

30, 2007, that his mother had a heart attack.  (Exhibit B, 30).

    Additionally, Defendants' motion ignores the fact of Ms. Perovich's conscious pain and

suffering which Perovich experienced at the hands of Defendants herein.  The videotape attached

hereto as exhibit A, demonstrates that Plaintiff, Maria Perovich was screaming in excruciating

pain, when she forced the floor and then when Defendant Fett had a knee on Plaintiff's head, and

Cattaneo had a knee on her back.  Ms. Perovich is also heard on the audio portion of the

videotape crying from the pain she experienced after suffering from being assaulted by Fett and

Cattaneo.

    Defendants' argue that the fuzzy pictures provided by Plaintiff show bruising and nothing

more, but the pictures together with the audio portion of the videotape, along with the medical

records substantiate a valid 1983 claim and therefore, Defendants' motion must be dismissed.

Further, if Defendants did not believe that Plaintiff Perovich was indeed seriously injured, then

Sergeant Cattaneo would have not called an ambulance on behalf of Ms. Perovich.

     Based on the law, the depositions and the affidavit,  Defendants are not entitled to

20

qualified immunity on the § 1983 claim. Reasonable jurors will also almost certainly conclude that the use of force in this case was not objectively reasonable, and Defendants clearly violated Ms.Perovich's Fourth Amendment right to be free from an unconstitutional seizure.

## IV.  PLAINTIFF'S STATE LAW CLAIMS CAN BE REMANDED TO STATE COURT IN THE EVENT THAT THIS HONORABLE COURT WERE TO DISMISS PLAINTIFFS' 1983 CLAIMS

Defendants have suggested that if this Honorable Court would dismiss Plaintiffs' federal law claims that the court could exercise jurisdiction and dismiss the state law claims.  This Honorable Court has the authority to exercise pendent jurisdiction and likewise can remand any remaining state law claims to state law in the event that the court chooses not to exercise jurisdiction.   Defendants suggest that if this Honorable Court were to reach a decision that it was to dismiss all of Plaintiffs' federal claims, then this Court must dismiss the remaining state law claims.  This analysis is flawed, as this Court can choose to not exercise any further jurisdiction upon Defendants remaining state law claims and remand the matter to the appropriate state court tribunal.  Counsel respectfully submits that all of Plaintiffs' claims should be decided by the trier of fact, and in the event that this Honorable Court dismisses Plaintiff's federal claims, Plaintiffs' seek a remand of their state law claims.

## V.  CONCLUSION

Defendants had no justification coming to Plaintiff's residence and threatening to take her vehicle, like they had no justification in entering Plaintiff's residence and later forcing Plaintiff to the floor and thereafter causing Plaintiff to be hospitalized where she suffered not simply bruises, but may have suffered a minor heart attack when the officers were assaulting an elderly disabled woman.   Plaintiff respectfully requests that this Honorable Court enter an order

21

denying Plaintiff's Motion for Summary Disposition and set this matter on for a trial before the

trier of fact.

Respectfully submitted,

/s/ Patrick J. McQueeeny
PATRICK J. McQUEENEY (P45797)
Attorney for Plaintiffs
33830 Harper Avenue
Clinton Township, Michigan 48035
(586) 774-6363

Dated:  September 20, 2010

## CERTIFICATION OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk
of the Court using the ECF system which will send notification to all attorneys of
record.

/s/ Patrick J. McQueeney
PATRICK J. McQUEENEY (P45797)
Attorney for the Plaintiffs
33830 Harper Avenue
Clinton Township, Michigan 48035
(586) 774-6363

Dated:  September 21, 2010

22