UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF MARIA PEROVICH,
VICTOR GOJCAJ,

        Plaintiffs,                Case No.: 2:09-CV-
                                      12192

                                HON: Patrick Duggan

- vs -

STERLING HEIGHTS POLICE OFFICER
ANTOINETTE FETT, STERLING HEIGHTS POLICE
SERGEANT DAVID CATTANEO, STERLING HEIGHTS
POLICE OFFICER AARON BURGESS AND CLINTON
TOWNSHIP POLICE DETECTIVE LEO MELISE,

        Defendants,

_____/

DEPOSITION OF VICTOR GOJCAJ

    The deposition of VICTOR GOJCAJ taken before JANICE J.
FLYNN, Notary Public and Court Reporter, CER 5416, in and for
the County of Macomb, State of Michigan, held on Wednesday,
February 17, 2010 at 33830 Harper Avenue, Clinton Township,
Michigan 48035 commencing at 11:50 a.m.

APPEARANCES:          LAW OFFICES OF PATRICK J. MCQUEENEY
                     BY: PATRICK J. MCQUEENEY, ESQ.
                     Attorney for Plaintiff
                     33830 Harper Avenue
                     Clinton Township, Michigan 48035

                     O'REILLY RANCILIO, PC.
                     BY: LINDA MCGRAIL BELAU, ESQ.
                        MARC D. KASZUBSKI, ESQ.
                     Attorney for Defendants Cattaneo Burgess
                     and Fett
                     12900 Hall Road, Suite 350
                     Sterling Heights, Michigan 48313

                     PLUNKETT COONEY
                     BY: PETER W. PEACOCK, ESQ.

Attorney for Defendant Leo Melise
10 South Main Street
Suite 400
Mt. Clemens, Michigan 48043
INDEX

Witness:                                          Page:

VICTOR GOJCAJ

    Examination by Ms. McGrail Belau          3

    Examination by Mr. Peacock               99

    Examination by Mr. McQueeney            143

    Reexamination by Ms. McGrail            152

    Reexamination by Mr. Peacock            155

    Reexamination by Mr. McQueeney          157

Exhibits:                                         Marked:

    Plaintiff's Exhibit One             38

    Plaintiff's Exhibit Two             55

    Plaintiff's Exhibit Three                59

    Plaintiff's Exhibit Four            64

    Plaintiff's Exhibit Five            71

    Plaintiff's Exhibit Six             74

    Plaintiff's Exhibit Seven & Eight        77

    Plaintiff's Exhibit Nine            82

```
 1                    Clinton Township, Michigan

 2                    Wednesday, February 17, 2010

 3                    At about 11:50 a.m.

 4                              *

 5              V I C T O R   G O J C A J

 6         Having been first duly sworn by the Notary Public to

 7         tell the truth, the whole truth and nothing but the

 8         truth, testified upon his oath as follows:

 9                              EXAMINATION

10   BY MS. McGRAIL BELAU:

11   Q     Would you state and spell your name for the record,

12         please.

13   A     My name is Victor Gojcaj.  V-i-c-t-o-r.  The last

14         name is G-o-j-c-a-j.

15   Q     Victor, did you go to Utica High School?

16   A     Yes.

17   Q     My name is Linda McGrail.  We went to school

18         together years and years ago.  Ligature, right?

19   A     Yeah.

20   Q     Okay.

21   A     Oh, my god.

22   Q     Years ago.

23   A     Hi, Linda.
```

| | | |
|---|---|---|
| 1 | Q | How are you doing.  I'm sorry that we have to see |
| 2 | | each other under these circumstances, but you |
| 3 | | understand this is a deposition.  I have to ask you |
| 4 | | questions about the lawsuit that you filed against |
| 5 | | the City of Sterling Heights police officers.  I |
| 6 | | represent those Sterling Heights police officers, |
| 7 | | okay? |
| 8 | A | Okay. |
| 9 | Q | Have you ever had your deposition taken before? |
| 10 | A | No. |
| 11 | Q | Okay.  There's certain rules that we have to follow. |
| 12 | | This lady that's sitting between us is typing down |
| 13 | | everything that's being said; therefore, everything |
| 14 | | that happens here today needs to be verbalized. |
| 15 | | Everything I ask I will state verbally and I ask |
| 16 | | that everything that your respond to also needs to |
| 17 | | be verbalized.  Your responses cannot be nods of the |
| 18 | | head or shakes of the head or hand gestures, okay? |
| 19 | A | (Witness nods his head in the affirmative.) |
| 20 | Q | Yes? |
| 21 | A | Yes. |
| 22 | Q | And then also words such as uh-huh or uh-uh they |
| 23 | | can't be typed down right.  So I need you to say |
| 24 | | actually say yes or no, okay? |
| 25 | A | Yes.  Okay. |

```
 1   Q      Also, when this is all said and done she's going to
 2          type down what's been said and it needs to kind of
 3          read like a script of a play with a question and
 4          answer, question and answer.  Because of that, I
 5          need you to wait until my question is done being
 6          asked before you answer even though you probably
 7          know where I'm going with a question and I'll give
 8          you the same courtesy and let you finish responding
 9          to my question as well, okay?
10   A      Okay.
11   Q      If you don't understand a question I'm asking,
12          please ask me to rephrase it.  If you didn't hear
13          what I'm asking, ask me to speak up.  Please take
14          your time.  Think about what I've asked because if
15          you answer a question, I'm going to assume that you
16          heard, understood and are answering truthfully under
17          oath, okay?
18   A      Okay.
19   Q      Where do you currently reside, Victor?
20   A      In Utica.  Hickory West.  12020.
21   Q      1202 Hickory West in Utica?
22   A      Yeah.  2-0.  12020.  12020 Hickory West, Utica.
23   Q      How long have you lived there?
24   A      Since November.
25   Q      Of 2009?
```

```
 1   A    Yes.

 2   Q    Prior to that did you live at 43153 Penny Drive?

 3   A    Yes, 22 years.

 4   Q    With whom do you reside with at 12020 Hickory West?

 5   A    Two roommates.

 6   Q    Is this --

 7   A    Andrea Piccolo and then Tony he just moved in.  I

 8        don't know his last name.

 9   Q    Is this an apartment or a house on Hickory West?

10   A    It's a condo.  Andrea Piccolo owns it.

11   Q    And then you're renting from Andrea?

12   A    Yeah.  Yes.

13   Q    Yeah is fine.  Did you -- You graduated from Utica?

14   A    Yes.

15   Q    Okay.   Nineteen ninety?

16   A    No, '93.

17   Q    Okay.

18   A    I had to go back.

19   Q    Did you go to school at all after graduating from

20        Utica?

21   A    I went to Macomb for a little bit, and then I didn't

22        do nothing for almost 20 years.  I'm back in college

23        now online at Ashford University.

24             MR. PEACOCK: I'm sorry.  What was it?

25             THE WITNESS: Ashford University online.
```

1    BY MS. McGRAIL BELAU:

2    Q    When did you start that?

3    A    Oh, just five weeks ago I finished my first class.

4         They have five week classes online.  I'm going for

5         my BA.

6    Q    Bachelor of Arts.

7    A    No.  Yeah, Bachelor of Arts.  Either -- Or I don't

8         know.  I'm taking my basics now either for criminal

9         justice or political science.  I don't want to take

10        your job away from you so I'll probably go --

11   Q    I don't want you to do that either.

12   A    -- for political justice.

13             MR. McQUEENEY: We don't wish it on anyone.

14        Trust us.

15   BY MS. McGRAIL BELAU:

16   Q    Are you currently employed?

17   A    I have a corporation.

18   Q    What's the name of that corporation?

19   A    Help Forgotten Disabled Americans.  It's a nonprofit

20        tax exempt.

21   Q    Help Forgotten Disabled --

22   A    Americans.

23   Q    Americans.

24   A    I've had it for two years since December 7, 2007.

25   Q    December 7, 2007.  You said that's a nonprofit?

```
 1   A    Yes.  Registered with the state of Michigan.

 2   Q    And are you paid through Help Forgotten?

 3   A    No, it's a membership only.

 4   Q    How many hours a week do you work with Help

 5        Forgotten?

 6   A    It depends.  It varies.  I just started working more

 7        with it lately.  Because of the incident that

 8        happened with my ma, I kinda threw everything away,

 9        but I'm getting back into it again.

10   Q    Okay.  And what's the range amount of hours you

11        might work?  Five hours?  Twenty hours?  Five to

12        twenty?

13   A    Five to twenty.  That's a good estimate.

14   Q    What's the purpose of Help Forgotten?

15   A    Collecting donations to help out people who are

16        disabled; money, furniture, vehicles.  I've

17        collected a few vehicles and tons of furniture.

18        Couches and that.  You know, people who get disabled

19        and they can't work no more.  They lose everything

20        they have so I try to help them out to regain some

21        of their esteem back.

22   Q    So you collect money and furniture and --

23   A    Mostly furniture.  Not too much money because people

24        don't have much money to donate.

25   Q    Okay.  And then do you give that furniture to
```

| | | |
|---|---|---|
| 1 | | disabled people -- |
| 2 | A | Yeah. |
| 3 | Q | -- or do you sell it? |
| 4 | A | No, I give it -- |
| 5 | Q | Hold on. |
| 6 | A | Oh, I'm sorry. |
| 7 | Q | You gotta let me finish asking my questions.  That's |
| 8 | | what I was talking about so that the record is |
| 9 | | clear, okay? |
| 10 | A | Okay. |
| 11 | Q | 'Cause otherwise it just becomes very disjointed |
| 12 | | when it's typed out, okay? |
| 13 | A | Okay. |
| 14 | Q | Do you actually then donate that furniture to |
| 15 | | disabled Americans or do you sell that furniture and |
| 16 | | give the money to people? |
| 17 | A | I give the furniture away to the people that need |
| 18 | | it.  I might ask for five or ten dollars for gas. |
| 19 | | That's about it. |
| 20 | Q | From the disabled people? |
| 21 | A | Yeah, from the people collecting the furniture.  The |
| 22 | | vehicles I try to sell them.  If I can't sell them, |
| 23 | | then I give them away, because the vehicles that |
| 24 | | I've gotten, they've been pretty much garbage, and |
| 25 | | the money I just help pay for their bills, |

Page 10

```
 1              electricity and gas bills they have.  I don't give

 2              them cash up front because most of them are

 3              alcoholics.

 4    Q         Does Help Forgotten have a bank account?

 5    A         Not right now, but I gotta reestablish.  Like I

 6              said, I let part of it go and I gotta get

 7              reestablished.  I haven't gotten any cash coming in.

 8              So there was no use for reopening a bank account.

 9    Q         Does Help Forgotten file any tax returns?

10    A         No.  I filed -- What's that called.  I can't

11              remember.  It's like how you file a 1099 but it's

12              not a 1099.  It's under another number to show what

13              I did, which I didn't do anything.  I didn't even

14              have to file it because last year I didn't do

15              nothing because of circumstances, what happened.

16    Q         Are there any other books and records of Help

17              Forgotten?

18    A         I have some receipts.

19    Q         What kind of receipts?

20    A         Just receipts on things that I collect like

21              furniture because I have to give out a receipt for

22              tax -- so they can use them for tax purposes.

23    Q         So you get receipts for tax purposes.

24    A         Yeah, so they can use it for a write off, whoever

25              donates.
```

1   Q   And then do you have some sort of record you give to

2       show what you've done with those items?

3   A   I'm supposed to, but I don't.  I'm supposed to, but

4       I have a little bit.  Like I said, I started this

5       before, you know, and now I'm getting into it fully,

6       you know.

7   Q   How much money did Help Forgotten take in in the

8       last year?

9   A   Maybe a couple of hundred dollars.  That's it.  A

10      few hundred.

11  Q   Besides Help Forgotten are you employed anywhere?

12  A   No.

13  Q   Besides Help Forgotten what was your last

14      employment?

15  A   Contractor.

16  Q   When were you a contractor?

17  A   Up until ninety -- up until 2006.  I injured my

18      back.

19  Q   Was that the incident with Joseph Noto or something

20      like that?

21  A   Yeah.

22  Q   So from 2006 until present you have not been

23      employed at all?

24  A   No.

25  Q   Not on a part-time basis?

Page 12

```
 1   A      Nothing.

 2   Q      I've heard you've worked either part time as a

 3          bouncer or a body guard for somebody.

 4   A      No, that is not true.  I have a bad back.  I

 5          couldn't defend myself.  How could I defend someone

 6          else.

 7               MR. McQUEENEY: There's no question.

 8               THE WITNESS: All right.

 9   BY MS. McGRAIL BELAU:

10   Q      You've applied for social security disability.

11   A      Yes.

12   Q      You were denied for that.

13   A      Yes.

14   Q      Now, Maria was your mother; is that correct?

15   A      Yes.

16   Q      And how do you spell Maria's last name?

17   A      Perovich, P-e-r-o-v-i-c-h.

18   Q      Do you have any brothers or sisters?

19   A      No.

20   Q      You are the personal rep of her estate; is that

21          correct?

22   A      Yes.

23   Q      When was her estate filed?

24   A      Not until I think May of 2008.  No, I'm sorry.

25          October of -- She died in June 2008.  So her estate
```

1      was filed in October of 2008.

2              MR. McQUEENEY: No.  Objection.  Wait a

3      minute.  Let's make a record here.  John Tatone

4      opened the estate sometime I believe in 2009.

5              MS. McGRAIL BELAU: John Tatone's representing

6      the estate?

7              MR. McQUEENEY: John Tatone is the attorney

8      that represents the estate.  The estate was opened

9      in 2009 for purposes of this lawsuit.  There had

10     been no estate in my estimation that had been opened

11     in advance of a --

12              MS. McGRAIL BELAU: Okay.

13  BY MS. McGRAIL BELAU:

14  Q   Victor, what did you do to prepare for today's

15      deposition?

16  A   I went to church.

17  Q   Anything else?

18  A   No.

19  Q   Did you review any documents?

20  A   No.

21  Q   Other than your attorney, did you talk to anyone?

22  A   Nobody, other than my attorney.

23  Q   Did you review any tapes?

24  A   No.

25              MR. McQUEENEY: When?  Objection as to the

```
 1              form of the question.  Are you talking about during

 2              his preparation or any time prior to that?

 3    BY MS. McGRAIL BELAU:

 4    Q         In preparation for today's deposition.

 5    A         No.

 6    Q         Okay.  I want to talk a little bit about the

 7              incident involved in this matter on October 30,

 8              2007, okay, and I want to go back to the date prior

 9              to that on October 29, 2007.  Did you go to P.F.

10              Chang's on that date?

11    A         Yes.

12    Q         And did you have what, lunch or dinner there?

13    A         I had dinner.  Well, I didn't eat the dinner.  My

14              friend ate the dinner.  I had one drink and I bought

15              him one drink and I ordered dinner and then I wanted

16              to leave instead of eating dinner and I said take

17              care of the bill.

18                   MR. PEACOCK: I'm sorry.  What did you say?

19                   THE WITNESS: I said take care of the bill

20              because he ate the food and that's what happened

21              with that.

22    BY MS. McGRAIL BELAU:

23    Q         Okay.  P.F. Chang's is located in Clinton Township?

24    A         Yes.

25    Q         And so you left P.F. Chang's.  You did not pay for
```

```
 1          that tab, correct?

 2    A     No.

 3    Q     You're now telling me --

 4    A     Not that night.

 5    Q     You're now telling me that you thought your friend

 6          was going to pay for that tab?

 7    A     Yes.

 8    Q     That you asked your friend to pay for that tab.

 9    A     Yes.

10    Q     Now, it's my understanding that the waiter at P.F.

11          Chang's would testify that you said you forgot your

12          wallet in the car.  You're saying that's not true?

13                MR. McQUEENEY: Objection as to the form of

14          the question.  It calls for speculation.  If you

15          know the answer, you can answer.

16    BY MS. McGRAIL BELAU:

17    Q     If the waiter were to come in a deposition or trial

18          and say that you told him you just forgot your

19          wallet in the car and went out and then never came

20          back, he'd be lying?

21    A     No.  No.  I did say that.

22    Q     Okay.

23    A     That's why my friend was going to pay the tab.

24    Q     Okay.  So you told the waiter that you forgot your

25          wallet in the car.
```

```
 1    A    Right.

 2    Q    Okay.  So what you said before about it was your

 3         friend's meal, that's not the case?

 4    A    Well, it was my meal, but I didn't want it.

 5    Q    Okay.

 6    A    I had to leave 'cause I seen the Notos there and I

 7         was in a lawsuit with them.  So I had to leave.  I

 8         wanted to leave.  I didn't want no confrontation.

 9    Q    Okay.  That's not what you told the waiter at the

10         time, right?

11    A    I don't -- Well, I told him about the wallet.  I

12         didn't have to get into detail.  I didn't want him

13         knowing my business.

14    Q    What's your friend's name?

15    A    My friend that was there that night?

16    Q    Yes.

17    A    Paul.

18    Q    What's his last name?

19    A    Lutori.

20    Q    How do you spell that?

21    A    I don't know.  L-u-t-o-r-i.

22    Q    Do you still speak to Mr. Lutori?

23    A    No, I was pretty angry with him.

24    Q    When was the last time you saw or spoke to Mr.

25         Lutori?
```

```
 1   A     That night.

 2   Q     Do you know where Mr. Lutori lives?

 3   A     He used to live on Player Drive in Troy.

 4   Q     Player Drive in Troy.

 5   A     Yeah.

 6   Q     Do you have his phone number?

 7   A     Nope.  I was pretty angry with him.

 8   Q     Why were you angry with him?

 9   A     Because he didn't pay the tab and I had -- the next

10         morning I had the animal pounding on my door.

11   Q     Okay.  So you never called Mr. Lutori after the fact

12         to say hey, why didn't you pay this tab?

13   A     Well, yeah, I did.

14   Q     Okay.  Well, you told me you didn't talk to him

15         after that night.

16   A     I'm sorry.  I did talk to him the next day.

17   Q     Okay.

18   A     That was it after that.

19   Q     And what did he tell you?

20   A     He says so.  So what.

21   Q     And you never told Detective Melise that Mr. Lutori

22         said he was going to pay the bill; did you?

23             MR. McQUEENEY: Objection as to the question -

24         - the form of the question when he suggested he

25         never told that to Detective Melise.  When are you
```

Page 18

```
 1            suggesting that?

 2    BY MS. McGRAIL BELAU:

 3    Q     You can answer.  When Detective Melise came to your

 4          house on October 30, did you ever tell him that your

 5          friend was going to pay for that bill?

 6    A     He never asked.  I was in distraught after what

 7          happened to my mother.

 8    Q     Okay.  Well, you were accused of walking out on a

 9          tab.  You never said hey, that was my friend's tab;

10          he said he was going to pay for it?

11    A     No, I never said that.  I wanted to give him the

12          money right there and then.  He wouldn't take it.

13          He said you gotta go to P.F. Chang's and pay for it.

14          So I went after the hospital.  After I brought my ma

15          home from the hospital, I went that day on the

16          thirtieth.

17    Q     You said you saw Mr. Adams at P.F. Chang's that day?

18    A     No.

19    Q     Who did you see at P.F. Chang's that day?

20    A     The --

21               MR. McQUEENEY: Are you talking about October

22          29?

23               MS. McGRAIL BELAU: October 29.

24               THE WITNESS: Yeah, I seen the -- What was the

25          last name.  The one who assaulted me.
```

```
 1   BY MS. McGRAIL BELAU:

 2   Q      Noto.

 3   A      Noto.  I seen him at P.F. Chang's.

 4   Q      Which Noto?

 5   A      Jerry Noto.

 6   Q      Was that the father or the son?

 7   A      The son.

 8   Q      I thought from the records the son never actually

 9          assaulted you.

10   A      Yeah, he did.

11   Q      He did.

12   A      He slammed the garage door on me.  A big industrial

13          garage door.  That's what messed up my back.

14   Q      Do you know if Mr. Noto actually saw you there then?

15   A      I don't know.  I didn't stick around to find out.  I

16          didn't want no confrontation.  That's why I left the

17          way I did.  Maybe I said some lies to the waiter or

18          whatever.  I thought I was going to have -- my buddy

19          was going to pay the tab so I just wanted to leave.

20   Q      So you admit that you said some lies to the waiter

21          that day?

22              MR. McQUEENEY: Objection.  That's a

23          mischaracterization of his testimony.

24              THE WITNESS: I wanted to leave.

25   BY MS. McGRAIL BELAU:
```

Page 20

1    Q    Let's go to the events on October 30, 2007.  You

2         were living with your mother at that time.

3    A    Yes.

4    Q    On Penny Drive in Sterling Heights.

5    A    Yes.

6    Q    And at what, approximately, 9:45 in the morning a

7         Clinton Township detective appeared at your house;

8         is that correct?

9    A    That's correct.

10   Q    Okay.  That was Detective Melise.

11   A    Yes.

12   Q    And did your mother tell you to hide at that point?

13   A    I didn't hide.

14   Q    Well, where were you?

15   A    I was watching the video surveillance of the TV in

16        the other room what was going on in the front of the

17        house.

18   Q    Where was the surveillance set up?

19   A    Well, I had one in the front room and one in my

20        bedroom.

21   Q    Okay.  So you were in --

22   A    A had a TV in the front room and a TV in my bedroom.

23   Q    And where were you at this time?

24   A    In my bedroom.

25   Q    So you were in the bedroom when the incident was

```
 1        going on?

 2   A    At the front door, yeah.  In the verbal.

 3   Q    Okay.  Let me be clear.  You were in your bedroom

 4        when the incident at the front door was occurring?

 5   A    The verbal part, yes.

 6   Q    Okay.

 7   A    The actual physical part I was in the front room.

 8   Q    Okay.  And you were aware that the officers were

 9        asking to speak with you?

10   A    Yes.

11   Q    Why didn't you come out to speak with the officers?

12   A    'Cause my ma didn't want me to and I didn't want to

13        cause conflict with her because she was in pain and

14        a diabetic and everything and I didn't want to cause

15        her anymore distress.

16   Q    Do you know why your mom didn't want you to come out

17        and speak with the officers?

18            MR. McQUEENEY: Objection as to the form of

19        the question.  If you know.

20   BY MS. McGRAIL BELAU:

21   Q    Do you know?

22   A    Do I know why?

23   Q    Yes.

24   A    Because the way Melise was pounding on the door for

25        a half an hour, he didn't seem like he was going to
```

Page 22

```
 1          be polite.
 2    Q     Did she say anything to you as to why you should not
 3          come out?
 4    A     No.
 5    Q     Were you worried that it had anything to do with you
 6          not paying the bill the night before at P.F.
 7          Chang's?
 8    A     No, I didn't know what was going on.  He never
 9          stated -- If he would have said on the video camera,
10          showed his badge, and said I'm here about P.F.
11          Chang's last night about a tab not paid, I would
12          have came to the front door and I would have talked
13          to him, but that never came out of his mouth.
14    Q     Okay.  Well, certainly, at some point you realized
15          that he was a police officer and the other, Sterling
16          Heights, were officers, correct?
17    A     After the Sterling Heights came and checked him out.
18    Q     And you still didn't come to the door, correct?
19    A     No, she didn't want me to come to the door.  She was
20          hysterical at that moment.  I didn't want to cause
21          her anymore grief.  She was yelling at them.
22          Yelling at me.  I didn't want to cause her any
23          grief.  She's been disabled 20 years.  I've been
24          taking care of her, you know.  They were over there
25          harassing her and causing her so much distress, I
```

Page 23

```
 1            didn't know what to do.  That's my ma, you know.

 2            What are you gonna do.

 3     Q      So you decided not to come to the door because she

 4            was hysterical?

 5     A      Yeah, I didn't want to cause her anymore distress.

 6            She said no, don't come.  I didn't come.

 7     Q      The pickup truck on the video that was out front,

 8            was that the vehicle that you drove on a regular

 9            basis?

10     A      I drove all the vehicles.  We had three vehicles at

11            that time, but.

12     Q      Was the pickup truck the vehicle that you had driven

13            to P.F. Chang's the night before?

14     A      Yep.  Yes.

15     Q      Did your mother tell the police officers that you

16            were not home?

17     A      Yes.

18     Q      And that was a lie?

19     A      Yes, she was protecting me.

20     Q      Protecting you from what?

21     A      They were like vultures at the door.  Melise for a

22            half an hour pounding.

23     Q      Him pounding, none of that's on the video, correct?

24     A      No, because I didn't realize the tape wasn't plugged

25            in.  After eight hours the tap rewinds itself and
```

Page 24

```
 1          pops out and it was in the morning and I didn't push
 2          it back in and hit the record button to continue
 3          taping until after I -- after she called the police
 4          and the police were coming, Sterling Heights, and I
 5          realized the tape's not recording so I pressed it in
 6          and hit record.
 7    Q     So the --
 8    A     'Cause it was an eight hour tape.
 9    Q     So the tape you presented to us -- You know that we
10          were given a copy of that tape, right?
11    A     Yeah.
12    Q     In the course of this litigation.  I mean we have a
13          tape that's got, I don't know, eight hours or
14          something.
15    A     Eight hours.  Every eight hours it stops.
16    Q     Okay.  The incident is somewhere smack dab in the
17          middle of that.  Are you aware of that?
18                MR. McQUEENEY: Objection.  Hold on a minute,
19          Victor.  I don't know if it's in the middle of it.
20          It's about an hour or so -- The incident is roughly
21          an hour or so into the tape.  Maybe an hour and 15
22          minutes.
23    BY MS. McGRAIL BELAU:
24    Q     So at the beginning of that tape is when you hit
25          record?
```

Page 25

| | | |
|---|---|---|
| 1 | A | I don't know where it was.  It was in the VCR. |
| 2 | Q | You popped that tape in and hit record and then from |
| 3 | | there on is when it started recording? |
| 4 | A | Uh-huh. |
| 5 | Q | Yes? |
| 6 | A | Yes. |
| 7 | Q | Okay.  You're saying that Leo Melise was at your |
| 8 | | door prior to you hitting record pounding on your |
| 9 | | door? |
| 10 | A | Yes, for a half an hour.  That's why my ma called |
| 11 | | the police. |
| 12 | Q | Okay. |
| 13 | A | We didn't know who he was.  Anyone could buy a badge |
| 14 | | on the internet.  He was in street clothes with a |
| 15 | | regular vehicle. |
| 16 | Q | And you're saying it took the Sterling Heights |
| 17 | | Police Department an hour, hour and a half, to |
| 18 | | appear at your door? |
| 19 | A | No, they came right away after she called. |
| 20 | Q | Okay.  Did your mother tell the officers that she |
| 21 | | was going to get a gun and shoot them? |
| 22 | A | No. |
| 23 | Q | What did she say? |
| 24 | A | She was talking to Detective Melise saying I'm going |
| 25 | | to get -- 'cause he's threatening to tow her |

```
 1            vehicles, which that was --

 2   Q        Well, let me ask you this --

 3   A        -- wrong.

 4   Q        -- did she say she was going to get a gun?

 5   A        Yeah.

 6   Q        Okay.

 7   A        And escort him off her property -- off the premises.

 8   Q        She said she was going to get a gun.

 9   A        Yeah, and escort him off the premises --

10   Q        And she called them bastards.

11   A        -- which is totally different --

12   Q        Correct?  She called the bastards.

13            MR. McQUEENEY: Can we let him finish the

14            question.

15            MS. McGRAIL BELAU: He did finish it.  It was

16            just simply answering a question.

17   BY MS. McGRAIL BELAU:

18   Q        She called them bastards.  Yes or no.

19   A        I don't remember that.

20   Q        Okay.  And you've already testified she was

21            hysterical, right?

22   A        Right.

23   Q        And through all this you're back in your bedroom,

24            correct?

25   A        Yes.
```

1    Q    You can only see what's on the videotape at this

2         point.

3    A    I can hear also.

4    Q    Okay.  But, basically, you're seeing the same thing

5         that I'm seeing on the videotape at this point.

6    A    Yes.

7    Q    And when you come out of your bedroom, your mother's

8         already down on the floor, correct?

9    A    Yes, my bedroom was right there, the door.  The

10        first door from the front room.  So for me to get

11        out to my bedroom to get into the front room was

12        like that (witness snaps his fingers.)

13   Q    Okay.  But when you come out of your bedroom -- I'm

14        just trying to figure out -- We're seeing the same

15        thing on the videotape.  So you and I are on the

16        same page as far as what we see on the videotape,

17        correct?

18   A    Correct.

19             MR. McQUEENEY: Well, objection to the form of

20        the question.  How does he know what your

21        interpretation of what you see on the videotape is?

22        No.

23   BY MS. McGRAIL BELAU:

24   Q    We're all looking at the same videotape.  You

25        produced it to me, right?

Page 28

```
 1   A     Yes.

 2   Q     At the point on the videotape where the officers

 3         yell get down, get down, is that the point where you

 4         come out?  Correct?

 5   A     That was when I was out.

 6   Q     Correct.  'Cause they're yelling at you to get down

 7         on your knees.  They don't know who you are at this

 8         point.

 9   A     Right.

10   Q     Okay.

11   A     I got a taser gun pointed at me.

12   Q     And at that point your mother's already on the

13         ground.

14   A     Screaming.

15   Q     The question is is she already on the ground at that

16         point?

17   A     Yeah.

18   Q     Okay.

19   A     Yeah.

20   Q     So you didn't actually see her fall or her actually

21         go down onto the ground.  She's already on the

22         ground at that point.

23   A     No, I didn't see her, how she got on the ground.

24   Q     Okay.

25   A     She was on the ground and --
```

```
 1   Q     And the officers --
 2   A     -- Cattaneo was on top of her with his knee jabbed
 3         right in her lower back where she had back surgery.
 4   Q     But attempting to handcuff her at that point.
 5   A     Right.
 6   Q     And she was struggling at that point trying to
 7         prevent them from handcuffing her?
 8   A     Well, they were stretching her out.  She was
 9         screaming bloody murder.  She was --
10   Q     My question is was she trying to prevent them from
11         handcuffing her at that point?
12               MR. McQUEENEY: Objection.  Let him finish his
13         answer.  Don't cut him off.  Finish.
14               THE WITNESS: Ask me one more time.
15   BY MS. McGRAIL BELAU:
16   Q     Was she trying to prevent them from handcuffing her
17         at that point?
18   A     No, how could she.  She had two officers on top of
19         her.  She's a weak woman.  She's been disabled 20
20         years.  How could she prevent anybody from doing
21         anything to her.
22   Q     She wasn't struggling with them at all?
23   A     No, she was screaming.
24   Q     You didn't tell your mother to stop fighting them?
25   A     No, I did not.  I said call an ambulance.  What are
```

Page 30

```
 1        you guys doing to her.  Get off of her.  I'm

 2        screaming call an ambulance, call an ambulance, call

 3        an ambulance.

 4   Q    As soon as she complained of medical concerns, did

 5        they stop trying to cuff her?

 6   A    No.  No, they wouldn't -- They were on top of her

 7        like she was an animal.

 8   Q    In fact, once the situation was under control they

 9        permitted you to allow you to get her some water;

10        did they not?

11   A    Yes.

12   Q    What I said was correct?

13   A    Yes.

14   Q    Did you tell one of the officers that your mother

15        suffered from some mental health issues?

16   A    No.

17   Q    Did your mother suffer from some mental health

18        issues?

19   A    No.

20   Q    Which hospital did your mother go to?

21   A    Troy Beaumont.  She had a heart attack.

22   Q    One question at a time.  How long was she at Troy

23        Beaumont?

24   A    Eight hours.  They calmed her down.  The EKG report

25        shows that she had a heart attack.
```

Page 31

```
 1   Q    She had a heart attack and she was only there for

 2        eight hours?

 3   A    They brought her back down with medication.  She

 4        wanted to come back home.  So I brought her home.

 5        She didn't want to stay.  She's been disabled for 20

 6        years.

 7   Q    Okay.  The way --

 8   A    She's been seeing --

 9   Q    Victor.  Victor.

10   A    -- doctors for 20 years.

11   Q    Victor, the way it goes is I have to ask you --

12   A    She's tired of them.

13   Q    -- a question and you have to answer.

14             MR. McQUEENEY: Let her ask the questions.

15   BY MS. McGRAIL BELAU:

16   Q    Your attorney, if he feels necessary, will have an

17        opportunity to ask you questions to follow up later.

18   A    Okay.

19   Q    Okay.  You filed some court documents and I'll go

20        through that with you later in this deposition where

21        you claim that she had a near heart attack from this

22        incident.  Did she actually have a heart attack from

23        this incident or was it a --

24   A    Yes.

25   Q    -- near heart attack?
```

Page 32

```
 1    A    It was a heart attack.  The EKG report show it.

 2    Q    Who told you she had a heart attack?

 3    A    The doctor.

 4    Q    What was the doctor's name?

 5    A    I don't remember.  It's on the report.  The doctor

 6         should be on the report.  I supplied all the

 7         reports.  You should have a copy of all the reports.

 8    Q    What follow-up treatment did she have to have as a

 9         result of this alleged heart attack?

10    A    She had to go see her primary doctor, which I took

11         her the next day.  I was constantly taking her to

12         the hospital and doctors for the next three months

13         like it was unbelievable.  She couldn't drive

14         anymore.  Her mental -- She was like distraught.

15         She couldn't drive no more.  She'd usually drive

16         herself to the doctor and she would just sit in her

17         room after that watching TV.  She wouldn't even come

18         out in the front room.

19    Q    Let me backup.  What's the name of her primary care

20         doctor?

21    A    Dr. Eveara.

22    Q    How do you spell that?

23    A    Eveara.

24    Q    How do you spell that?

25    A    E-v-e-a-r-a.
```

1    Q    E-v-e-a-r.

2    A    Yeah, Eveara.  Eveara.

3    Q    Male or female?

4    A    Female.  On Mound.  She's on Mound Road.

5    Q    Mound and what?

6    A    Right across the street from Walmart.  South of Hall

7         Road, which you have medical statements also we

8         provided.

9              MR. PEACOCK: For the record, is it Alivia

10        Rivera?

11             THE WITNESS: Yeah.

12             MR. PEACOCK: R-i-v-e-r-a.

13             THE WITNESS: I thought it was with an a.

14             MR. PEACOCK: Olivia.  First name is Alivia.

15        A-l --

16             THE WITNESS: I never knew her first name,

17        sir.

18             MR. PEACOCK: Just for purposes of clearing up

19        the record.

20   BY MS. McGRAIL BELAU:

21   Q    Does your mother treat with any other doctors?

22   A    No, just her and the doctors that take care of her

23        in the hospital when she goes to the hospital.

24   Q    At Troy Beaumont.

25   A    Troy Beaumont.  I took her there like four times to

Page 34

```
 1          the hospital.

 2     Q    Did your mother treat at any other hospital, besides

 3          Troy Beaumont?

 4     A    No, not during that period.

 5     Q    Okay.  Let's go back for the last ten years.

 6          Besides Troy Beaumont, did your mother treat at any

 7          other hospitals?

 8     A    Royal Oak Beaumont.  She had two heart -- two stints

 9          put in her heart back in 2003 in Royal Oak and then

10          she had her pancreas removed, her thyroid removed,

11          at St. John's three years ago.

12     Q    Besides Royal Oak Beaumont, Troy Beaumont and St.

13          John's, had your mother treated at any other

14          hospitals?

15     A    In ten years?

16     Q    The last ten years.

17     A    No.  No, that's it.

18     Q    Besides Dr. Rivera, has she treated with any other

19          doctors?

20     A    Yeah, she was changing doctors.  She had Dr. Kay.

21          He's on Van Dyke, Seventeen and Van Dyke.

22     Q    What kind of doctor is he?

23     A    He's for back and for her diabetes.  She's diabetic.

24     Q    He treats back and diabetes?

25     A    Well, one or the other.  That's what she was seeing
```

Page 35

```
 1          doctors for.
 2   Q      When was the last time she saw Dr. Kay?
 3   A      That was before.  A couple of years ago.  Then she
 4          found Dr. Rivera and she was seeing her for the past
 5          couple of years before she passed away.
 6   Q      Any other doctors, besides Dr. Rivera and Dr. Kay?
 7   A      Plenty of them.  I can't remember their names.
 8   Q      Okay.  Any other health care providers?
 9   A      Plenty of them.  She's been disabled 20 years.
10          She's been --
11   Q      Your mother was disabled because of a back injury?
12   A      Yes.
13   Q      In the early nineties?
14   A      Yeah, Dr. Faremouth did the surgery and he screwed
15          up the surgery and that's what disabled her.
16   Q      I know Dr. Faremouth.
17   A      She was disabled because of the injury.  She had two
18          ruptured disks and he screwed her up and she was --
19          I mean she could get around a little bit, but not
20          much and so I --
21   Q      Did she have a lawsuit against Dr. Faremouth?
22   A      No, he asked her don't sue me because I'm trying to
23          retire and because my ma --
24              MR. PEACOCK: I'll object to the hearsay
25          nature of those statements.
```

Page 36

1          THE WITNESS: She could have used him.

2          MS. McGRAIL BELAU: Objection.  Foundation.

3   BY MS. McGRAIL BELAU:

4   Q    There's no question on the table, Victor.

5          MR. McQUEENEY: Well, that's all right.  It's

6        on the record.

7          MR. PEACOCK: Soon to be stricken.

8   BY MS. McGRAIL BELAU:

9   Q    You took some pictures or somebody took some

10        pictures.

11  A    Yeah, I took pictures.

12          (Whereupon, Defendant's Deposition Exhibit

13        Number One was marked for identification.)

14  BY MS. McGRAIL BELAU:

15  Q    Victor, I'm showing you what I've had marked as

16        Exhibit One, and, just for the record, there's eight

17        pages of pictures here that were produced to us in

18        discovery.  Can you tell me what these are.

19  A    Pictures of my mother.

20  Q    Okay.  Who took these pictures?

21  A    I did.

22  Q    What date did you take these pictures or were these

23        all taken on the same date or different dates?

24  A    Well, these were taken on the same day, the next

25        day, the third day.

Page 37

1          MR. PEACOCK: The next day, I'm sorry, did you

2     say?

3          THE WITNESS: Yes, the next day, the third

4     day, the fourth day.  Some of the bruising didn't

5     show up as dark right away.

6  BY MS. McGRAIL BELAU:

7  Q    Okay.  Let's go through them one by one then.  This

8     first picture --

9  A    That was probably the first day.

10  Q    Okay.  And that's a picture of what looks like a

11     right elbow.

12  A    The first picture?

13  Q    Yes.

14  A    Between the elbow and shoulder.  Like this part

15     here.

16  Q    Okay.  So the underarm area.

17  A    Underarm area.

18  Q    And what's that supposed to be a picture of?

19  A    Fingerprint bruises.

20  Q    Okay.  Where are the original of these pictures, by

21     the way?

22  A    On my camera phone.

23  Q    Your camera phone.  Do you still have those

24     originals?

25  A    I still have the camera phone, but it broke and I

1          don't know how to get -- I mean if you know someone

2          who can get the pictures off 'cause you can't see

3          the screen no more.  It's black.  And everyone that

4          I talk to, that I took the camera to, said that with

5          the screen being black -- I still have the camera

6          with the pictures.

7     Q    So, basically, you still have the camera.

8     A    It's a camera phone.

9     Q    You still have the phone, but it's broke and you're

10         not --

11    A    Yeah.

12    Q    -- sure if the pictures can be retrieved.

13    A    Right.  Maybe if you know someone, you know.  I've

14         talked to a couple of different people and they

15         can't, so.

16    Q    When did you pull these pictures off of your camera

17         phone?

18    A    Maybe like three months/two months.  Two months

19         after and I put them in my computer, which I have my

20         computer tower still and I saved them on my computer

21         under document -- under pictures.

22    Q    So you still have a digital copy of these on your

23         computer?

24    A    Yes.

25    Q    Okay.

```
 1   A    On the tower.

 2   Q    So this picture is of your mother's underarm and is

 3        this supposed to be of a bruise or what is this

 4        supposed to be of 'cause it's not real clear?

 5   A    Well, it's fingerprint bruises like four of them.

 6        It's pretty faint on that picture.

 7   Q    Okay.

 8   A    But you'll see it on the next one.

 9   Q    Was this the picture taken what, the day after, or

10        when was this picture taken?

11   A    The same day.

12   Q    The same day.

13   A    When I brought her home.  Right when I brought her

14        home.

15   Q    Okay.

16   A    That was the day, the second picture.

17   Q    So this would have been -- We're looking at page two

18        of this packet and this would have been October 31?

19   A    Yes.

20   Q    You took this picture as well?

21   A    Yes.

22   Q    We're looking at the same arm as in the first

23        picture?

24   A    Yes.

25   Q    And there's what, four bruises there?
```

Page 40

1   A   I count five.  I don't know.  Four.

2   Q   Okay.

3   A   You can see a long one.  It could be one.  Yeah,

4       four bruises.

5   Q   Let's go to the third page.  What day was this

6       picture taken?

7   A   I don't remember that one.  It was one of those days

8       though within that week period.

9   Q   Well, she's wearing the same shirt as she was in the

10      second picture.

11  A   That was her -- That was her house dress.

12  Q   Okay.

13  A   She could have wore that all week.

14  Q   Okay.  So the third picture, what is this picture

15      of?

16  A   The bruise on the top of her hand.

17  Q   Now, there's a shadow running along the bottom side.

18      That's not a bruise.  That's just a shadow.

19  A   The bruise does go into that shadow.  It's actually

20      the top part of her --

21  Q   Show me -- Point for me so I can see what part is

22      the bruise.

23  A   Like this.  See the dark area.  The dark area above

24      it.

25  Q   Okay.

```
1              MR. McQUEENEY: Why don't you make a record of

2         that.

3   BY MS. McGRAIL BELAU:

4   Q    Yeah, circle in blue ink what part is the bruise.

5        Okay.  Now, the black part on the bottom there of

6        your circle, that's shadowing --

7   A    Yeah.

8   Q    -- and it runs along the arm and into the hand?

9   A    Yeah, but you'll see it in the next picture of her

10       hand.  It will show the bruises.

11  Q    Okay.

12             MR. McQUEENEY: For the record, what you've

13       circled on the third picture shows the front of the

14       hand extending from the top of the hand to the

15       bottom of the hand.

16             THE WITNESS: Yes.

17             MR. McQUEENEY: Okay.

18  BY MS. McGRAIL BELAU:

19  Q    All right.  Let's go on to page four.  The writing

20       on these pictures where it says right arm, left arm,

21       is that your handwriting?

22  A    Yes.

23  Q    Okay.  Do you know when this picture was taken?

24  A    I think the same day 'cause she had that blue shirt

25       on, which shows on the front first page.
```

Page 42

```
 1   Q      Same day meaning October 30?

 2   A      Yes.

 3   Q      What's this picture of?

 4   A      A bruise on her inner arm.  It looks like a thumb

 5          bruise.

 6   Q      And let's go to the next page.  Do you know when

 7          this picture was taken?

 8   A      A couple of days after.

 9   Q      And what is that a picture of?

10   A      A bruise on her left hand.

11   Q      Okay.  Why don't you circle that bruise too just so

12          we're clear which is the bruise and which is the

13          shadow.  Let's go on to the next page.  Do you know

14          when that was taken?

15   A      That was taken like a few days -- like four days

16          after, three days after, the same bruise got darker.

17   Q      Okay.  That's the bruise shown on two pages prior?

18   A      Right.  Yes.

19   Q      Okay.

20   A      The right arm bruise.

21   Q      And then the last page -- or not last page.  The

22          second from the last page.

23   A      That was taken the next day.

24   Q      Meaning October 31?

25   A      Yes.
```

Page 43

1   Q      And that's --

2   A      The right arm is the first page.

3   Q      That's the same bruises that are shown on the second

4          page?

5   A      The first page.  The first and second page.

6   Q      The first and second page.  And what day was this,

7          did you say?

8   A      The third day after.

9   Q      Okay.  And the last page, what is that?

10  A      Her lower back.  It shows a scar.

11  Q      I'm not seeing that.  Can you circle that.

12  A      Yeah, of her back surgery.  Where Cattaneo had his

13         knee.

14  Q      So that's --

15  A      Jabbed in her back, her lower back.  That's why she

16         screamed bloody murder.

17            MR. McQUEENEY: All right.  Hold on a minute.

18         There's not a question on the table.

19  BY MS. McGRAIL BELAU:

20  Q      So that's the scar from her surgery, correct?

21  A      Yeah, where she had her back surgery.

22  Q      Okay.  Thank you.  You can just set those aside.

23         Now, your mother was charged with resisting and

24         obstructing a police officer; was she not?

25  A      Yes, I believe that was one of the charges.

Page 44

1    Q     And you attended court with her?

2    A     Yes.

3    Q     And she eventually pled no contest to attempted

4          resisting and obstructing a police officer?

5                MR. McQUEENEY: Objection as to the form and

6          foundation.

7    BY MS. McGRAIL BELAU:

8    Q     Well, you were in court when she entered a plea

9          agreement; were you not?

10   A     Yeah, I was next to her the whole time.

11   Q     Okay.  And she pled no contest to attempted

12         resisting and obstructing a police officer; did she

13         not?

14               MR. McQUEENEY: Go ahead and answer if you

15         know.  Do you know what she pled to?

16               THE WITNESS: Yeah, she pled no contest.

17   BY MS. McGRAIL BELAU:

18   Q     To the charge that I just stated?

19   A     See, there was two charges.  I don't know which one

20         she pled no contest to.

21   Q     Okay.  That's fair.

22   A     One of them was dismissed and the other one was no

23         contest.  So whatever one that was not dismissed was

24         the one no contest.

25   Q     Okay.  And she had a retained attorney that assisted

Page 45

```
 1              her in that process?

 2   A    Yeah, from Ford Motor Company.

 3   Q    Bill Boyer (phonetic).

 4   A    Yeah, Ford Motor Company lawyer.

 5   Q    What was the date of your mother's passing?

 6   A    June 23, 2007.

 7   Q    Two thousand seven or two thousand eight?

 8   A    Two thousand eight.

 9   Q    Okay.

10   A    Sorry.  I'm getting confused with the year.

11   Q    It happens.  And what was the cause of her death?

12              MR. McQUEENEY: If you know.

13              THE WITNESS: It's questionable.

14   BY MS. McGRAIL BELAU:

15   Q    Okay.  Where was she when she passed away?

16   A    In the hospital.  Providence Science Neuro Center.

17   Q    She was at Providence?

18   A    Providence Hospital.

19   Q    How long was she at Providence Hospital?

20   A    A little over a week.  They transferred her from

21        Henry Ford on Nineteen.  She was there for --

22   Q    How long was she at Henry Ford prior to being

23        transferred?

24   A    Oh, ten days.

25   Q    Prior to being admitted at Henry Ford, did she
```

Page 46

```
 1        appear ill or have any concerns or?
 2   A    Yeah, the right side of her body was numb and she
 3        could barely walk.  She couldn't speak.
 4   Q    How long had that been going on before she went into
 5        Henry Ford?
 6   A    The day I brought her home from court on the twenty-
 7        eighth of May.  I brought her home from court.  She
 8        sat in the front room and she started shaking.  Her
 9        legs and her arms were shaking like this for a few
10        seconds and then I looked at her, 'cause I was
11        sitting right in front of her in the chair, and I
12        says what happened.  Are you okay.  She couldn't
13        talk.  She tried to get up and her right side of her
14        body was dead.
15   Q    Do you need to take a break, Victor?
16             MR. McQUEENEY: Do you want to take a break,
17        Victor?
18   BY MS. McGRAIL BELAU:
19   Q    I'm going to talk a little bit about this and I know
20        that can be difficult so if you need to take a
21        break, just let me know, okay.
22   A    No, we gotta do this.  I gotta get this over with.
23        I'll be okay.
24             MR. McQUEENEY: Let's take a break.
25             (Whereupon, there was a brief pause in the
```

```
 1        proceedings.)

 2   BY MS. McGRAIL BELAU:

 3   Q    Okay.  We were talking about the day your mom came

 4        home from entering a plea at Sterling Heights

 5        District Court, correct?

 6   A    Yes.

 7   Q    And you said that day she was numb and couldn't

 8        speak and was shaking, correct?

 9   A    Correct.

10   Q    Now, was it that day that she went to Henry Ford

11        Hospital?

12   A    No.

13   Q    When did she go to Henry Ford Hospital?

14   A    Three days later.

15   Q    Did she see any doctors in that three days?

16   A    No.

17   Q    Did she go to any other hospitals in those three

18        days?

19   A    No.

20   Q    Any other urgent care facilities?

21   A    No, she didn't want to go.  I called the priest and

22        the priest talked to her on the phone and convinced

23        her to go to the hospital.

24   Q    What's the name of the priest you called?

25   A    Dr -- I mean Father Zeaven.
```

1    Q      How do you spell that?

2    A      Z-e-a-v-e-n.  He's been our priest for a long time.

3           She couldn't talk.  So I put the phone up next to

4           her ear and he -- I didn't hear what he told her.

5           He convinced -- 'Cause I was like that day I was

6           like ma, I gotta take you to the hospital.

7    Q      So May 31 is the day she went to Henry Ford?

8    A      June 2 -- or June 1.

9    Q      June 1 she went to Henry Ford.

10   A      Yeah.

11   Q      And how long was her stay at Henry Ford?

12   A      Like ten days.

13   Q      And she was transferred from Henry Ford to

14          Providence?

15   A      Yes.

16   Q      Do you know why she was transferred to Providence?

17   A      'Cause they were going to perform surgery.

18   Q      What kind of surgery?

19   A      To remove some of the tumor.

20   Q      What kind of tumor?

21   A      A malignant.  I believe it -- A malignant tumor.

22   Q      What kind of malignant tumor?

23   A      They don't know.  They had to do a biopsy.  They

24          didn't even know what kind of tumor it was.

25   Q      Where was the tumor located?

1    A       In her head.

2    Q       In her brain?

3    A       Yes, which was growing at a tremendous rate.

4    Q       Was it this brain tumor that was causing her

5            problems in the hospital?

6                    MR. McQUEENEY: Objection.

7    BY MS. McGRAIL BELAU:

8    Q       If you know.

9                    MR. McQUEENEY: Objection.  Only if you know.

10                   THE WITNESS: I don't know.

11   BY MS. McGRAIL BELAU:

12   Q       When she was at -- Well, did any doctors tell you

13           what her problems were?

14   A       Yeah, she had a tumor growing at a very fast rate.

15   Q       In her brain?

16   A       In her brain.

17   Q       Besides the diagnosis of the brain tumor, did the

18           doctors give you any other diagnoses as to what her

19           problems were?

20   A       Yeah, I had a doctor told me that there was dead

21           tissue in her brain which could have caused -- could

22           have been from a stroke.  Dead tissue in her brain

23           which caused -- It shows that she could have had a

24           stroke.  That's the -- one of the -- one of the

25           signs or whatever.  And one doctor said she could

Page 50

1          have had -- the stroke could have caused the tumor

2          to start growing or the tumor could have caused her

3          to have a stroke.

4   Q     Did any doctor tell you that this brain tumor was

5          caused by the incident of October 30?

6   A     No.

7   Q     And was it this brain tumor that eventually caused

8          her death?

9              MR. McQUEENEY: Objection as to the form of

10        the question.  It calls for speculation.  Certainly

11        it also calls for a medical evaluation.  Only if you

12        know.

13  BY MS. McGRAIL BELAU:

14  Q     Well, your lay opinion.  What's your lay

15         understanding as to the cause of her death?  Was it

16         this brain tumor?

17  A     She had a stroke which caused the brain tumor to

18         start growing and it grew to a size of a grapefruit

19         within two weeks time.

20            MR. PEACOCK: Just so I'm clear, did you say

21        the stroke caused the brain tumor to grow?

22           THE WITNESS: Yeah.

23  BY MS. McGRAIL BELAU:

24  Q     So the brain tumor caused her death, but you're

25         saying the stroke caused her brain tumor?

Page 51

```
 1              MR. McQUEENEY: No, that's --

 2              THE WITNESS: To the --

 3              MR. McQUEENEY: Objection.  Quiet.  Objection.

 4         It's a mischaracterization of his testimony.  He

 5         said the stroke caused the brain tumor to grow.

 6    BY MS. McGRAIL BELAU:

 7    Q    Okay.  Let me ask you this, did she die of a stroke

 8         or did she die of a brain tumor?

 9    A    She died of a brain tumor.

10    Q    Okay.  And is it your testimony that the stroke

11         caused her to have a brain tumor?

12    A    No, you're switching the question around.

13    Q    Okay.

14    A    The stroke caused the brain tumor to grow rapidly.

15    Q    Okay.  She already had a brain tumor.  It was just

16         the stroke that caused it to grow.

17    A    It triggered -- It triggered it to start growing.

18    Q    What's the basis of your opinion in that regard?

19    A    My basis?

20    Q    Yeah.

21    A    From being with her every day and watching her

22         symptoms.

23    Q    Well, you don't have a medical degree.

24    A    No, I don't.

25    Q    So you have to be getting that belief from
```

Page 52

```
 1              somewhere, right?

 2    A         Yeah.

 3    Q         Where are you getting that belief from?

 4    A         From seeing her shaking in the front room and the

 5              day of court when I brought her home and not her

 6              being able to talk.

 7    Q         Okay.

 8    A         And the right side of her body being dead, which are

 9              stroke like symptoms.

10    Q         But you have no --

11    A         I've done a lot of reading on it.

12    Q         But you have no scientific basis for that belief.

13              That's just your personal belief.

14    A         It's my personal belief and from what the doctor

15              says it's either this or that.

16    Q         Okay.  I want to know what doctor told you that that

17              could be the case then.  What doctor told you that?

18    A         Dr. Chairacki.

19    Q         How do you spell Chairacki.

20    A         C-h-a-i-r-a-c-k-i -- s-k-i -- c-k-i.

21    Q         And what hospital is Dr. Chairacki with?

22    A         She was with Providence.  She was a neuroscience

23              doctor, which she's higher rated than just a regular

24              D.O. or M.D.

25    Q         And it's your testimony that you believe Dr.
```

1        Chairacki would testify that the stroke caused the

2        tumor to grow?

3             MR. McQUEENEY: Objection to the form of the

4        question.  He can't possibly know what she's

5        prepared to testify to.

6    BY MS. McGRAIL BELAU:

7    Q   Well, did she tell you that?

8    A   She wrote it down.  It was either that or the other

9        thing, which you have the evidence in her own

10       handwriting what she wrote down.

11   Q   What did she write down?

12   A   She wrote down either the stroke caused the tumor or

13       the tumor was caused by the stroke.

14   Q   The stroke caused the tumor or the tumor was caused

15       by the stroke.  What's the difference between the

16       two?  I'm not understanding.

17   A   I --

18            MR. McQUEENEY: Well, wait.  Objection as to

19       the form of the question.  You're asking him to

20       interpret somebody else's writing?  Is that what

21       you're asking him?

22            MS. McGRAIL BELAU: I'm asking him to explain

23       his testimony.

24   BY MS. McGRAIL BELAU:

25   Q   What's your understanding is the difference?

Page 54

1    A    My understanding of the difference would be that the

2         stroke was caused -- She had a stroke that caused

3         the tumor to grow.

4    Q    Okay.

5    A    Which led to her death.

6    Q    And you're telling me that Dr. Chairacki would come

7         in and testify in this regard?

8              MR. McQUEENEY: Same objection.

9    BY MS. McGRAIL BELAU:

10   Q    Is that based upon something you read or something

11        she told you?

12   A    She did tell me that and wrote that down.

13   Q    Okay.

14   A    She did tell me that and she wrote that down.

15   Q    She told you that.

16   A    Yes.

17   Q    And wrote that down.

18   A    Yeah.

19   Q    Where did she write that down?

20   A    Well, you have a copy of --

21             THE WITNESS: Did you give them a copy of that

22        paper?

23             MR. McQUEENEY: Absolutely.

24             THE WITNESS: Yeah, you should have a copy of

25        that.

1           MS. McGRAIL BELAU: Do you have a copy of

2      that?

3           THE WITNESS: Her handwriting with her phone

4      number in the questions.

5           MS. McGRAIL BELAU: Can we get a copy of this

6      because this is actually my original.  I'm going to

7      have it marked.

8           MR. McQUEENEY: You realize our copy costs are

9      two dollars a page, right?

10          MR. KASZUBSKI: That's it?

11          (Whereupon, there was a brief pause in the

12     proceedings.)

13          (Whereupon, Defendant deposition Exhibit

14     Number Two was marked for identification)

15   BY MS. McGRAIL BELAU:

16   Q   I'm handing you what's been marked as Exhibit Two.

17       Is this what you were referencing when you said --

18       is it Dr. --

19   A   Chairacki.

20   Q   Chairacki wrote down --

21   A   Yes.

22   Q   -- that the tumor had been caused by the stroke or

23       caused to grow because of the stroke?

24   A   Yes.

25   Q   Are you aware of it being written down any other

Page 56

```
 1           place about the tumor being caused to grow by the

 2           stroke or caused by the stroke?

 3    A      Am I aware of what?

 4    Q      It being written down anywhere else or is this the

 5           only reference you were talking about?

 6    A      This is the only reference.

 7    Q      Okay.

 8    A      This was given to me the day of her death.

 9    Q      Okay.  And what this says is he felt that patient

10           had a stroke with --

11               MR. McQUEENEY: Wait a minute.

12               MS. McGRAIL BELAU: What's it say?

13               MR. McQUEENEY: It doesn't say he.  Objection

14           to that statement.

15               MS. McGRAIL BELAU: His.

16    BY MS. McGRAIL BELAU:

17    Q      Well, what's that say?

18    A      It is felt that patient had a stroke with -- It says

19           right --

20               MR. McQUEENEY: Dense.  Dense?  Yeah, dense

21           right hemiplegia.  The stroke would occur as a

22           result with brain tumor or ischemic injury.

23               MR. PEACOCK: I think it says the stroke could

24           occur as a result of the brain tumor or ischemic

25           injury.
```

```
 1              MR. McQUEENEY: Right.  Any questions -- Okay.

 2              MS. McGRAIL BELAU: Please call.

 3    BY MS. McGRAIL BELAU:

 4    Q    Did you discuss with Dr. Chairacki that you had a

 5         potential lawsuit that you were going to be bringing

 6         against the City of Sterling Heights and/or its

 7         officers?

 8    A    No.

 9    Q    Did you ask her to write this note because of --

10    A    Yes.

11    Q    -- potential litigation?

12    A    I asked --

13              MR. McQUEENEY: Objection to the form of the

14         question.

15    BY MS. McGRAIL BELAU:

16    Q    You can answer.

17              MR. McQUEENEY: You can answer.

18              THE WITNESS: I asked her to write it 'cause I

19         needed it for my records just in case in the future

20         I would have done something.

21    BY MS. McGRAIL BELAU:

22    Q    Okay.

23    A    With this because the death was bad enough that I

24         was going through.

25    Q    At the time of your mother's passing, were you
```

Page 58

```
 1              considering bringing a lawsuit against the City of

 2              Sterling Heights or did it not even cross your mind

 3              at this point?

 4      A       It didn't cross my mind that -- Well, no, I did

 5              because I started a civil suit in December 2007 as

 6              pro per with Macomb County Circuit Court, but I

 7              never served Sterling Heights the papers.

 8      Q       You started a lawsuit --

 9      A       I filed it but never had them served because I just

10              --

11      Q       Why did you file it but never had it served?

12      A       Well, I was angry what happened to my ma that day

13              and to me so I filed it and then I realized that I

14              can't fight Sterling Heights in pro per.  There's no

15              way I would be able to represent myself and her.  So

16              I let it go.  I never had them served.  After I

17              opened up that case against Sterling Heights, she

18              was charged right after that.

19      Q       Well, you never served them with a complaint, right?

20      A       No.

21      Q       You have no indication that they were aware of the

22              complaint, correct?

23      A       Correct, but they had another case pending and they

24              could have found it on record.

25      Q       You have no indication that they found it, correct?
```

Page 59

```
 1    A      Correct.
 2                  (Whereupon, Defendant's Deposition Exhibit
 3           Number Three was marked for identification.)
 4    BY MS. McGRAIL BELAU:
 5    Q      Exhibit Three.  That's the complaint you filed
 6           against the City of Sterling Heights?
 7    A      Yeah, this is the complaint.
 8    Q      That's the complaint you filed on your behalf and
 9           your mother, Ms. Perovich's behalf, correct?
10    A      Correct.
11    Q      And on the third page you signed both your name and
12           Ms. Perovich's name?
13    A      No, I signed --
14    Q      I'm sorry.
15    A      I signed my name and she signed her own name at that
16           time.
17    Q      Okay.  And she read this prior to signing it?
18    A      Yes.
19    Q      And agreed with the factual allegations within this?
20    A      Yes.
21    Q      Okay.  Let's look at actually paragraph twenty.  We
22           talked about this.  You told me that she suffered a
23           heart attack and I said well, I thought I saw some
24           documents that she almost suffered a heart attack
25           and here it is right here.  It says hospital report.
```

Page 60

1            She almost suffered a heart attack.  Which was it?

2            Did she or did she not suffer a heart attack?

3   A    She did.  The EKG report states that she did.

4   Q    Okay.  And yet you filed a complaint that you signed

5            and your mother signed that said she almost suffered

6            a heart attack.

7   A    Well --

8               MR. PEACOCK: I'm just going to place an

9            objection as to this witness's characterization as

10          to what an EKG show.  There's been no foundation

11          that this gentleman can tell how an EKG reads.

12  BY MS. McGRAIL BELAU:

13   Q    Yeah, let me ask you that.  How do you know what

14          that report reads or what it shows --

15   A    The doctor told me.

16   Q    Okay.  What doctor told you what it said?

17   A    I don't remember his name.  The doctor that was

18          caring for her that day.

19   Q    Okay.  So you didn't read the report yourself.

20   A    No, I didn't read it.  I was told by the doctor

21          verbally.

22   Q    Okay.  And then despite allegedly being told that at

23          the hospital when you filed your complaint on your

24          own behalf a month later, you don't write she had a

25          heart attack.  You write she almost suffered a heart

1      attack.

2              MR. McQUEENEY: Well, objection to the form of

3      the question.  He doesn't know -- He didn't testify

4      when he talked to the doctor in the sequence of

5      events.

6    BY MS. McGRAIL BELAU:

7    Q   When did you talk to the doctor?

8    A   That day on the thirtieth of October.

9    Q   Okay.  So before you filed this complaint.

10   A   I didn't follow through with this complaint because

11       mentally I wasn't 100 percent at the time.

12   Q   Okay.

13   A   'Cause of the situation that happened with my

14       mother.

15   Q   Okay.

16   A   That's why I never had it served.

17   Q   And you put nothing in this complaint about the fact

18       that your mother said she was going to get a gun,

19       correct?

20   A   No, I did not.

21   Q   And you put nothing in this complaint about Officer

22       Fett allegedly jamming her knee into your mother's

23       head, correct?

24   A   Correct.

25   Q   And you asked for the city to pay you and your

Page 62

1       mother 10 million dollars for noneconomic damages?

2    A   Correct.

3    Q   How much in damages are you seeking for your

4        lawsuit?

5    A   I don't have a number right now.

6    Q   You don't have a number.

7    A   No, I don't know how to -- My mother was alive when

8        I filed this.  Now she's dead.  I don't know how to

9        put a figure on my loss.

10   Q   And you blame --

11   A   She was my mother, my father and my best friend.

12   Q   You blame the Sterling Heights police officers for

13       her death of the brain tumor?  Don't look at your

14       lawyer for an answer.  Do you blame the Sterling

15       Heights police officers for the death of your mother

16       of a brain tumor?

17           MR. McQUEENEY: Well, I'll object to the form

18       of the question.  If you know the answer.

19           THE WITNESS: I object.  I mean I --

20   BY MS. McGRAIL BELAU:

21   Q   You can't object.

22   A   I know.  I know.  That's why -- I'm sorry that I

23       said that.  I'm trying to put words -- If this never

24       happened to her on October 30, I believe, strongly

25       believe, she'd still be alive to this day with the

```
 1            brain tumor 'cause I believe -- This is my belief

 2            only and I'm not a professional.  I believe -- And

 3            I've done reading on this, but I'm still not a

 4            professional.  People live a full life with brain

 5            tumors if they aren't activated.  Now, two weeks

 6            that brain tumor is growing from a size of a half

 7            dollar to a size of a grapefruit.  I believe it was

 8            triggered.  I mean it's just common sense.  It was

 9            triggered.  What triggered it?  I believe it was the

10            stroke 'cause she had stroke like symptoms.  She

11            couldn't talk and the right side of her body was

12            paralyzed.  Now --

13    Q       Victor, let me ask you a question now.  I understand

14            that you believe that this was caused by it, but

15            what proof do you have of that?

16    A       I don't have proof on paper.

17    Q       I don't know if you're aware of this, but when you

18            filed your complaint in Federal District Court there

19            are two plaintiffs in this action.  Are you aware of

20            that?

21    A       Two plaintiffs?

22    Q       I'll show you a copy of the complaint.

23    A       Me and my mother?

24    Q       Correct.

25    A       Yes.
```

Page 64

1   Q      You and the estate of your mother.

2   A      The estate of my mother, yes, I am aware of that.

3               (Whereupon, Defendant's Deposition Exhibit

4          Number Four was marked for identification.)

5   BY MS. McGRAIL BELAU:

6   Q      I'll put that in front of you just so you have that.

7          That's Exhibit Number Four.  I asked you what you

8          were seeking in damages for this matter and you were

9          not able to put a number on this, but with regards

10         to your mother, what out of pocket damages has she

11         allegedly suffered as a result of the alleged

12         wrongdoing of these Sterling Heights officers?

13  A      She had medical insurance that covered everything.

14  Q      Okay.

15  A      Her total bill was a hundred and sixty thousand

16         dollars, which was covered by her insurance company.

17  Q      You personally, do you have any out of pocket

18         monetary damages that you suffered as a result of

19         the alleged wrongdoing of the Sterling Heights

20         officers?

21  A      Out of pocket, probably not.

22  Q      Okay.

23  A      I've had plenty of loss.

24  Q      I saw a reference as to your mother going by

25         ambulance to Beaumont on 12/20/07.

Page 65

```
 1   A      Yes.

 2   Q      Why did she go to Beaumont on 12/20/07?

 3   A      Because they came to arrest her for a felony

 4          warrant.  They knocked on the front door.  It was at

 5          nighttime.  The Sterling Heights -- Three Sterling

 6          Heights officers, different officers, they knocked

 7          on the door.  My ma answered the door.  I was in my

 8          bedroom and I came out and they're like -- they said

 9          to my ma someone hit your car and my ma's like oh,

10          my god and she opened the door and they came in and

11          grabbed her.  She almost fell.  She didn't fall.  I

12          grabbed her arm and walked her to the chair and sat

13          her down.  They wanted to take her to jail and I was

14          pleading to the cops she cannot lay on a concrete

15          bench.  There's no way.  She's disabled.  She cannot

16          lay.  I was pleading with them.  I'll bring her in.

17          I'll turn her in.  So that's what happened.  And

18          because of that incident --

19   Q      They allowed her to turn herself in?

20   A      Right.

21   Q      Okay.

22   A      They allowed me to turn her in.

23   Q      And they did have a felony warrant for her arrest

24          when they --

25   A      Right.
```

```
 1   Q    -- came to the house that day?

 2   A    Right.

 3   Q    How long was she at Beaumont on that day?

 4   A    I don't remember.

 5   Q    Was that Troy Beaumont?

 6   A    Yeah, Troy Beaumont again.  The ambulance came.  She

 7        was -- She had shortness of breath.  She couldn't

 8        stand on her own.  She couldn't believe what was

 9        happening to her before Christmas.

10   Q    Who is Reverend Zeaven?

11   A    Reverend Zeaven.

12   Q    Okay.  How do you spell that?

13   A    Z-e-a-v-e-n, I believe.

14   Q    In your answers to interrogatories you expressed

15        that you had been it sounded like basically having

16        some counseling with him over the incident; is that

17        correct?

18   A    Yeah, that's the way I was brought up.

19   Q    Okay.

20   A    If we have a problem, we go to the church.

21   Q    Okay.  What church is he with?

22   A    St. Lazerus.

23   Q    Where is St. Lazerus located?

24   A    Outer Drive and Van Dyke.

25   Q    How many times have you discussed this matter with
```

Page 67

1          him?

2     A    Numerous amount of times.

3     Q    Have you discussed the incident on October 30 or

4          your mother's passing with him?

5     A    I didn't talk to him about that incident on October

6          30.

7     Q    Okay.  So you must have been discussing your

8          mother's passing.

9     A    Passing.  Dealing with the passing part.  He came

10         and read her her last rights at the hospital.  He

11         came at Henry Ford Hospital and prayed for her and

12         then they transferred her to Providence.  I had the

13         Providence Hospital priest at Providence Hospital

14         read the last rights for her too.

15    Q    You have claims for emotional distress against the

16         Sterling Heights officers; is that correct?

17    A    Correct.

18    Q    You've also filed claims for emotional distress

19         against the officers on behalf of your mother's

20         estate; is that correct?

21    A    Correct.

22    Q    You've also filed claims for emotional distress on

23         your behalf and/or your mother's behalf against

24         several other individuals; have you not?

25              MR. McQUEENEY: Well, I object to the form of

1          the question.  I don't know if I understand it.

2                    MS. McGRAIL BELAU: Well, it goes to damages.

3          He's made other claims for emotional distress

4          against numerous other people and other lawsuits and

5          motions and whatnot that he's filed within the

6          Macomb County Circuit Court.

7                    MR. McQUEENEY: Are you referencing the

8          complaint that's in existence or why don't you break

9          it down so.

10                   MS. McGRAIL BELAU: I'll go through it.

11    BY MS. McGRAIL BELAU:

12    Q    You've filed other claims, PPO's, lawsuits against -

13         -

14    A    Yeah.

15    Q    -- multiple other people, correct?

16    A    Yeah, that's my neighbor.

17    Q    Well, not just against your neighbor, right?

18    A    And the Notos.  The Notos and my neighbor.  I was

19         assaulted by the Notos and I was assaulted by my

20         neighbor and he pled guilty to the assault charges.

21    Q    Okay.  Hold on one second.  I'm going to get my

22         documents in order here.  Let's just go through some

23         of these and see what they are.

24    A    Okay.

25    Q    You filed for a personal protection order against --

Page 69

```
 1          is it Girolamo Noto?

 2    A     Yeah.  Yes.

 3    Q     You've also filed for a personal protection order

 4          against Joseph Noto.

 5    A     Yes.

 6    Q     And one of them is a father and one of them is a

 7          son.

 8    A     Yes.

 9    Q     And which is which?

10    A     Girolamo Noto is the father.  Jerry Noto is the son.

11    Q     And that dates back to March 30, 2006?

12    A     Yes.

13    Q     And tell me about that.  Were you working for them?

14    A     Yes.

15    Q     What were you doing for them?

16    A     I was refacing their building.  Reconstructing the

17          face of their building.

18    Q     You had your own company at that time?

19    A     I don't recall if I was working for them by the hour

20          or if I was subcontracting through them.  I believe

21          I was subcontracting through them.  Yes, I was

22          subcontracting through them.

23    Q     Okay.

24    A     I was a subcontractor at that time.

25    Q     And what happened?
```

Page 70

```
 1   A    What happened with that?

 2   Q    Yes.

 3   A    I wanted more money to continue and they didn't want

 4        to pay me.  So I went to grab my tools out of the

 5        back of the garage -- or the back part of the

 6        industrial building they had and they -- Jerry

 7        slammed the door on me, the garage door, and they

 8        were throwing me up against my truck and everything,

 9        the father and son, and I couldn't believe what they

10        were doing.  I didn't raise my hands against them at

11        all.  I had the -- you know, the Warren Police

12        Department take pictures of what they did to me.  I

13        had redness around my neck.  They had their hands

14        around my neck.

15   Q    Warren never brought any charges?

16   A    No.

17   Q    In fact --

18   A    They were never brought up on any charges.

19   Q    In fact, the Notos actually claimed that you had

20        fraudulently converted monies.

21   A    I didn't convert no monies fraudulently.  I don't

22        know what they -- how they came up with that.

23   Q    But that's what they claimed in response to the

24        charges?

25   A    I --
```

Page 71

1              MR. McQUEENEY: Objection.  Hold on a minute.

2       Let me get my objection on the record.  Objection as

3       to the form of the question.  Do you have anything

4       to show him that that's what they claimed?

5              (Whereupon, Defendant's Deposition Exhibit

6       Number Five was marked for identification.)

7  BY MS. McGRAIL BELAU:

8  Q    I'm handing you Exhibit Five.  This is entitled

9       Verified Motion to Set Aside Default Judgement and

10      Order to Seize Property and For a Dismissal of

11      Lawsuit and Motion for Sanctions for Abuse of

12      Process.  After you received your PPO, you actually

13      filed a complaint against the Notos; is that

14      correct?

15 A    Yes.

16 Q    And then you took a default judgement against them?

17 A    Yes.

18 Q    And you attempted to execute on their property?

19 A    Yes.

20 Q    And they had the default judgement and the execution

21      set aside because they claimed that service was not

22      properly done; is that correct?

23 A    That's what they claimed.

24 Q    And that default judgement was set aside?

25 A    Yes.

Page 72

```
 1   Q    And the writ was set aside?

 2   A    Because I wasn't notified for the motion, to show up

 3        at the motion for that, to set aside the --

 4   Q    Okay.  What eventually happened with this lawsuit?

 5   A    Well, I let it go because ma died and I couldn't

 6        handle --

 7   Q    So it was just dismissed?

 8   A    Yeah, it was dismissed and -- It got dismissed.

 9   Q    Did anybody pay anyone any money on it?

10   A    No, after ma died it got dismissed in July.  She

11        died in June.  It got dismissed in July or August.

12   Q    What's the number on the top of that, the case

13        number?

14   A    073642-NO.

15   Q    Let's look at paragraph ten.  Your attorney had

16        asked me if I had seen anywhere where you would have

17        seen that the Notos actually said that you had

18        fraudulently converted monies and that's where I had

19        seen that.  It says because of plaintiff's

20        fraudulent conversion of monies prepaid for

21        materials and supples which monies were never used

22        for same.  Does that refresh your recollection as to

23        what --

24   A    Now that I see it, yeah.

25   Q    -- they're saying when this suit was filed?
```

Page 73

1    A    That was their argument, but they could never prove

2         it 'cause I had receipts and everything.  Receipts

3         for everything.

4    Q    Did they file a counterclaim against you in this

5         matter?

6    A    A counterclaim?

7    Q    Were they seeking money out of you too?

8    A    Yeah, and that was dismissed.  They did file a

9         counterclaim, but everything got dismissed.

10   Q    You also filed a PPO against your neighbor, Brian

11        Adams; is that correct?

12   A    Correct.

13   Q    And did you try to get a PPO against his girlfriend,

14        Amanda Lissman (phonetic)?

15   A    Yeah.

16   Q    And did you also file a complaint against Mr. Adams?

17   A    Yes, I was awarded fifteen thousand and what do you

18        call that where you go in front of the three

19        lawyers.

20             MR. PEACOCK: Case evaluation.

21             THE WITNESS: Yes, but the other side never

22        accepted and then ma died after that and I pretty

23        much let that case get dismissed too.

24   BY MS. McGRAIL BELAU:

25   Q    Do you believe that Mr. Adams' actions was at least

Page 74

1          partially responsible for the stress and harm that

2          was done to your mother?

3     A    No.

4     Q    You don't believe that.

5     A    He never physically abused my mother.

6     Q    Okay.

7     A    There was only a couple of words here and there

8          whenever he would see her outside.

9               (Whereupon, Defendant's Deposition Exhibit

10          Number Six was marked for identification.)

11    BY MS. McGRAIL BELAU:

12    Q    Let's look at Exhibit Six.  Let's look at the date

13         of this.  It's on the second page.  It's dated

14         November 3, 2007, correct?  And this is entitled

15         Verified Motion to Grant Judgement to Plaintiff in

16         the Matter of Default.  Victor Gojcaj versus Brian

17         Frank Adams, correct?

18    A    Yes.

19    Q    Paragraph three you allege that the mother that your

20         take care of is a heart patient and needs lots of

21         rest, correct?

22    A    Yes.

23    Q    And then on the very last paragraph you state

24         wherefor I, the plaintiff, is asking for the total

25         amount of the judgement to repair the damage done to

Page 75

| | | |
|---|---|---|
| 1 | | me and my mom, correct? |
| 2 | A | Correct. |
| 3 | Q | So, therefore, you're alleging that somehow Mr. |
| 4 | | Adams has done damage to you and your mother? |
| 5 | A | Well, yeah, he verbally spoke to my mom bad, you |
| 6 | | know. |
| 7 | Q | And, in fact, you filed this complaint exactly five |
| 8 | | days after the Sterling Heights police officers are |
| 9 | | at your door.  I'm sorry.  It's dated five days |
| 10 | | after.  Filed two and a half weeks after. |
| 11 | A | I had it ready I think to file it, but I didn't |
| 12 | | enter it in. |
| 13 | Q | Well, let's look at the time stamp on the front |
| 14 | | there.  That's November 14, 2007. |
| 15 | A | Yeah, I did that.  I filed it after my birthday, |
| 16 | | November 10. |
| 17 | Q | Okay.  So about two and a half weeks after they were |
| 18 | | at your door. |
| 19 | A | Yep. |
| 20 | Q | Okay. |
| 21 | A | Yes. |
| 22 | Q | You also accused Ms. Lissman across the street from |
| 23 | | you for causing mental anguish to you and your mom; |
| 24 | | is that correct? |
| 25 | A | She lived next door with Brian -- That was Brian |

Page 76

```
 1              Adam's girlfriend.  Yes.

 2    Q         And, in fact, you sued her for the mental anguish

 3              that she caused you and your mother, correct?

 4    A         Yes, which I dismissed that case.  She filed a PPO

 5              against me one week after I filed a lawsuit against

 6              her.

 7    Q         In fact, you were suing her for two hundred and

 8              fifty thousand dollars for the pain and suffering

 9              that she caused you and your mother allegedly.

10    A         I just wanted them quiet.  I know they didn't have

11              no money.

12    Q         But that is not my question.  You sued her for two

13              hundred and fifty thousand dollars --

14    A         Yes.

15    Q         -- for the pain and suffering and it was all

16              noneconomic damages, correct?

17    A         Yes.

18    Q         She hadn't cost you any out of pocket expenses,

19              correct?

20    A         Yeah, she cost me expenses.  We agreed to dismiss --

21    Q         There's no question on the table.

22              MR. McQUEENEY: Hey, there's no question on

23              the table.  Please.

24              THE WITNESS: All right.

25              MR. McQUEENEY: We discussed this.
```

Page 77

1            THE WITNESS: Okay.

2            MR. McQUEENEY: Can we go off the record for a

3       second.

4            MS. McGRAIL BELAU: Yeah.

5            (Whereupon, there was a brief pause in the

6       proceedings.)

7            MS. McGRAIL BELAU: These are two separate

8       documents.

9            (Whereupon, Defendant's Deposition Exhibit

10      Numbers Seven and Eight were marked for

11      identification.)

12  BY MS. McGRAIL BELAU:

13  Q    Here you go, Victor.  All right.  I'm showing you

14      Document Seven and Eight.  Number Seven appears to

15      be a document that was filed on October 21, 2007.

16      I'll represent in Macomb County Circuit Court by

17      you, Plaintiff Victor Gojcaj, against Girolamo Noto;

18      is that correct?

19  A    Correct.

20  Q    And it's entitled Complaint For Assault and

21      Aggravation.

22  A    Correct.

23  Q    Okay.  Is this the complaint you filed with regards

24      to the assault on May 19, 2006?

25  A    Correct.

Page 78

1   Q      That you attempted to take a default on and

2          eventually execute on his property.

3   A      Correct.

4   Q      And then the other document, Number Eight, was a

5          document filed just the day before on August 20,

6          2007, correct?

7   A      Correct.

8   Q      And this was in a matter of -- Well, it says Brian

9          Frank Adams versus Victor Gojcaj.

10  A      Yes.

11  Q      Was he suing you or were you suing him in this

12         matter?

13  A      I was suing him.

14  Q      Okay.  So it should have said Victor Gojcaj versus

15         Brian Frank Adams.

16  A      Yeah, I was in the process of learning.

17  Q      That's understandable.  And this is Motion for

18         Assault and Aggravation.  Was this the complaint

19         where you were seeking damages from him?

20  A      Yes.

21  Q      Okay.  And back to the Noto complaint, you're

22         seeking is it two million or two hundred thousand

23         dollars from him?

24  A      Two hundred thousand, I believe.

25  Q      Okay.  And in the Brian Adams complaint you're

Page 79

```
 1        seeking --

 2                  MR. McQUEENEY: Wait a minute.  I object.

 3        Where do you see -- You said on the Noto complaint?

 4                  MS. McGRAIL BELAU: On the Noto complaint at

 5        the bottom.

 6                  MR. McQUEENEY: Oh, okay.  Is that two

 7        thousand dollars?

 8                  MS. McGRAIL BELAU: It's either two hundred

 9        thousand or two million.  I'm not sure.

10                  MR. McQUEENEY: Well, it could be two

11        thousand.  Do you know what that number is?

12                  THE WITNESS: I can't remember.  I think it

13        was -- Well, I know it started with a two.  Two

14        thousand.  Two million.  Two hundred thousand.  I

15        don't know.  I don't remember.

16    BY MS. McGRAIL BELAU:

17    Q   Okay.  And from Brian Adams you were seeking a

18        hundred and thirty-two thousand dollars, right?

19    A   Correct.

20    Q   And these two documents were filed one day apart

21        from each other, right?  August 21 and August 20.

22    A   Correct.

23    Q   And you imply in both of these documents that you

24        haven't had any complications with anyone else.

25    A   Correct.
```

```
 1   Q     Okay.  And I quote on the one you say, on the second

 2         line; "In a violent manner that I've never seen

 3         before from anyone" and then on Document Eight first

 4         line you say "Or had any other complications with

 5         anyone", correct?

 6             MR. McQUEENEY: Where are you looking at,

 7         Linda?  Or had any other -- Okay.  All right.  So

 8         you're referencing Exhibit Eight.

 9             MS. McGRAIL BELAU: I'm comparing Exhibit

10         Seven and Exhibit Eight.

11             MR. McQUEENEY: Okay.  And what's the

12         comparing contrast?  I don't quite understand the

13         question at all.

14   BY MS. McGRAIL BELAU:

15   Q     These matters were in front of different judges,

16         correct?

17   A     Correct.

18   Q     And you, basically, implied to both judges that you

19         had no other complications with anyone else to each

20         of these different judges; did you not?

21             MR. McQUEENEY: Objection.  I don't think

22         that's what he testified to.  Exhibit Eight --

23             MS. McGRAIL BELAU: I don't need a talking

24         objection.

25   BY MS. McGRAIL BELAU:
```

1    Q    Is that what you implied to these judges when you

2         filed these?

3              MR. McQUEENEY: Exhibit Eight speaks for

4         itself and Exhibit Seven doesn't reference that

5         statement.

6              THE WITNESS: They were different situations.

7    BY MS. McGRAIL BELAU:

8    Q    Okay.  Now, there are numerous numerous other

9         motions and whatnot that you filed in the course of

10        these cases.  You also had an appeal with regards to

11        your denial of disability.  You may have had one or

12        other two PPO's, correct?

13   A    Well, against Brian Adams.

14   Q    Right.  And following all these motions and

15        complaints and whatnot, prior to this, actually, you

16        didn't have to file filing fees or motion fees or

17        anything of that sort because of your lack of

18        income, correct?

19   A    Correct, but I still had other costs, copying cost

20        and.

21   Q    Okay.  But to actually get something filed to be

22        heard in front of the court, you didn't have to

23        expend fees, right?

24   A    Correct.

25   Q    Filing all these different motions and complaints

Page 82

1       and whatnot, the Chief Circuit Court Judge actually

2       suspended your ability to be able to file complaints

3       and motions without paying fees, correct?

4    A  Correct, he did.

5    Q  Do you know what preceded that?

6    A  There was --

7          MR. McQUEENEY: Objection as to the form of

8       the question.

9    BY MS. McGRAIL BELAU:

10   Q  If you know.

11   A  I don't remember which case it was, but it was

12      another one.

13         (Whereupon, Defendant's Deposition Exhibit

14      Number Nine was marked for identification.)

15   BY MS. McGRAIL BELAU:

16   Q  Well, it's in front of you and it actually applied

17      to every single case you had pending at that time.

18   A  Uh-huh.

19   Q  Correct?

20   A  Correct.

21   Q  Do you know what preceded his order sua sponte, and

22      sua sponte means he did it on his own.

23   A  I don't know.

24         MR. McQUEENEY: Wait a minute.  Are you asking

25      him why Judge Caretti decided what he wanted to do

Page 83

```
 1          sua sponte and --
 2                  MS. McGRAIL BELAU: I'm asking him if he knows
 3          what preceded the decision that he had to start
 4          paying his own filing fees.
 5                  MR. McQUEENEY: Well, how can he possibly know
 6          that?
 7                  MS. McGRAIL BELAU: If he knew.  He can tell
 8          me if he didn't know.
 9                  THE WITNESS: I was just about to say --
10                  MS. McGRAIL BELAU: He may know.
11                  THE WITNESS: -- I don't know.
12                  MS. McGRAIL BELAU: Okay.
13  BY MS. McGRAIL BELAU:
14   Q      Okay.  Prior to the order coming out, had anybody
15          suggested that any of your filings were frivolous?
16   A      They were what?
17   Q      Frivolous.
18   A      I don't know what frivolous means.
19                  MR. McQUEENEY: Objection as to the form of
20          the question.
21  BY MS. McGRAIL BELAU:
22   Q      Did not have merit.
23   A      No, not that I can recall.
24   Q      Have you ever been convicted of a crime?
25   A      Drunk driving.
```

Page 84

```
 1   Q      When was that?

 2   A      Driving on a suspended license.

 3   Q      When was that?

 4   A      October of 2000, and then driving on a suspended

 5          license after that 'cause I didn't have a license

 6          from the drunk driving.

 7   Q      When was that?

 8   A      Like within the year.  In 2001 sometime.

 9   Q      Those are the only crimes you've been convicted of?

10   A      Convicted of, yeah.  I've been -- I was charged with

11          insufficient funds back in '96 for a check that I

12          wrote for a hundred and fifty dollars in Eastpointe.

13   Q      You wrote a check for a hundred and fifty dollars

14          that bounced in Eastpointe?

15   A      No, a hundred and twenty-five dollars.

16   Q      A hundred and twenty-five dollars.

17   A      Yeah, that was back in '96.  That's when I started

18          my construction company and I thought I was going to

19          get paid and put money in the bank and.

20   Q      And you were charged with that?

21   A      Yeah.

22   Q      Did you plead to that or what happened with that?

23   A      We pled to it.  Some minor charge.  They wanted to

24          hit me for a felony and it was dropped to a

25          misdemeanor, but other than that, I don't have
```

Page 85

```
 1              nothing else that I can recall.

 2    Q         What were you sentenced with in that matter, do you

 3              know?

 4    A         Probation nonreporting.  Six months nonreporting

 5              probation.

 6    Q         Costs and fines.

 7    A         Costs and fines.

 8    Q         Besides the OUL, the DWLS and the nonsufficient

 9              funds, were you charged with any other crimes?

10    A         Well, I have three drunk drivings on my record.  One

11              in '95 and one in '98 and one in 2000.

12    Q         Were you drinking October 30, 2007?

13                   MR. McQUEENEY: Object.  Well, objection as to

14              the form.  When?  In the morning?  Noon?  Evening?

15    BY MS. McGRAIL BELAU:

16    Q         Prior to the police coming to the house.

17                   MR. McQUEENEY: Are you talking about that day

18              when the police arrived?

19                   MS. McGRAIL BELAU: Correct.

20                   THE WITNESS: In the morning?  No, I was

21              sleeping.

22    BY MS. McGRAIL BELAU:

23    Q         Okay.  Were you drinking the prior evening?

24    A         I had two drinks.

25    Q         Besides any of the OUIL's, the driving while license
```

Page 86

1        suspended or the nonsufficient funds, have you been

2        charged with any other crimes?

3   A    Not that I can recall.

4   Q    Were you charged with some crimes in Oakland County?

5   A    Not having -- Yeah, not having a business license.

6   Q    You were charged with larceny by conversion of a

7        thousand dollars or more and --

8   A    No, I wasn't charged.

9   Q    -- not having a license.  You weren't charged with

10       that?

11  A    Nope, I wasn't charged with --

12  Q    Well, you may have been acquitted but you were

13       charged of it; weren't you?

14  A    Well, I was acquitted, yes.  I was acquitted.

15       That's right.

16  Q    What happened there?

17  A    I was doing a job and they didn't want to pay me

18       towards -- I had done a contract.  They paid me

19       draws as I go along.  Well, he stopped paying me

20       draws.  So I stopped doing the work.  I kept all my

21       receipts on all the material again and they tried to

22       get me for larceny by conversion.  It cost me seven

23       thousand dollars in attorney fees to be found not

24       guilty by a jury.

25  Q    Well, you paid seven thousand in restitution, right?

Page 87

```
 1   A      And then I had to pay seven thousand restitution

 2          because I didn't have a business license to do

 3          cement work.  Cement and brick work, which I didn't

 4          know I needed, but now.

 5   Q      That's similar to the allegations that were made by

 6          the Notos; was it not?

 7   A      Similar, yeah, but I had receipts of the materials

 8          again.  So that's why no charges were brought

 9          against me.

10   Q      What were you sentenced to as a result of that

11          conviction?

12                 MR. McQUEENEY: Are you talking about not

13          having a business license?

14                 MS. McGRAIL BELAU: Correct.

15                 THE WITNESS: Thirty days.

16   BY MS. McGRAIL BELAU:

17   Q      Ninety days.

18   A      Well, I only did thirty.

19   Q      You were released early.

20   A      Yeah.

21   Q      But you were sentenced to ninety initially?

22   A      Yes, because I didn't have the seven thousand to pay

23          back in restitutions and then my family came up with

24          seven thousand to pay it back and that's why they

25          released me after thirty days.
```

Page 88

1    Q    You filed a false police report on at least one

2         prior occasion; have you not?

3              MR. McQUEENEY: I'm sorry.  I didn't hear

4         that.

5    BY MS. McGRAIL BELAU:

6    Q    You filed a false police report on at least one

7         prior occasion; have you not?

8    A    False police report?

9    Q    Correct.

10   A    Never.

11   Q    Have you called the Sterling Heights Police

12        Department to report that your neighbor, Brian

13        Adams, was having a loud party when nobody was home?

14   A    They just left.  The cops came -- The cops came and

15        they had just left.

16   Q    What do you mean?  Who had just left?

17   A    Brian Adams and his thunks.  The cops they were sick

18        and tired of coming over to his house.

19   Q    I have police reports that indicate that you

20        apologized.  You were just frustrated with the

21        situation and you wouldn't do it again.  You're

22        saying that did not happen?

23   A    That did not happen.  Every time I called was for a

24        reason.  I didn't even make nothing up.  I never

25        made anything up.

1   Q      I'm not going to mark this, but I want you to take a

2          look at this police report.  Share it with your

3          attorney.

4   A      Saturday -- On a Saturday party night at his house.

5                 MR. McQUEENEY: Wait.  Wait.  Wait.  What's

6          going on here?  Is he reading this into the record?

7                 MS. McGRAIL BELAU: He doesn't have to read it

8          into the record.

9                 MR. McQUEENEY: No, don't read it into the

10         record.  I'm going to object.  It's a hearsay

11         statement.

12                THE WITNESS: Okay.

13  BY MS. McGRAIL BELAU:

14  Q      Do you agree with that recitation, factual

15         recitation, on there?

16                MR. McQUEENEY: Well, wait a minute.  I'm

17         going to object.  It's a hearsay statement created

18         by an officer in an uncharged circumstance.  I'm

19         going to object and instruct him not to answer

20         because --

21                MS. McGRAIL BELAU: Well, that would be great

22         if we were in trial, but we're in a discovery

23         deposition.

24                MR. McQUEENEY: It's not admissible and it

25         won't lead to admissible information.

Page 90

1              MS. McGRAIL BELAU: You're instructing your

2      client not to answer?

3              MR. McQUEENEY: Absolutely.

4              MS. McGRAIL BELAU: We're in a discovery

5      deposition.

6              MR. McQUEENEY: I don't care.

7              MS. McGRAIL BELAU: This isn't trial.

8              MR. McQUEENEY: It's not even -- He wasn't

9      even charged with that and you don't even have the

10     officer to come forward and say that this even

11     occurred.  He was never arrested or convicted of it.

12     I'm instructing him not to answer.

13             MS. McGRAIL BELAU: On the grounds of what?

14     That it's hearsay?

15             MR. McQUEENEY: It's not going to lead to

16     admissible evidence.

17             MS. McGRAIL BELAU: Certainly, if he's filed a

18     false police report, that goes to his credibility

19     and it certainly goes to my ability to --

20             MR. McQUEENEY: He was never charged with it

21     and you know that; otherwise, you would have had the

22     documents submitted into evidence during his

23     deposition.  This is a harassment technique and he's

24     never been charged with it.  I'm instructing him not

25     to answer it.

```
 1              MS. McGRAIL BELAU: Because it's hearsay?

 2              MR. McQUEENEY: It's not going to lead to

 3         admissible evidence.

 4              MS. McGRAIL BELAU: It goes to his

 5         credibility.  He's filed a false police report and

 6         it goes to his credibility --

 7              MR. McQUEENEY: Don't answer it.

 8              MS. McGRAIL BELAU: -- as a plaintiff and as a

 9         witness.

10              MR. McQUEENEY: I've made my position clear.

11              MS. McGRAIL BELAU: Okay.

12    BY MS. McGRAIL BELAU:

13    Q    Victor, in your complaint, and I'm trying to find

14         it, there's an allegation that Officer Fett had her

15         knee in your mother's head.  Do you recall that

16         allegation?

17    A    Yes.

18    Q    Is that something that you witnessed or something

19         that your mother told you about?

20    A    I witnessed.

21    Q    And that's after you came out of your room?

22    A    Yes.

23    Q    And was that while she was attempting to handcuff

24         your mother?

25    A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | And, again, you did not put that in your initial |
| 2 | | complaint that you filed in Macomb Circuit Court. |
| 3 | A | I believe not.  There was a lot that I didn't put. |
| 4 | Q | The videotape of the incident, how did you come into |
| 5 | | possession of that videotape? |
| 6 | A | It was mine. |
| 7 | Q | Well, it was initially confiscated by the Sterling |
| 8 | | Heights police officers; was it not? |
| 9 | A | Yeah, the stole it. |
| 10 | Q | They stole it.  How did they steel it? |
| 11 | A | They didn't ask for my permission for my property. |
| 12 | Q | Do they have to ask for your permission when |
| 13 | | investigating a crime? |
| 14 | A | Well, when they're inside the house without a |
| 15 | | warrant, they should. |
| 16 | Q | Okay.  So they stole your videotape and then what |
| 17 | | happened? |
| 18 | A | I talked to a detective and I got it back. |
| 19 | Q | Well, what detective did you talk to? |
| 20 | A | I don't remember his name. |
| 21 | Q | And what did you say to get it back? |
| 22 | A | I said I have a video.  I walked up to the counter |
| 23 | | at the police station upstairs. |
| 24 | Q | Uh-huh. |
| 25 | A | Where the file room is and I said I would like to |

```
 1            have my videotape back to the lady and she found it

 2            and she said it's gotta be released by a detective.

 3            Let me get a detective to sign for it.

 4    Q       You were talking to the evidence counter, basically?

 5    A       Yeah.

 6    Q       Okay.  And you said --

 7    A       So she got some detective.  I don't know.  He signed

 8            for it.  I got the tape back.  That was it.

 9    Q       Okay.  Did somebody call you after the fact

10            expressing that the wrong videotape had been

11            released to you and asking you to return it?

12    A       Yeah, that was -- Yes.

13    Q       Do you know who called you?

14    A       No, I don't remember.

15    Q       When you got the tape back, was it this tape of this

16            night in question?

17    A       I had two tapes.  One was the Brian Adams incident

18            how he assaulted me in front of my home.

19    Q       Okay.

20    A       And the other one with the police officers with my

21            mother.

22    Q       Okay.

23    A       So.

24    Q       Which tape was released to you when you went to the

25            evidence counter like you just discussed?
```

Page 94

1    A    Well, eventually I got both of them.

2    Q    Okay.  When you went to the evidence counter we just

3         talked about, was it the Brian Adams tape that was

4         given to you or the October 30 tape that was given

5         to you?

6    A    I don't remember.

7    Q    How did you get this October 30 tape back then?

8              MR. McQUEENEY: Hang on.  Let me object.  I

9         think he's already testified that he got it when the

10        detective released it to him.

11             MS. McGRAIL BELAU: Well, then he just said he

12        doesn't know if it was the Brian Adams tape that was

13        given to him or the October 30 tape.  So I want to

14        know if he remembers or doesn't remember.

15             MR. McQUEENEY: He said he got both tapes.

16   BY MS. McGRAIL BELAU:

17   Q    Did you get two tapes that day or one tape?

18   A    No, I got one tape that day.  There was two

19        different occasions where I had to go pick up tapes.

20   Q    Okay.  That's what I was trying to get to the bottom

21        of.  Then you got a phone call asking to return a

22        tape back?

23   A    Yeah.

24   Q    What tape were they asking that you return?

25   A    The incident with the police.

Page 95

1   Q       The October 30 tape.

2   A       Yeah.

3   Q       Did you return that tape?

4   A       Yeah, I returned it.

5   Q       Okay.  Then how come you still have a copy of that

6           tape?

7   A       'Cause that wasn't the only copy that I had of the

8           tape.

9   Q       You made an additional copy?

10  A       I had another -- I had another VCR in my room

11          recording the same thing with the TV.  When I said I

12          was in my bedroom watching everything and there's

13          also another TV in the front room.

14  Q       So when the incident was happening on October 30,

15          you were recording in the family room and in your

16          bedroom?

17  A       Yes.

18  Q       Do you always record on two TV's on that?

19  A       Well, the way the setup was each camera had --

20  Q       That wasn't my question.  Do you always record on

21          two TV's with that video camera?

22  A       Yes, I got --No.  One TV is for one video camera.

23          The other TV is for the other camera.

24  Q       So you have two video cameras set up?

25  A       Yes.

1   Q   And this was for one of the video cameras.

2   A   Yes.

3   Q   Where is the other video camera?

4   A   It wasn't recording.  It was just monitoring.

5   Q   Okay.

6   A   They both weren't recording at first.  The one in

7       the front room, which had a better focus.

8   Q   All right.  Which is it?  Is there one videotape of

9       this incident or two videotapes of this incident?

10  A   One.

11  Q   Okay.  And that videotape was taken by the Sterling

12      Heights Police on October 30.

13  A   Yes.

14  Q   And when you went to the counter they gave it to

15      you.

16  A   Yes.

17  Q   And then they called you and they asked you to bring

18      it back.

19  A   Yes.

20  Q   And did you bring it back?

21  A   Yes.

22  Q   Or did you bring a different tape back and say it

23      was the October 30 tape?

24  A   I brought the same tape back as far as I knew.

25  Q   As far as you knew.

Page 97

1    A    Yeah.

2    Q    Okay.  How do you still have a copy of it then?  Did

3         you make a copy before bringing it back?

4    A    I don't remember.

5    Q    You don't know how you still have a copy of this

6         tape?

7    A    Well, Boyer got it back.  Boyer, that was

8         representing my mother in Sterling Heights, got it

9         back.

10   Q    Okay.  So the defense attorney got a copy back after

11        the criminal proceedings?

12   A    Yeah.

13   Q    And then gave it to you.

14   A    Yeah, I requested for it.

15   Q    Okay.  So that's how it came back in your

16        possession.

17   A    Right.

18   Q    Okay.

19   A    Yeah.

20   Q    And then in the course of this proceeding we

21        requested a copy of it.  Did you give the original

22        to your attorney or do you still have the original?

23   A    No, the attorney has the original.

24   Q    Do you still have a copy of this tape in your

25        possession?

Page 98

1    A    Yeah, on CD.

2    Q    You made a copy on a CD for yourself?

3    A    Yeah.

4    Q    Like a DVD copy of it?

5    A    Yeah, like a DVD copy off the computer.

6    Q    The original is a VHS tape?

7    A    Yes.

8    Q    Did you doctor that tape at all?

9    A    No.

10   Q    And the six or eight hours on that videotape there's

11        no blip except for two blips within the ten minutes

12        that the police are there.  Did you notice that?

13   A    Yes.

14   Q    And there's one blip where there's no video and no

15        audio and then there's one blip where there's no

16        audio.

17   A    Yes.

18   Q    Do you have any idea how those two blips occurred in

19        there?

20   A    No, I don't.  It's an old VCR.  I mean I didn't have

21        high technology equipment.  It was just a cheap

22        camera.  Cheap VCR hooked up to the TV.  Cheap

23        tapes.

24   Q    That doesn't happen anywhere else in the entire six

25        to eight hours a tape.

Case 2:09-cv-12192-PJD-VMM   Document 27-2   Filed 09/21/10   Page 99 of 102


```
 1   A      I don't know what to say about that.  I did not -- I
 2          did not mess with that tape at all.
 3   Q      I don't have any --
 4   A      The cops might have.
 5   Q      You were the last one to have possession of that
 6          tape, correct?
 7   A      They were the first one that had possession of that
 8          tape.
 9   Q      You were the last one.
10   A      And I was the last one.
11   Q      Nothing further.
12              MR. McQUEENEY: Can we take a break before you
13          get started?
14              MR. PEACOCK: Sure.
15              (Whereupon, there was a brief pause in the
16          proceedings.)
17                         EXAMINATION
18   BY MR. PEACOCK:
19   Q      Victor, my name is Pete Peacock and I represent --
20   A      Leo Melise.
21   Q      -- Officer Melise.  I'm going to be relatively brief
22          because Ms. McGrail did an excellent job and you
23          answered the majority of questions I would have
24          asked.  You say you live at 12020 Hickory West in
25          Utica, Michigan; is that correct?
```

```
 1    A      Correct.

 2    Q      And you live with Andrea Piccolo and Tony somebody,

 3           correct?

 4    A      Correct.

 5    Q      Is there a house phone number there?

 6    A      No.

 7    Q      No land line?

 8    A      No.

 9    Q      No.

10    A      No.

11    Q      Okay.  Does Andrea have a cell phone?

12    A      Yes.

13    Q      Do you know Andrea's phone number?

14    A      I have it on my phone.

15    Q      Can you check for me, please, if your phone is with

16           you.

17    A      It's in my coat.

18    Q      Where's your coat?

19                 THE WITNESS: In your office, or his office.

20                 MR. PEACOCK: Can we get the phone.

21                 MR. McQUEENEY: Right now?

22                 MR. PEACOCK: Would you mind, Mr. McQueeney.

23           You know I'm going to forget this if I don't do it

24           now.

25                 (Whereupon, there was a brief pause in the
```

```
 1          proceedings.)

 2    BY MR. PEACOCK:

 3    Q     Victor, you're looking in your cell phone for Andrea

 4          Piccolo's cell phone number.

 5    A     Yes.

 6    Q     Did you find it?

 7    A     Yes.

 8    Q     What is it, please?

 9    A     586-935-2283.

10    Q     935-2283.  Okay.  Is there any other numbers

11          associated with Andrea Piccolo?

12    A     No.

13    Q     Okay.  How about Tony, do you have Tony's cell phone

14          number?

15    A     No.

16    Q     And you can't remember Tony's last name.

17    A     No, he just moved in.  I don't --

18    Q     How did he know about the vacancy in the --

19    A     Through Andrea.

20    Q     Through Andrea.  Is he Andrea's boyfriend?

21    A     No.

22    Q     What's the rent that you pay to the owner of the

23          condo?

24    A     The amount?

25    Q     Yes.
```

```
 1    A    Four-fifty.

 2    Q    And who owns the condo?

 3    A    She does.

 4    Q    She does.  And what is your source of income?

 5    A    My charity.

 6    Q    How much do you pay yourself from your charity?

 7    A    I don't pay myself.

 8    Q    Who pays you?

 9    A    It's a membership only.

10    Q    How many members are there with --

11    A    Just myself right now.

12    Q    Okay.  The Help Forgotten Disabled Americans is a

13         membership organization?

14    A    Yes.

15    Q    And how many members are there?

16    A    Just myself right now.

17    Q    Okay.  And how do you pay yourself with just your

18         membership?

19    A    I don't pay myself.  I pay business expenses.

20    Q    Okay.  Well, how do you pay the rent of four hundred

21         and fifty bucks a month to Andrea Piccolo?

22    A    'Cause my office is where I live, so.

23    Q    Your office is where you live?

24    A    Yeah.

25    Q    So the Help --
```