UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


THE ESTATE OF MARIA PEROVICH,

VICTOR GOJCAJ,


                    Plaintiffs,


        vs                              No. 2:09-CV-12192


STERLING HEIGHTS POLICE

OFFICER ANTOINETTE FETT,

STERLING HEIGHTS POLICE SERGEANT

DAVID CATTANEO, STERLING HEIGHTS

POLICE OFFICER AARON BURGESS

AND CLINTON TOWNSHIP POLICE

DETECTIVE LEO MELISE,


                    Defendant.

-------------------------------/

Page 2

1              The Deposition of LEO MELISE, taken

2     before Mary Di Santo (CSR-3169), a Certified Shorthand

3     Reporter and Notary Public in and for the County of Macomb,

4     State of Michigan, at 10 South Main Street, Suite 400, Mount

5     Clemens, Michigan, on Tuesday, June 29, 2010, at 3:00 p.m.

6

      APPEARANCES:
7                        LAW OFFICE OF PATRICK J. McQUEENEY
                         Attorney at Law
8                        33830 Harper Avenue
                         Clinton Township, Michigan  48035
9                        BY:  PATRICK J. McQUEENEY, ESQ.

10                       Appearing on behalf of the Plaintiff:

11
                         O'REILLY RANCILIO, P.C.
12                       Attorneys at Law
                         12900 Hall Road, Suite 350
13                       Sterling Heights, Michigan  48313
                         BY:  MARC D. KASZUBSKI, ESQ.
14
                         Appearing on behalf of the Defendant.
15                       Cattaneo, Burgess & Fett:

16
                         PLUNKETT COONEY
17                       Attorneys at Law
                         10 S. Main Street, Suite 400
18                       Mount Clemens, Michigan  48043
                         BY:  JOHN W. MARTIN, JR., ESQ.
19
                         Appearing on behalf of the Defendant Melise:
20
                         Also Present:  Lee Coppege
21

22

23

24

25

```
 1
 2
 3
 4
 5                        I N D E X
 6                                        PAGE
 7      EXAMINATION BY MR. MCQUEENEY          4
 8      EXAMINATION BY MR. KASZUBSKI         52
 9      EXAMINATION BY MR. MARTIN            57
10      RE EXAMINATION BY MR. MCQUEENEY      61
11
12      EXHIBIT NUMBERS ONE THROUGH EIGHT     4
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                              Mount Clemens, Michigan

2                              June 29, 2010

3                              3:00 p.m.

4

5                    *   *   *

6

7        (WHEREUPON DEPOSITION EXHIBIT NUMBERS ONE

8         THROUGH EIGHT WERE MARKED.)

9

10                   *   *   *

11

12             L   E   O      M   E   L   I   S   E

13

14     being first duly sworn to tell the truth, the whole

15     truth and nothing but the truth, testified as follows:

16

17                    EXAMINATION

18

19     BY MR. MCQUEENEY:

20   Q  Let the record reflect this is the deposition of is it

21      Detective?

22   A  Detective.

23   Q  Detective Leo Melise of the Clinton Township Police

24      Department taken in the matter of the Estate of Maria

25      Perovich versus Sterling Heights police officer

1          Antoinette Fett et al.

2                  Detective, as I introduced myself my name is

3          Patrick McQueeney, I represent the Estate of Maria

4          Perovich and Victor Gojcaj.  I'm going to be asking you

5          questions throughout regarding this case.  I ask that

6          you answer them clearly, no nodding of the head like

7          you just did, no shrugging of the shoulders, if I ask

8          you a question you answer it I'll presume you

9          understood the question, if I ask you a question you

10         need me to rephrase it I'll rephrase the question.  If

11         you need to take a break for any reason let me know.

12         However, if I ask you a question I'll ask you to answer

13         the question before you take a break.

14                 State your full name for the record, please?

15    A    Leo Joseph Melise, M-e-l-i-s-e.

16    Q    Detective, I just want to go through a little bit of

17         your background.  Currently you're with the Clinton

18         Township Police Department?

19    A    Yes.

20    Q    And how long you been with the Clinton Township Police

21         Department?

22    A    24 years and nine months.

23    Q    And you're a detective, how long you been a detective

24         within the Clinton Township Police Department?

25    A    Approximately 11 years.

| | | |
|---|---|---|
| 1 | Q | Any other law enforcement agencies you been employed |
| 2 | | by? |
| 3 | A | I worked for the sheriff's department prior to, for two |
| 4 | | and a half years. |
| 5 | Q | Okay.  And what, what unit in that department? |
| 6 | A | I was a corrections officer. |
| 7 | Q | Corrections officer? |
| 8 | A | Uh huh. |
| 9 | Q | Why did you leave the sheriff's department? |
| 10 | A | Got an offer by Clinton, I passed the test, went to |
| 11 | | Clinton. |
| 12 | Q | All right.  Other than Clinton Township and the |
| 13 | | sheriff's department, that is the Macomb Sheriff's |
| 14 | | Department? |
| 15 | A | Macomb County. |
| 16 | Q | Other than those two employments, any other law |
| 17 | | enforcement employment? |
| 18 | A | No. |
| 19 | Q | Okay.  How far did you go in school? |
| 20 | A | I got an associates and I have a bachelors. |
| 21 | Q | Bachelors is in what? |
| 22 | A | Business. |
| 23 | Q | Business.  When did you obtain your bachelors? |
| 24 | A | I think it was 2002 or three, I can't remember, it's |
| 25 | | been awhile. |

1   Q  You said you have an associates, what is the associates

2       in?

3   A  Criminal justice from Macomb Community College.

4   Q  When did you get your associates?

5   A  Probably in '98, '99, I can't remember.

6   Q  You recall the date of October 29, 2007?

7   A  I'm not exactly sure on the date.

8   Q  Okay.  I show you a copy of your report will that

9       refresh your recollection?

10   A  Sure.

11           MR. MCQUEENEY:  Marc, I'm sorry, I don't have

12       an extra copy.

13           MR. KASZUBSKI:  That is your report?

14   A  That's not my report.

15   Q  (Continuing by Mr. McQueeney)  That's not your report?

16   A  That's not my report.

17   Q  Okay.  Is this your report?

18   A  Yes, that's my supplement.

19   Q  Okay.  You recall the date of October 30, 2007?

20   A  Yes.

21   Q  After you reviewed your report.  Okay.  First of all,

22       would you acknowledge that report is three pages?

23   A  Yes.

24   Q  Okay.  On that date were you working with the Clinton

25       Township Police Department?

Page 8

```
 1   A   Yes.

 2   Q   And did you go to, did you go to an address on Penny in

 3       Sterling Heights?

 4   A   Yes.

 5   Q   Okay.  Was this as a result of an investigation you

 6       were conducting from an incident at P.F. Changs?

 7   A   Yes.

 8   Q   What was going on at P.F. Changs which led you to the

 9       address on Penny?

10   A   Defraud an innkeeper report.

11   Q   Did you interview anybody at P.F. Changs?

12   A   The officer did.

13   Q   Okay.  Was that the officer that created the other

14       report?

15   A   Yes.

16   Q   Okay.  Did you see that report before you were involved

17       with the case?

18   A   Before I was, it was assigned to me.

19   Q   It was assigned to you, okay.  And the officer you said

20       did the investigation at P.F. Changs, you didn't do any

21       investigation yourself?

22   A   No, not at P.F. Chang, the report was written.

23   Q   The report was written, you saw the report then you

24       were, you went to the address on Penny in Sterling

25       Heights?
```

```
 1    A    Yes.

 2    Q    What's the protocol about investigating an incident in

 3         another jurisdiction?

 4    A    Like any other investigation.

 5    Q    Okay.  Did you try to maintain or did you attempt

 6         contact with the person involved at the P.F. Changs

 7         before you went to the residence?

 8    A    No.

 9    Q    Okay.  Did you contact Sterling Heights prior to

10         October the 30, 2007?

11    A    No.

12    Q    No you just went over there?

13    A    Yes.

14    Q    What's the protocol if you're going to do an

15         investigation of an inhabitant in another jurisdiction,

16         is there a protocol?

17    A    No.

18    Q    Through Clinton Township Police Department?

19    A    No.

20    Q    You can go anywhere?

21    A    Yes.

22    Q    And conduct an investigation?

23    A    Yes.

24    Q    Okay.  Why didn't you call them, well, first of all,

25         who was involved in the incident at P.F. Changs, do you
```

| | | |
|---|---|---|
| 1 | | know? |
| 2 | A | Can I look at the report? |
| 3 | Q | Absolutely. |
| 4 | A | It was a '95 Ford pick up black in color and the |
| 5 | | license plate came back registered to the Penny |
| 6 | | address. |
| 7 | Q | Okay.  Did you ultimately find out who was at P.F. |
| 8 | | Changs after the case was assigned to you? |
| 9 | A | What are you asking? |
| 10 | Q | My question is, after the case was assigned to you do |
| 11 | | you know who was involved in this defrauding innkeeper |
| 12 | | case at P.F. Changs? |
| 13 | A | Do I know? |
| 14 | Q | Yes. |
| 15 | A | After I did the investigation I did. |
| 16 | Q | Correct. |
| 17 | A | Right. |
| 18 | Q | Okay.  Who was that? |
| 19 | A | I'm not sure of his name now Victor, Victor Gojcaj, I |
| 20 | | don't know how you pronounce it. |
| 21 | Q | Gojcaj. |
| 22 | A | It's usually Gojcaj, okay. |
| 23 | Q | Okay.  And so you went to the residence on Penny in |
| 24 | | Sterling Heights to meet with Victor, correct? |
| 25 | A | Yes. |

```
 1    Q    And other than seeing that report, that one page report

 2         did you do any other investigation prior to going to

 3         the residence in Sterling Heights?

 4    A    No, I went to the residence to do my investigation.

 5    Q    Okay.  And when you got there were you in a marked

 6         police vehicle?

 7    A    No, I was in a detective car.

 8    Q    Okay.  And were you in plain clothes or were you in

 9         identifying --

10    A    Plain clothes.

11    Q    Okay.  And were there any features showing that you

12         were a law enforcement officer?

13    A    My weapon and my badge.

14    Q    Okay.  Was the badge clearly visible or was it inside

15         your clothing?

16    A    It was right here.

17    Q    Down on your belt?

18    A    It was in my hand when I, it was there and there.

19    Q    Okay.  All right.  And you recall what time you went to

20         the residence?

21    A    Around 9:45 or so.

22    Q    Okay.  A.M.?

23    A    Yes.

24    Q    And how did you know to go to that residence?

25    A    That's where the plate was registered to.
```

1   Q   Okay.  The plate was registered to whom?

2   A   You know at this point I can't remember.  It's not in

3       --

4   Q   Is it on that report?

5   A   The lien return's not here so I couldn't tell you

6       exactly.  Do you have the lien return.  Okay, yes, it

7       does, I'm sorry.  Comes back to Marie Perovich.

8   Q   Perovich?

9   A   Perovich.

10  Q   Did you know that at the time when you went to the

11      residence that the vehicle that is referenced in the

12      report was registered to Miss Perovich?

13  A   Yes, it was on the report.

14  Q   Were you going to speak to Victor or Miss Perovich?

15  A   The owner of the vehicle.

16  Q   The owner of the vehicle?

17  A   Uh huh.

18  Q   Did you think it was Victor?

19  A   I didn't know who Victor was.  I went there to talk to

20      whoever.

21  Q   Okay.  And you said you got there around 9:45 or

22      thereabouts?

23  A   Couldn't tell you exactly, yes.

24  Q   Okay.  Did you prepare any notes or anything other than

25      that report?

1   A   No.

2   Q   Did you have any handwritten notes, okay.  What did you

3       do when you got to the residence?

4   A   Rang the doorbell and knocked on the door.  I saw the

5       vehicle matching the description in front of the house.

6   Q   All right.  What type of vehicle was that?

7   A   Ford pick up.

8   Q   When you went out there to the residence was it just

9       yourself or anybody else from Clinton Township?

10  A   Just myself.

11  Q   Okay.  And did you knock at the front door?

12  A   Yes.

13  Q   Okay.  Can you describe the house for me?

14  A   Not at this time I can't.  I know the front door.

15  Q   Okay.

16  A   I rang the doorbell, I knocked on the door.

17  Q   Okay.

18  A   It was a brick house I think.

19  Q   Brick house, was it a ranch, was it a colonial?

20  A   I think it was a ranch, I'm not sure.  I can't recall.

21  Q   We'll show you a video later.  And was there a large

22      porch in front?

23  A   Just a slab.

24  Q   Small slab?

25  A   Yeah.

| | | |
|---|---|---|
| 1 | Q | Okay.  Were there steps leading up to the house, if you |
| 2 | | recall? |
| 3 | A | I don't think there was more than one step. |
| 4 | Q | Okay. |
| 5 | A | If it was a step. |
| 6 | Q | Okay.  And when you knocked on the door did somebody |
| 7 | | immediately answer? |
| 8 | A | No. |
| 9 | Q | Okay.  How long were you at the residence knocking at |
| 10 | | the door before somebody answered? |
| 11 | A | Five, eight minutes, somewhere around there. |
| 12 | Q | Okay.  And did you communicate with dispatch or anybody |
| 13 | | in your department? |
| 14 | A | Yes. |
| 15 | Q | Okay.  Who did you communicate with? |
| 16 | A | I contacted dispatch and I asked them to send me a |
| 17 | | wrecker to the house and also a Sterling Heights marked |
| 18 | | unit. |
| 19 | Q | Okay.  And when you contacted dispatch you said contact |
| 20 | | Sterling Heights? |
| 21 | A | Yes. |
| 22 | Q | Okay.  You didn't call Sterling Heights yourself? |
| 23 | A | No, I had dispatch do it. |
| 24 | Q | Then you had also said, wanted a wrecker sent out to -- |
| 25 | A | To tow the vehicle. |

| | | |
|---|---|---|
| 1 | Q | Tow the truck? |
| 2 | A | Tow the truck. |
| 3 | Q | Why tow the truck? |
| 4 | A | It was used in a crime. |
| 5 | Q | What crime? |
| 6 | A | Defrauding an innkeeper. |
| 7 | Q | Does the offense of defrauding an innkeeper allow the |
| 8 | | seizure of the vehicle? |
| 9 | A | Yes. |
| 10 | Q | Hand you deposition exhibit, is that five, sir? |
| 11 | | MR. MARTIN:  Yes. |
| 12 | Q | (Continuing by Mr. McQueeney)  Okay.  Detective, I |
| 13 | | handed you deposition exhibit number five, first of |
| 14 | | all, would you acknowledge it's one page? |
| 15 | A | Yes. |
| 16 | Q | Okay.  Is that the statute you're referring to |
| 17 | | defrauding an innkeeper MCL 750 point 292? |
| 18 | A | Just because it says defrauding an innkeeper right |
| 19 | | there, the prosecutor could charge a couple different |
| 20 | | things.  I went there under defrauding an innkeeper. |
| 21 | Q | Is there a provision under defrauding the innkeeper |
| 22 | | statute that you know of that permits the, I guess the |
| 23 | | seizure of an automobile or a truck or anything? |
| 24 | A | Is it written? |
| 25 | Q | Yes. |

| 1 | A | No, it's not written. |
|---|---|---|
| 2 | Q | Okay.  What permits you to seize the vehicle? |
| 3 | A | Michigan criminal law. |
| 4 | Q | Michigan? |
| 5 | A | Motor vehicle code does. |
| 6 | Q | The motor vehicle.  Can you point me to a specific |
| 7 |   | section, if you know? |
| 8 | A | Don't have it with me, do you have it.  I don't have it |
| 9 |   | with me, no. |
| 10 | Q | Okay.  That's under, your testimony is under the motor |
| 11 |   | vehicle code? |
| 12 | A | Michigan criminal law. |
| 13 | Q | Michigan criminal law.  That permits the seizure of a |
| 14 |   | vehicle? |
| 15 | A | Involved in a crime, yes. |
| 16 | Q | Okay.  You said you don't have the specific site for |
| 17 |   | the motor vehicle, do you have a site for the Michigan |
| 18 |   | criminal code? |
| 19 | A | No, I don't. |
| 20 | Q | Other than that report, who is that report that one |
| 21 |   | page written by? |
| 22 | A | Officer Hill. |
| 23 | Q | Officer Hill, okay.  And did you talk to Officer Hill |
| 24 |   | about the seizure of the vehicle? |
| 25 | A | No. |

1   Q   Okay.  That was your decision to seize the vehicle?

2   A   That was my decision, yes.

3   Q   How was it, how was it used as an instrumentality in a

4       crime?

5   A   He left without paying and he drove away in the

6       vehicle.

7   Q   Okay.  So if I understand you so any time that a crime

8       was committed and you jump in your vehicle you can

9       seize the vehicle?

10  A   Yes.

11  Q   Okay.  At that time when you were doing the

12      investigation you hadn't decided whether or not you

13      were going to charge anybody with this defrauding an

14      innkeeper yet, right?

15  A   I wanted to talk to the gentleman.

16  Q   Okay.  And had, had he paid the, this bill or whatever

17      you wouldn't have seized the vehicle, right?

18  A   No.

19  Q   Okay.  You just testified a couple minutes ago that, it

20      took about five to eight minutes or so before somebody

21      ultimately answered the door?

22  A   No.

23  Q   No?

24  A   No, it took five to eight minutes before I called

25      dispatch.

1   Q   Okay, I'm sorry.  Nobody answered for the first five to

2       eight minutes and then you called dispatch.  What

3       happened after you called dispatch?

4   A   Dispatch called me right back and said Sterling was

5       coming out there because somebody had called the police

6       on me.

7   Q   Somebody had called the police on you?

8   A   Yes.

9   Q   Did the wrecker ever show up?

10  A   No, not that I know of, I don't think so.

11  Q   And how long after you made that call did the Sterling

12      Heights Police arrive in response to somebody calling

13      the police on you do you know?

14  A   Within a couple minutes I think.  I can't remember

15      exactly.

16  Q   And you're still standing outside the residence,

17      correct?

18  A   No, I'm at the curb, at my car.

19  Q   You're at the car, okay.  And do you know how many

20      units arrive from Sterling Heights?

21  A   I remember three.

22  Q   Three, okay.  And how many officers from Sterling

23      Heights arrived, do you know?

24  A   Three.

25  Q   Three, okay.  Do you know their names at this time?

1    A    I know last name of Burgess.

2    Q    Burgess?

3    A    And just by what you said Fitt.

4    Q    Fett?

5    A    Fett.  And I can't pronounce the other one, I couldn't

6         pronounce it at the scene when I saw it on my name

7         plate.

8    Q    Was it Sergeant Cattaneo?

9    A    Yes.

10   Q    Okay.  Do you know who arrived first?

11   A    No, I couldn't tell.

12   Q    They didn't all arrive together, did they, if you know?

13   A    Pretty close I think.  I can't remember.  I can't

14        recall.

15   Q    Okay.  What did you do when the officers arrived?

16   A    I told them, explained what was going on and everything

17        and then I walked up to the door with them.

18   Q    Okay.  So you walked up to the door with all the

19        officers?

20   A    Yes.

21   Q    Had anybody come out of the house when the other

22        officers arrived when you --

23   A    No.

24   Q    Okay.  And what did you do after you walked up to the

25        door with these officers?

```
 1    A    We knocked on the door.

 2    Q    Okay.  Who knocked on the door, was it you or --

 3    A    I think it was one of the uniformed officers.

 4    Q    Okay.  That's what was going to be my next question,

 5         you're jumping the gun on me.

 6    A    Sorry.

 7    Q    Was all the officers wearing I guess identifiable

 8         clothing?

 9    A    Fully uniformed.

10    Q    Fully uniformed, okay.  Did they arrive in marked

11         units?

12    A    Yeah, as much as I can remember, yes.

13    Q    Okay.  One of the officers knocked at the door.  How

14         long from the time that you arrived about 9:45 until

15         the officer knocked on the door, how much time had

16         elapsed, do you know?

17    A    I couldn't tell you.

18    Q    Okay.  Did you see anybody outside?

19    A    No.

20    Q    Okay.  What was the weather like that day, if you

21         recall?

22    A    It was sunny.

23    Q    Sunny?

24    A    Uh huh.

25    Q    Cold out?
```

Page 21

```
 1    A    I don't think it was cold.

 2    Q    Warm?

 3    A    I can't remember, it's been a few years.

 4    Q    All right.  And when that officer knocked, you

 5         obviously don't know the name of the officer, that

 6         officer knocked at the door what did you do?

 7    A    Stood there.

 8    Q    Okay.  And did anybody answer the door?

 9    A    After a minute or so, yes, somebody answered the door.

10    Q    Okay.  And who answered the door?

11    A    An older lady.

12    Q    Can you give me physical description of the older lady?

13    A    I wish I could, no.

14    Q    Okay.  Was she heavy, obese?

15    A    No.

16    Q    Large?

17    A    No.

18    Q    Okay.  You know if she used a cane or a walker to get

19         around?

20    A    No.

21    Q    Okay.

22              MR. MARTIN:  That's no you don't know or no

23         you didn't see one?

24    A    No, I don't know, I'm sorry.

25    Q    (Continuing by Mr. McQueeney)   Okay.  Did you notice
```

Page 22

1      any handicapped or infirmities that prevented her from

2      walking or anything like that?

3   A  No.

4   Q  You don't recall or --

5   A  I didn't see any.

6   Q  Okay.  All right.  Did anybody else come to the door

7      with her?

8   A  No.

9   Q  Okay.  And you said this one officer whose name you

10     don't know he was a male officer that knocked at the

11     door, was it the female officer?

12  A  I can't recall.

13  Q  Okay.  And you said an older lady came to the door and

14     did she come out on to the porch?

15  A  No.

16  Q  Okay.  Where were you positioned with the other three

17     officers, were you on the porch, were you off to the

18     side?

19  A  I was at the, towards the street on the porch.

20  Q  On the porch?

21  A  On the cement.

22  Q  Were you behind the officer that knocked?

23  A  They were to my right and I was right to their left.

24  Q  Okay.  What did the woman do when she opened the door?

25  A  If I recall she was on her, she was on the phone.

1   Q   On the phone, okay.

2   A   And she was yelling at us and she was saying you're not

3       the police, I think she was telling them you're not the

4       police to the uniformed officers.

5   Q   Okay.  Okay.  The front door to the residence are there

6       two doors or one door, is there a screen door?

7   A   Screen door.

8   Q   And a main door?

9   A   Big door.

10   Q   Okay.  When she opened the door she opened the main

11       door?

12   A   Uh huh.

13   Q   Did, is that a yes?

14   A   Yes, I'm sorry, yes, I'm sorry.

15   Q   Did she open the screen door at all?

16   A   Yes, she opened the screen door a little bit.

17   Q   Did she push it open with a particular hand that you

18       saw?

19   A   I couldn't see, it wasn't a clear screen door.

20   Q   Okay.  Was there tinted glass or anything?

21   A   Like a metal guard to keep bugs out or something like

22       that.  I couldn't see through it.

23   Q   You saw, did you hear her talking, could you see her

24       talking on the phone or you heard her talking on the

25       phone?

| | | |
|---|---|---|
| 1 | A | I think I saw her with a phone up to her ear. |
| 2 | Q | Okay.  Do you know what hand she was using to hold the |
| 3 | | phone? |
| 4 | A | No. |
| 5 | Q | All right.  And you said she's yelling at us saying |
| 6 | | you're not the police? |
| 7 | A | Yes. |
| 8 | Q | Was that you or all the officers? |
| 9 | A | All of us. |
| 10 | Q | Okay.  And did you show her your badge? |
| 11 | A | I had been showing my badge to the video camera that I |
| 12 | | showed up there, I had my badge out. |
| 13 | | MR. MARTIN:  When you went up to the porch |
| 14 | | with the officers you had your badge out too? |
| 15 | A | Yes, prior to that I had it out. |
| 16 | Q | (Continuing by Mr. McQueeney)  Okay.  So you said, |
| 17 | | let's back up for a minute.  You said you showed the |
| 18 | | badge to the video camera.  When did you observe that |
| 19 | | video camera, was it prior to the arrival of the |
| 20 | | officers? |
| 21 | A | Oh yes. |
| 22 | Q | Okay.  Was it at the time you went up on to the porch |
| 23 | | and was knocking at the front door? |
| 24 | A | After a minute or so, I was knocking looking around, I |
| 25 | | saw the video camera. |

Page 25

```
 1   Q   All right.  Did you put it up in front of the camera?

 2   A   Uh huh.

 3   Q   Okay.  You don't know if anybody saw that, right?

 4   A   I don't know.

 5   Q   Okay.  And then you said you showed the badge when you

 6       went up to the door with the officer?

 7   A   I think I did.  I can't recall if I had it out when the

 8       marked, when the uniformed officers were there or not,

 9       I can't remember if I did.

10   Q   Okay.  You said it was clipped to your --

11   A   Right here.

12   Q   Okay.  Then you took it off to show it.  All right.

13       Okay.  So how long did you show it when you, when that

14       woman opened the door?

15   A   I couldn't tell you.

16   Q   Okay.  And then what happened with the woman on the

17       phone, did she eventually hang up the phone?

18   A   The officer says you're talking to our dispatch.

19   Q   Okay.

20   A   You're talking to our dispatch.  And she was still

21       yelling at us.

22   Q   All right.  What was she saying when she was yelling at

23       you?

24   A   She was just yelling.

25   Q   Okay.  And how long was she yelling at you, a minute,
```

1       five minutes, ten minutes, do you know?

2    A  It wasn't ten minutes or so but I couldn't tell you

3       exactly how long.

4    Q  Okay.  Eventually she puts down the phone at some

5       point, right?

6    A  I couldn't tell you when.

7    Q  All right.  Did she ever open that screen door?

8    A  Yes.

9    Q  Okay.  How did she open it, she push it open?

10   A  I couldn't tell you.

11   Q  Okay.  All right.  When she opened the screen door

12      where were you.  Were you still on the porch?

13   A  Yes, I was still on the porch.

14   Q  Was there an officer between you and the screen door a

15      uniformed --

16   A  There was one at the opening of the screen door.

17   Q  Was there a male or female officer?

18   A  I couldn't tell you for sure I don't want to guess.

19   Q  Was there any other officers other than that one

20      officer that was between you and the screen door, were

21      there any other officers?

22   A  The three officers were right there.

23   Q  All right there in front of you?

24   A  Next to me, we were all right there.

25   Q  Okay.  What was this woman doing?

```
 1              (WHEREUPON AN OFF THE RECORD DISCUSSION WAS
 2              HAD.)
 3
 4   Q   (Continuing by Mr. McQueeney)   Detective, okay.  After
 5       this woman stopped yelling or whenever she stopped
 6       yelling what happened after that?
 7   A   She had the door open she threatened she was going to
 8       go get a gun and shoot us.
 9   Q   Okay.  Okay.  She never got a gun, right?
10   A   No.
11   Q   Okay.  Do you recall exactly what she said?
12   A   I'm going to get a gun and shoot you.
13   Q   I'm going to get a gun and shoot you, okay.  And what
14       did you say?
15   A   I didn't say anything.  We all looked at each other
16       kind of in amazement.
17   Q   Detective, I've handed you exhibit number six,
18       transcribed by a court reporter from Hanson Court
19       Reporting.  First of all, would you acknowledge it is,
20       the exhibit is 18 pages?
21   A   Last one is 18.
22   Q   Okay.  Okay.  I ask that you turn to page five,
23       detective.  See where it says woman voice at the very
24       top of the page?
25   A   Uh huh.
```

1  Q  You touch my vehicle?

2  A  Uh huh.

3  Q  Then it says some male officer I don't know who that is

4     then what, then the woman voice you see that?

5  A  Uh huh, yeah.

6  Q  Okay.  Can you read that to yourself, sir?

7  A  Okay.

8  Q  Okay, you read it?

9  A  Uh huh.

10  Q  Do you see where it says I'm going to get my freaking

11     gun and get you off my premises?

12  A  Uh huh.

13  Q  Is that what you meant when you testified I'm going to

14     go get my gun and shoot you?

15  A  Yeah, that's what I recall.

16  Q  That's what you recall she said but it might be

17     different on the video?

18  A  Could be.

19  Q  Okay.  Other than saying she's going to go get her gun,

20     did she do anything else at that time in terms of an

21     aggressive act?

22  A  Not at that moment, no.

23  Q  Okay.  All right.  She didn't turn to make an entry

24     into getting the gun, correct?

25  A  I'm sorry.

1   Q   She didn't turn towards the residence in an attempt to

2        get, obtain a firearm, correct?

3   A   Not at first, no.

4   Q   Detective, I'm handing you Plaintiff's exhibit seven.

5        First of all, would you acknowledge it's one page?

6   A   Yes.

7   Q   Okay.  Does this look like the entry way to the

8        residence at, on Penny in Sterling Heights?

9   A   You know I couldn't tell.

10   Q   Couldn't tell?

11   A   It's been so long, I don't remember looking around.

12   Q   Okay.  You went into the residence, right?

13   A   Uh huh.

14   Q   You, is that a yes?

15   A   Yes, I'm sorry, yes.

16   Q   If I don't make you say yes she's going to have my head

17        later.

18   A   Yes.

19   Q   Okay.  You went in with the other officers?

20   A   Yes.

21   Q   Okay.  And how long after this older woman suggested

22        she was going to get a gun did you go into the

23        residence?

24   A   I couldn't tell you, it might have been a minute,

25        minute and a half if that, or less.

Page 30

1   Q   Okay.  And you didn't have a warrant to go into the

2       residence, no arrest or search warrant, right?

3   A   No.

4   Q   And why were you going into the residence?

5   A   Why was I going into the residence?

6   Q   Yes.

7   A   She threatened, and the officers were going to go in, I

8       followed the officers in for their safety.

9   Q   There were three officers other than yourself from the

10      Sterling Heights Police Department, right?

11  A   Right.

12  Q   Okay.  Did you actually need to go in yourself for

13      their safety?

14  A   We don't know who's in the house.

15  Q   Okay.  Right, you don't know who's in the house?

16  A   Right.

17  Q   If that woman said I'm going to go get a gun you could

18      have left, correct?

19  A   Could have.

20  Q   There is nothing preventing you from leaving, right?

21  A   Right.

22  Q   But the officers entered and you entered yourself,

23      correct?

24  A   Yes.

25  Q   Was the threat the reason why you went into the

```
 1        residence?

 2   A    Yes.

 3   Q    Was there any other act that the, that preceded the

 4        entry into the residence that caused you to go into the

 5        residence?

 6   A    I think she shoved the officers.

 7   Q    She shoved the officer?

 8   A    I think, if I recall right.

 9   Q    Look at exhibit four?

10   A    I don't have, they're over here, I put them back over

11        there.

12   Q    I'm sorry.  That's your report, correct?

13   A    Uh huh.

14   Q    Is that a yes?

15   A    Yes, sorry.

16   Q    Again, it's three pages, correct?

17   A    Yes.

18   Q    Okay.  Okay.  On the first page of your report at the

19        very bottom of the page could you read the last five

20        lines to yourself.

21   A    Okay.

22   Q    Okay.  You see where, this is your report, correct?

23   A    Right.

24   Q    Okay.  It says the w/f I presume white female, correct?

25   A    Yes.
```

Page 32

1   Q   Then said that if we don't, didn't get off her property

2       she would get a gun and shoot us, right?

3   A   Right.

4   Q   And then it says and she closed the storm door, is that

5       correct?

6   A   Screen door.

7   Q   Okay.  When she closed that door did she close the main

8       door also?

9   A   No.

10  Q   Okay.  So at that point the doors closed and then you

11      state in your report Sergeant Cattaneo opened the

12      screen door to speak with the lady and she pushed the

13      sergeant in the chest?

14  A   Yes.

15  Q   Okay.  Could you see that Sergeant Cattaneo open the

16      door?

17  A   Did I see it, yes, I was standing right there.

18  Q   You saw her push the sergeant in the chest?

19  A   Yes.

20  Q   Okay.  It says here he told her several times to calm

21      down and she pushed him again.  That's a second push,

22      correct?

23  A   Yes.

24  Q   When she pushed him the second time that you observed

25      both pushes, you observed the first one in the chest?

```
 1   A   Yes, then if I recall when he opened the door again she

 2       pushed him again.

 3   Q   Okay.  And when she pushed him according to your

 4       observations the second time where did she push him in

 5       the same location on the chest or on the arms?

 6   A   On the arms I think.

 7   Q   On the arms?

 8   A   I'm not sure.

 9   Q   Okay.  And what is your response to this, this second

10       push?

11   A   I think we all looked at each other.

12   Q   What do you mean you looked at each other?

13   A   We were surprised.

14   Q   Okay.  And did you tell the, you not the other

15       officers, did you tell this elderly woman that she had

16       committed an assault on a police officer?

17   A   No, I didn't.

18   Q   Did you hear that being stated by any of the other

19       officers?

20   A   Not that I recall.

21   Q   And so Sergeant Cattaneo enters the residence after he

22       opens the door, is that the time when you entered the

23       residence?

24   A   Yes.

25   Q   Were you second in or were the other officers in?
```

1  A  I think I was third or fourth.

2  Q  Third or fourth, okay.  And did you have your firearm

3     drawn?

4  A  No.

5  Q  Did the other officers have their firearm drawn?

6  A  No.

7  Q  And when you entered the residence is there a landing

8     that's up or down or anything like that?

9  A  I thought there was a landing there.

10  Q  You thought there was a landing there?

11  A  Not a big one, very small.

12  Q  Very small, okay.  Did, what did you see this elderly

13     woman do when you started entering the residence?

14  A  When I was, when I got in she was on the ground yelling

15     at us.

16  Q  She was on the ground?

17  A  Yes.

18  Q  How is she on the ground is she face down?

19  A  No, she was on her side like that yelling at us.

20  Q  She's on the side, was it right or left side?

21  A  Left side.

22  Q  Okay.  And she's on her left side she's yelling at you?

23  A  Yes.

24  Q  What is she yelling at that point?

25  A  At, she was yelling at us, I couldn't tell because a

```
 1        split second later the son came around.

 2    Q   Okay.  And what were you doing when she's on her side

 3        yelling at you, what were you doing?

 4    A   For the split second I was standing there then the son

 5        came.

 6    Q   Okay.  Did you assist any of the officers in, while you

 7        were in there or were you just there to observe?

 8    A   No, I assisted when the son, when Victor came in.

 9    Q   Okay.  So Victor came, where did he come from?

10    A   The back bedroom, somewhere in the back, around the

11        wall.

12    Q   So he came around the wall and what did you do when you

13        saw Victor?

14    A   I stood there and the Sterling officer pulled out his

15        taser said get down which he did.

16    Q   Okay.  You said you assisted this unknown officer with

17        Victor.  What did you do, what do you mean by assist

18        him?

19    A   Stood there.

20    Q   Okay.  Was he handcuffed?

21    A   No.

22    Q   Or detained in any fashion?

23    A   Just told him to get down we didn't know if he had a

24        weapon on him or anything like, he got down there.

25    Q   He immediately complied with whoever made that command?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | While he's down wherever he's down from what was going |
| 3 | | on with the elderly woman on the floor? |
| 4 | A | She was still yelling at the officers. |
| 5 | Q | Okay.  Had they started to handcuff her? |
| 6 | A | No, she wasn't handcuffed.  As far as I don't remember |
| 7 | | being handcuffed. |
| 8 | Q | Okay.  What were you doing after Victor, yourself |
| 9 | | personally what were you doing after Victor had -- |
| 10 | A | Got back up. |
| 11 | Q | Well, when he was first down on his knees were you |
| 12 | | doing anything? |
| 13 | A | No. |
| 14 | Q | Just standing there observing? |
| 15 | A | Uh huh. |
| 16 | Q | Okay.  After he got back up what happened then? |
| 17 | A | I talked to him. |
| 18 | Q | You talked to him.  Was it inside the residence or |
| 19 | | outside the residence? |
| 20 | A | I think I did both, inside and outside. |
| 21 | Q | All right.  When this elderly woman is on the floor was |
| 22 | | she still on the floor when Victor got back up? |
| 23 | A | I think she was sitting up.  I can't recall but Victor |
| 24 | | got back up I talked to Victor then we walked outside I |
| 25 | | think. |

1   Q   Okay.  Was this elderly woman still in the residence

2       with the other officers when you walked outside with

3       Victor?

4   A   I think so.

5   Q   You're not sure?

6   A   No, I'm not sure.  I was focused on him.

7   Q   Okay.  You know if this elderly woman gave Sergeant

8       Cattaneo permission to open the door go into the

9       residence?

10  A   Not that I heard.

11  Q   Okay.  You saw, when you came into the residence you

12      had already seen the elderly woman on the floor, you

13      didn't see how she got on the floor, right?

14  A   No.

15  Q   Okay.  Did you see, what was Sergeant Cattaneo doing

16      with the woman while she was on the floor, was he

17      holding her down?

18  A   No, if I recall I think he was telling her to calm

19      down.

20  Q   Telling her to calm down.  What was the female officer

21      doing?

22  A   I couldn't tell you.

23  Q   Okay.  Did you observe the female officer put her knee

24      on this elderly woman's head at any time to get her to

25      say I guess, let me rephrase that.  Did you see the

1      female officer put her knee on the elderly woman's head

2      at any time while she's on the floor?

3  A  No.

4  Q  Okay.  When she's on the floor for that period of time

5      until you walked out with Victor, was she still on the

6      floor when you were walking out with Victor that entire

7      period of time?

8  A  Yes.

9  Q  Did she eventually leave the residence?

10  A  Yes.

11  Q  How did she leave the residence?

12  A  They called for an ambulance.

13  Q  Who called for the ambulance, the Sterling Heights

14      officers?

15  A  I imagine.

16  Q  Okay.  You weren't there when she made that call,

17      correct?

18  A  I can't remember.

19  Q  Okay.  You didn't see what transpired with this elderly

20      woman on the floor after you left with Victor?

21  A  No, I know the ambulance came, the fire department

22      came.

23  Q  How long from the time that you walked out of the

24      residence to speak to Victor until the ambulance

25      arrived, how much time had elapsed?

```
1    A    A couple minutes.

2    Q    A couple minutes?

3    A    If that.

4    Q    And you didn't see what was going on between these

5         officers and this elderly woman after, during this

6         couple minutes after you left the residence with

7         Victor, right?

8    A    No, I was outside.

9    Q    Your focus was on Victor?

10   A    I was outside with Victor.

11   Q    Okay.  When she was on the floor did she change

12        positions, you said she was on her left side, did she

13        change positions at all?

14   A    I couldn't tell you.

15   Q    Okay.  Did she complain of any injuries while she was

16        on the floor?

17   A    No, she was, all I heard was screaming at us.

18   Q    Screaming at you, okay.  She didn't make any complaints

19        about any of her extremities, right?

20   A    I didn't hear anything, no.

21   Q    Did she complain about any chest pains or any heart

22        palpitations or anything like that?

23   A    Not that I recall.

24   Q    Other than what you described at the door when you

25        claimed she pushed Sergeant Cattaneo, did you see this
```

```
 1        elderly woman strike any of the other officers?

 2   A    No.

 3   Q    Okay.  When you left with Victor did all three officers

 4        remain in the residence or did any of them leave while

 5        you walked out with Victor?

 6   A    I can't remember.  I don't recall.

 7   Q    Did you remove any evidence or anything from the

 8        residence?

 9   A    No, videotape after.

10   Q    Did you remove it?

11   A    Victor gave it to me.

12   Q    Victor gave it to you?

13   A    Yes.

14   Q    When did he give it to you?

15   A    I asked him what the cameras were for he explained what

16        they were for, I said were you taping this, I said

17        could I have it, he goes, he took it out of the VCR and

18        gave it to me.

19   Q    Okay.  Did you see him take it out of the VCR?

20   A    Yes.

21   Q    Was this after this elderly woman was taken out by the

22        ambulance and I presume transported to the hospital?

23   A    I think so.

24   Q    Okay.

25   A    I can't recall.  I'm not sure.
```

Page 41

1    Q    It was the same day, right?

2    A    It was the same --

3    Q    Within --

4    A    Within that incident.

5    Q    Okay.  Okay.  What did you do with the tape?

6    A    I turned it over to the Sterling Heights Police.

7    Q    Okay.  You know who you gave it to?

8    A    One of the officers there.

9    Q    Okay.  Okay.  So I understand you correctly you asked

10        for the tape and Victor pulled it out of the machine

11        and gave it to you?

12   A    Yes.

13   Q    Where was the, this videotape located, if you know?

14   A    It was in one of the bedrooms?

15   Q    Okay.  So you had to walk further back into the house?

16   A    After I asked him I said where is it he said it's in

17        here he took me back there showed it to me.

18   Q    Okay.  When you walked in, let's back up for a few

19        minutes.  When you walked in and you're with the other

20        officers and this woman's on her side, did you do a

21        sweep of the house?

22   A    Did we do a sweep of the house?

23   Q    Yes.

24   A    Because we got in and he came around like that.

25   Q    Okay.  But did anybody look around the house to see if

1      there were weapons in the house like, well, a gun in

2      the house?

3   A   We didn't do a search, no.

4   Q   Okay.  Was there a search done at any time that you

5      were present in the house?

6   A   No.

7   Q   When you left with Victor, got the videotape, was there

8      any search done of the house?

9   A   No.

10  Q   Okay.  Ever been sued before?

11  A   No, sir.

12  Q   Ever been disciplined by your department?

13  A   I got a poo poo letter in my file.

14  Q   What is a poo poo letter?

15  A   I got, it's out of my file, it's out of my file jacket.

16      I played a practical joke on an officer I got a poo poo

17      letter we call it.

18  Q   Very good.  I just want to back up a few questions.

19      You said that you saw that exhibit three the report,

20      who's that prepared by?

21  A   Officer Hill.

22  Q   Hill, that's right.  You saw that and you saw the

23      vehicle being registered to a woman?

24  A   Uh huh.

25  Q   Did you do any other background check?

1    A    If I remember I did.  I ran everybody listed at that

2         address and Victor's name came up.

3    Q    How did it come up, did he have any prior criminal

4         record or anything like that?

5    A    I can't recall.

6    Q    Could you have sent a letter to Victor to come in for

7         an interview in connection with this?

8    A    I could have.

9    Q    Okay.  Why didn't do you that?

10   A    Because I got the report on my desk that's how I do, I

11        try to get things opened and closed as quick as

12        possible and help out the citizens.

13   Q    Okay.  Detective, I'm handing you exhibit number two.

14        First of all, detective, would you acknowledge there's

15        nine pages contained within the exhibit?

16   A    Yes.

17   Q    And this is Answers to Interrogatories that were,

18        actually you know what can we go off the record.

19

20                (WHEREUPON AN OFF THE RECORD DISCUSSION WAS

21                 HAD.)

22

23

24

25

1    Q    (Continuing by Mr. McQueeney)   Thank you, Mr. Martin,

2         for being such a good and proper host and giving me the

3         signed page of Detective Melise.   Okay.   Detective, I'm

4         going to ask you a couple questions off your

5         Interrogatories.   These answers that you've provided

6         you've read over your answers, correct?

7    A    Yes.

8    Q    And now we have a signed page that all the answers are

9         true to the best of your knowledge, information and

10        belief, right?

11    A    Yes.

12    Q    And you saw all, you had an opportunity to review all

13        the answers prior to you signing it, correct?

14    A    Uh huh.

15    Q    Okay.

16    A    Yes, I'm sorry.

17    Q    Okay.   Okay.   Detective, turn to page eight and

18        paragraph 21, you see that, number 21?

19    A    Yes.

20    Q    Did you do anything to stop Officer Fett and Sergeant

21        Cattaneo from bringing Miss Perovich to the floor while

22        she was in her residence on October 30, 2007, you see

23        that?

24    A    Yes.

25    Q    Okay.   Your answer is from what I saw she tripped over

1     the landing?

2  A  Uh huh.

3  Q  Is that a yes?

4  A  Yes, I'm sorry.

5  Q  Okay.  Did you actually see that or did you see her on

6     the floor?

7  A  I saw her on the floor.

8  Q  You saw her on the floor, okay.  I'm handing you

9     Plaintiff's exhibit eight.  Detective, I've handed you

10    Plaintiff's exhibit eight.  First of all, let's

11    acknowledge that there are eight pages to the exhibit?

12  A  Okay.

13  Q  Okay.  Look at the first two, well, first of all, these

14    appear to be a set of pictures?

15  A  That's what they appear to be.

16  Q  Okay.  Look at the first three pages of the exhibit?

17  A  Okay.

18  Q  You seen them.  Does this look like the woman that was

19    on the floor that you saw, the elderly woman?

20  A  You know to be truthfully I couldn't tell you.

21  Q  Okay.  All right.  And you testified before you don't

22    know if she complained of any injuries to her arms or

23    extremities at all?

24  A  No, not that I recall.

25  Q  Do you know if that woman on the floor made any

1        complaint about her hands or her back or anything?

2    A   No, not that I recall.

3    Q   I'm giving you Plaintiff's exhibit number one.  First

4        of all, would you acknowledge this is two pages?

5    A   Yes.

6    Q   Okay.  This was graciously provided to me by your, one

7        of your lawyers there Pete Peacock.

8            MR. KASZUBSKI:  Are you saying he never

9        follows through.

10           MR. MCQUEENEY:  We have to leave the good

11       stuff to John over here.

12   Q   (Continuing by Mr. McQueeney)  Detective, have you ever

13       seen this before?

14   A   Yes.

15   Q   Okay.  Is this I guess it says at the top job

16       description for detective?

17   A   Yes.

18   Q   It lists duties and responsibilities of detectives for

19       the Clinton Township Police Department?

20   A   Yes.

21   Q   Okay.  On the second page it says, investigate serious

22       crimes, complaints and violations of the law.  In this

23       instance when you were investigating defrauding the

24       innkeeper you were investigating a complaint or a

25       violation of the law?

Page 47

1   A   Yes.

2   Q   Okay.  Was Mr. Gojcaj ever charged with the offense of

3       violating an innkeeper?

4   A   No, he went and paid.

5   Q   He went and paid?

6   A   Uh huh.

7   Q   Okay.  Did you receive information that he went and

8       paid?

9   A   Yes.

10  Q   Okay.  I think we're going to take a break for a minute

11      I'm going to show the video.

12

13          (WHEREUPON AN OFF THE RECORD DISCUSSION WAS

14              HAD.)

15

16          MR. MCQUEENEY:  Detective, we're going to

17      show you parts of a videotape that was seized in this

18      case then we'll ask you a few questions after you've

19      had an opportunity to see the videotape.

20

21          (WHEREUPON THE VIDEOTAPE WAS PLAYED)

22

23

24

25

```
 1              MR. MARTIN:    Detective, is that you standing

 2        at the front door?

 3    A   Unfortunately, yes.

 4    Q   (Continuing by Mr. McQueeney)   Okay.   Detective, did

 5        you have an opportunity to see the videotape?

 6    A   Yes.

 7    Q   Okay.   Is that the videotape that was taken, given to

 8        you?

 9    A   I imagine, I've never viewed it.

10    Q   Was that you that entered the residence?

11    A   That was me.

12    Q   Okay.   And you saw two other officers enter before you,

13        right?

14    A   Yes.

15    Q   Okay.   And you couldn't see on that tape that the two

16        pushes you described when you testified earlier, right?

17    A   Right.

18    Q   Okay.   And all four of the officers you saw enter the

19        residence, right?

20    A   Yes.

21    Q   Okay.   And you didn't, at least I couldn't I'm asking

22        you, could you hear that, any of the officers say that

23        they had been assaulted by this elderly woman?

24    A   I don't recall if I did or not.

25    Q   You want us to replay it?
```

1    A    I heard the sergeant or one of the officers asking her

2         you got to be crazy what are you doing.

3    Q    Did you hear any of the officers say that they had been

4         assaulted or pushed or shoved?

5    A    No, they didn't come out and say it.

6    Q    Okay.  And I saw that, was that you that was showing

7         the badge?

8    A    Yes.

9    Q    Okay.  The woman that you don't know her name

10        questioned whether in deed you were a law enforcement

11        officer?

12   A    Yes.

13   Q    Okay.  You heard what was said on the video

14        transmission, the audio portion that the elderly, did

15        you hear the elderly woman saying I'm going to go get

16        my freaking gun and get you off my premises?

17   A    Yes.

18   Q    You didn't hear she threatened to shoot you or the

19        other officers?

20   A    That is a threat, we take that as a threat.

21   Q    You take that as a threat?

22   A    Yes.

23   Q    You didn't have any knowledge of her capability of

24        carrying out that threat, right?

25   A    No, didn't know if she could or couldn't.

1   Q   Clearly you could have stepped back and left the

2        premises, correct?

3   A   Yes.

4   Q   And perhaps obtained a warrant on a later day, correct?

5   A   A warrant for what?

6   Q   In experience you could have contacted Victor through a

7        letter or some other communication and had him come to

8        the station, correct?

9   A   Yes.

10   Q   And that was not an option at that point, right?

11   A   For me?

12   Q   Right.

13   A   It could have been an option but it wasn't an option at

14        that point.

15   Q   Okay.  Did you advise this elderly woman that we're

16        taking the vehicle because it was used in the

17        commission of a crime?

18   A   I can't recall exactly what I told her but I wanted to

19        talk to her son, if I didn't talk to her son I was

20        going to take the vehicle.

21   Q   Okay.  And was the purpose for taking the vehicle

22        because she didn't want to produce her son?

23   A   I wanted her son to come talk to me.

24   Q   Okay.  Had she produced her son would you have not

25        threatened to take her vehicle?

Page 51

1   A   Right.

2   Q   Okay.  You using the vehicle to get her to produce the

3       son?

4   A   Right.

5   Q   Okay.  Just a few more questions, detective.  When you

6       said that this woman was on her left side on the floor,

7       and you saw another officer hold his taser at Victor

8       and you were watching Victor come around, what were the

9       other two officers doing?

10  A   I couldn't tell you.  I had my eyes on Victor coming

11      out.

12  Q   Was Victor near this elderly woman that was on the

13      floor when he came out of this back bedroom?

14  A   The living room wasn't very big.

15  Q   Okay.

16  A   She would have been behind us.

17  Q   She would have been behind you?

18  A   To the left behind us.

19  Q   Okay.  And she was on the floor as you say screaming at

20      you, at all of you, okay?

21  A   Yes.

22  Q   Do you recall what she was saying?

23  A   No, I can't recall.

24          MR. MCQUEENEY:  That's all I got.

25

1                          EXAMINATION

2

3        BY MR. KASZUBSKI:

4    Q   Detective, I just have a couple questions real quick.

5        Mr. McQueeney asked you the question about whether or

6        not you could have left and gone and sent a letter?

7    A   Yes.

8    Q   Is it your routine practice as a police officer when

9        somebody makes a threat to just leave the scene?

10   A   Not in that close proximity, no.

11   Q   When somebody says they're going to get a gun is it

12       ever police procedure to turn your back on them and

13       walk back to your car?

14   A   No.

15   Q   In fact wouldn't you when somebody has threatened to

16       get a gun at that point would you believe you have

17       somewhat of exigent circumstance to stop them from

18       carrying out that threat?

19   A   Yes.

20   Q   In that case you thought she threatened to get a gun --

21   A   Yes.

22   Q   And shoot you is what you thought at the time?

23   A   Yes.

24   Q   Yes?

25   A   Yes.

Page 53

1   Q   Okay.  She speaks with broken English?

2   A   Yes.

3   Q   Hard to understand?

4   A   Yes.

5   Q   You had no problem hearing she was getting her gun,

6       right?

7   A   Gun came out.

8   Q   Okay.  The next question I have I guess, you don't know

9       what's behind that door, do you?

10   A   No.

11   Q   You don't know if she's got a shot gun to the left or

12      hand gun on the counter in the back, right?

13   A   It's all possible.

14   Q   As it stands you thought it was a credible threat?

15   A   Yes.

16   Q   You went into that house for officer safety because you

17      thought it was a threat?

18   A   Yes.

19   Q   The videotape that you just saw does that capture

20      everything that you saw?

21   A   No.

22   Q   In fact at some point you see Officer Cattaneo you only

23      see parts of him for instance?

24   A   You don't see the other officer, no.

25   Q   You don't see all of her actions on the tape either?

Page 54

1    A    No.

2    Q    Can you tell me as you sit here today, do you actually

3         recall whether she stepped out at all on the porch or

4         was in the threshold?

5    A    She might have stepped out on the porch, I can't

6         recall.

7    Q    The video doesn't show?

8    A    No.

9    Q    You see her hands flailing pretty close to Officer

10        Cattaneo?

11   A    Yes.

12   Q    With the door open?

13   A    Yes.

14   Q    Then the video you don't see whether the door closes

15        completely, do you?

16   A    The screen door?

17   Q    Yes.

18   A    No, I don't see that.

19   Q    Do you recall whether Officer Cattaneo may have stopped

20        it from closing completely?

21   A    I don't think he let it close, I think they stopped it

22        from closing.

23   Q    As that point she was trying to go back into her house,

24        is that correct?

25   A    I didn't see her turn but she was --

1    Q    Retreating back into the house?

2    A    Yes.

3    Q    When you said she fell on her left side she was

4         yelling, you made a motion Mr. McQueeney didn't put it

5         on the record, she was shaking her arm up in the air?

6    A    Yeah, yelling at us.

7    Q    Flailing her arms around?

8    A    Yes.

9    Q    All at the same time she was yelling?

10   A    Yes.

11   Q    Did you do a protective sweep of the area when you

12        walked in to make sure there were no weapons?

13   A    We walked in all the sudden the son came through so

14        that was, we got him, you know, detained for a second.

15   Q    Okay.  Did you look around to see if there were any

16        weapons in your immediate area?

17   A    I didn't, no.

18   Q    Do you know if any of the officers from Sterling did?

19   A    I didn't see, I was with Victor.

20   Q    You were outside with Victor?

21   A    Yes.

22   Q    You don't know whether they actually looked around

23        anything of that nature?

24   A    No.

25   Q    You didn't, I think you testified you didn't see how it

1      was that Miss Perovich made it to the ground?

2   A  No.

3   Q  Okay.

4           MR. MCQUEENEY:  I don't think he identified

5      her as Miss Perovich, he said elderly lady, I don't

6      think he knows her name.

7   Q  (Continuing by Mr. Kaszubski)  The owner of the home.

8   A  The lady, I didn't see how she went down.

9   Q  I will represent to you it's Miss Perovich?

10   A  Okay.

11   Q  She's the one that filed the lawsuit.

12   A  I agree.

13   Q  Miss Perovich when she was in, you didn't see how Miss

14      Perovich got to the ground, correct?

15   A  No.

16   Q  Did you ever hear any of the officers say that she

17      dropped dead weight?

18   A  No, I didn't hear.

19   Q  Did you hear the officer say you must be crazy, lady

20      you must be crazy?

21   A  Yes.

22   Q  It appears they were surprised that she went to the

23      ground?

24   A  Yes.

25   Q  That is the reaction you took?

Page 57

```
 1    A    Yeah.

 2               MR. KASZUBSKI:  That's all I have, thank you.

 3

 4                         EXAMINATION

 5

 6    BY MR. MARTIN:

 7    Q    Just a couple questions, officer.  You never placed

 8         your hands on this elderly lady at all at the scene,

 9         did you?

10    A    No.

11    Q    You never observed any other officer either strike,

12         kick or hit this woman or place their knees on any part

13         of her body, did you?

14    A    No.

15    Q    In fact your focus wasn't always on her at the scene,

16         was it?

17    A    No.

18    Q    For instance, once you were inside the home you

19         mentioned about her son coming out of a back room and

20         your attention was focused on him, correct?

21    A    Yes.

22    Q    And while your attention was focused on him you

23         wouldn't necessarily known what was said between the

24         woman and the other officers and or what interaction

25         occurred, would you?
```

1   A   As soon as he came in my attention went straight to

2       Victor.

3   Q   Okay.  Is my statement accurate then?

4   A   Yes.

5   Q   And you never gave any instructions to anyone as to how

6       the lady was to be handled, correct?

7   A   No.

8   Q   And in fact you really are not in authority to do that

9       because you were in a different jurisdiction than that

10      which you worked for, correct?

11  A   Right.

12  Q   As far as the taking of the vehicle that's been

13      discussed today, while you mentioned that you used the

14      vehicle if you could in order to get the woman to

15      produce her son to talk to you.  The fact is under the

16      law you had the authority to take this vehicle that was

17      involved in the earlier crime, correct?

18  A   Yes, I did.

19  Q   Okay.  You never observed any of these officers abuse

20      this woman in any way, did you?

21  A   No.

22  Q   You never heard any of the officers threaten to beat

23      her up?

24  A   No.

25  Q   Or injure her, did you?

1   A   No.

2   Q   And just so we're clear, it's my understanding from

3        your earlier testimony you never observed any injuries

4        to this woman?

5   A   No.

6   Q   One minute here.  And again your purpose for going to

7        this home in Sterling Heights was to talk to the

8        gentleman who had been involved in the dash and dine,

9        if you will, the day earlier at the P.F. Chang

10       restaurant, correct?

11   A   Yes.

12   Q   That was based on the report that was prepared by an

13       officer from your department, correct?

14   A   Yes.

15   Q   In that report they identified in a general sense the

16       person involved, correct?

17   A   Gave a description.

18   Q   Correct.  And they also gave a license plate on the

19       vehicle, correct?

20   A   Yes.

21   Q   And the type of vehicle, correct?

22   A   Yes.

23   Q   When you went to the home the next day on Penny Street

24       in Sterling Heights, in fact the vehicle mentioned in

25       that earlier report was parked at the Penny address?

1    A    Right.

2    Q    And when you spoke to this gentleman at this Penny

3         address the day you went there with the Sterling

4         Heights Police he in fact told you or admitted to you

5         he hadn't paid the money, correct?

6    A    That's right.

7    Q    Didn't there come a point when he offered the money to

8         pay?

9    A    Yes, he would have to go back to P.F. Chang to pay for

10        it.

11   Q    He did that?

12   A    Yes.

13   Q    You verified that by calling the people at P.F. Chang?

14   A    Yes, I did.

15               MR. MARTIN:   Thank you very much.

16

17

18

19

20

21

22

23

24

25

Page 61

1                        RE EXAMINATION

2

3        BY MR. MCQUEENEY:

4    Q   Detective, I have some questions as a result of these

5        follow-up questions.  You testified that it's not good

6        police procedure to leave when you're threatened with a

7        gun, is that what you testified to --

8    A   Yes.

9    Q   In response to Mr. Kaszubski's questioning.  Is it not,

10       is it good police procedure under the threat of a gun

11       to go into a residence not knowing whether there's a

12       gun in there or not?

13   A   You try to eliminate the threat, to stop the threat.

14   Q   Do you know who's present in the residence?

15   A   You never do.

16   Q   You have a videotape showing the outside of the

17       residence, right?

18   A   Yes.

19   Q   You saw that.  Okay.  So you have an elderly woman and

20       she's going to threaten to go get a gun and aren't you

21       not putting yourself in harms way by going into her

22       residence not knowing if there is anybody else, an

23       armed person in there?

24   A   We do that daily but it would be more of a threat if we

25       turned our backs walked back to our car and she had a

```
 1        gun and came out blasting.

 2   Q    You could have moved off to the side of the house so if

 3        she's got the gun, correct?

 4   A    We could have done a lot of things, right.

 5   Q    Could have called the swat team, correct?

 6   A    Right.

 7   Q    None of that was done, right?

 8   A    No.

 9   Q    Okay.  You thought it was a credible threat but you

10        didn't see nor did you ever learn that anybody did a

11        protective sweep of the residence, correct?

12             MR. KASZUBSKI:  Objection, mischaracterizes

13        his testimony.  Go ahead.

14             MR. MCQUEENEY:  You can answer.

15   A    I didn't hear.

16             MR. MCQUEENEY:  He made an objection.

17             MR. KASZUBSKI:  I made an objection.

18   A    Okay.  I was with Victor, I didn't see, I wasn't in

19        there all the time.  I was outside with Victor.

20   Q    (Continuing by Mr. McQueeney)  You went outside with

21        Victor, did anybody come up to you and tell you that

22        they conducted a protective sweep of the residence?

23   A    No.

24   Q    You didn't do what you basically had --

25   A    Had Victor.
```

Page 63

1    Q    Okay.  You testified that you think the elderly woman

2         Miss Perovich stepped out on to the porch, did you see

3         in that videotape that she stepped out on to the porch?

4    A    You couldn't see if she did or not.

5    Q    Okay.  When you say she might have stepped out on the

6         porch, am I misstating your testimony or you just don't

7         know?

8    A    I don't know.

9    Q    Okay.  You said that Sergeant Cattaneo stopped the door

10        from closing, right?

11   A    I think so.

12   Q    Was that the screen door?

13   A    Yes.

14   Q    Okay.  When he stopped the door from closing, what was

15        this elderly woman doing?

16   A    I couldn't tell you.  I was, I didn't see it.

17             MR. MCQUEENEY:   Nothing else.

18             MR. KASZUBSKI:   Nothing else.

19             MR. MARTIN:  We're good.

20

21   (WHEREUPON THE DEPOSITION WAS CONCLUDED AT 4:45 P.M.)

22

23

24

25

CERTIFICATE

STATE OF MICHIGAN

COUNTY OF MACOMB

            I, Mary Di Santo, C.S.R. and Notary Public in and for the County of Macomb, State of Michigan, do hereby certify that the witness whose attached deposition was taken before me on the date hereinbefore stated, was first duly sworn by the Notary Public to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony contained in said deposition then given by said witness was by me reduced to writing in the presence of said witness by means of shorthand and afterwards transcribed upon a computer by myself.  The said deposition is a true and correct transcript of the testimony given by said witness as aforesaid.

            I do further certify that the deposition herein attached was taken at the time and place mentioned and described in the caption of said deposition.

            I do further certify that no request was made by any party for the witness' signature to be attached to said deposition.

            I do further certify that the parties were represented by counsel as hereinbefore designated.

            I do further certify that I am not connected by blood or marriage with any of the parties or their attorneys or agents and that I am not an employee of either of them, nor interested

1   directly or indirectly in the matters of controversy either as counsel,

2   agent or otherwise.

3               I do further certify that my certificate annexed

4   hereto implies to the original and typewritten copies only, signed

5   and certified transcripts only.  The undersigned assumes no

6   responsibility for the accuracy of any reproduced copies not made

7   under my control or direction.

8

9

10          Mary Di Santo, CSR - 3169
            Notary Public, Macomb County
11          My Commission Expires: 02-17-2013

14  DATED: _____, 2010
            Mt. Clemens, Michigan
15

16

17

18

19

20

21

22

23

24

25