UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

THE ESTATE OF MARIA PEROVICH,

VICTOR GOJCAJ,

      Plaintiffs,

    -vs-           Case No:  2:09-CV-12192

STERLING HEIGHTS POLICE OFFICER

ANTOINETTE FETT, STERLING HEIGHTS

POLICE SERGEANT DAVID CATTANEO,

STERLING HEIGHTS POLICE OFFICER

AARON BURGESS AND CLINTON TOWNSHIP

POLICE DETECTIVE LEO MELISE,

      Defendants.

_____/

        The deposition of AARON BURGESS was taken before Patricia A. Everett, CSR-4602, a Certified Shorthand Reporter and Notary Public in and for Oakland County, Michigan, (acting in Macomb County, Michigan), at 12900 Hall Road, Suite 350, Sterling Heights, Michigan, on the 7th day of July, 2010, commencing at 4:33 p.m., pursuant to the applicable Court Rules.

```
 1    APPEARANCES:

 2    LAW OFFICES OF PATRICK J. McQUEENEY

 3         33830 Harper Avenue

 4         Clinton Township, Michigan   48035

 5         (586) 774-6363

 6         For the Plaintiff

 7         BY:  MR. PATRICK J. McQUEENEY (P45797)

 8    O'REILLY RANCILIO, P.C.

 9         12900 Hall Road, Suite 350

10         Sterling Heights, Michigan   48313

11         (586) 726-1000

12         For the Defendants Cattaneo, Burgess and Fett

13         BY:  MR. MARC D. KASZUBSKI (P60333)

14    PLUNKETT COONEY

15         10 South Main Street, Suite 400

16         Mount Clemens, Michigan   48043

17         (586) 466-7605

18         For the Defendant Melise

19         BY:  MR. PETER PEACOCK (P37201)

20    ALSO PRESENT:  Mr. Lee Coppage

21

22

23

24

25
```

1                          I N D E X

2                                                    PAGE

3    Examination by Mr. McQueeney                     4

4

5

6                      E X H I B I T S

7                                            MARKED FOR

8    DESIGNATION                             IDENTIFICATION

9    Deposition Exhibit Nos. 1 - 7                    4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1        Sterling Heights, Michigan

2        Wednesday, July 7, 2010

3        At or about 4:33 p.m.

4              -        -        -

5        (At 4:33 p.m. Deposition Exhibit Nos.

6        1 through 7 marked for identification)

7                A A R O N     B U R G E S S,

8    having first been duly sworn, was examined and testified

9    on his oath as follows:

10               MR. McQUEENEY:  Let the record

11   reflect this is the deposition of Aaron Burgess, taken in

12   the case of Victor Gojcaj and the estate of Marie

13   Perovich versus Aaron Burgess et al.  This deposition is

14   taken pursuant to the Federal Rules of Evidence and the

15   Federal Rules of Civil Procedure.

16                        EXAMINATION

17   BY MR. McQUEENEY:

18   Q    Officer Burgess, I introduced myself off the record.  My

19        name is Patrick McQueeney.  I represent the plaintiffs in

20        this matter.  I'm going to be asking you a series of

21        questions.  The questions have to be answered clearly,

22        you have to enunciate all your answers, no shrugging of

23        the shoulders, nodding of the head, no huh-uh, uh-huh,

24        that sort of thing.

25               Everything that the court reporter is

1    taking down now will be taken down in your answers to my

2    questions.  If you answer the question, I'll presume you

3    understood the question.  If you need the question

4    rephrased, please advise me to rephrase the question.

5    I'll do the best I can to rephrase it.  I'm asking you

6    questions not to embarrass you.  This is a discovery

7    phase of this case.  We're going to ask you questions to

8    get some background and some information regarding this

9    case, okay?

10   A    Yes.

11   Q    State your full name for the record.

12   A    Aaron Burgess.

13   Q    And how old are you?

14   A    I'm forty-five.

15   Q    Okay.  And how far did you go in school?

16   A    I have sixty-nine credits of college.

17   Q    Where did you go to college?

18   A    Delta College and Henry Ford Community College.

19   Q    Delta College?

20   A    Up by Bay City.

21   Q    Animal House?

22                  MR. KASZUBSKI:  That was Delta House.

23   That's completely different and --

24                  THE WITNESS:  I missed all that.

25                  MR. McQUEENEY:  Very good.

1       BY MR. McQUEENEY, CONTINUING:

2   Q    Okay.  You said you have sixty-nine credits?

3   A    Yeah, I believe it's sixty-nine.

4   Q    Okay.  Other than Delta College, any other education, any

5      other -- other than high school, any other degrees or

6      certificates that you've obtained?

7   A    I've got several certificates through police -- various

8      police trainings, Detroit Police Academy.

9   Q    Okay.  I've been provided an abundance of documentation

10     from your esteemed counsel.  Is that what you're

11     referencing, all the certificates that were provided

12     through discovery?

13   A   As far as I know, yes.

14   Q   Okay.  You're currently employed with the Sterling

15     Heights Police Department?

16   A   Yes.

17   Q   And what is your rank?

18   A   I'm a sergeant.

19   Q   How long have you been a sergeant?

20   A   Two and a half years.

21   Q   Okay.  Prior to becoming a sergeant, what was your

22     position in the department?

23   A   I was an officer.

24   Q   And how long were you an officer?

25   A   Since December 7th, 1995.

```
 1   Q    Okay.  Any other prior police enforcement work?

 2   A    Yeah.  I worked for the Detroit Police Department and

 3        also for the Wayne County Sheriff's Department.

 4   Q    When did you work for DPD?

 5   A    Exact years, what was it, '92, '93 to '95 and from '89

 6        until about '92, I believe, for Wayne County.

 7   Q    Okay.

 8   A    About two and a half years for each, I'm sorry.

 9   Q    Sure.  Why did you leave Wayne County?

10   A    Originally I moved down here to work for the Detroit

11        Police Department.  Unfortunately, Detroit had laid off

12        five hundred police officers, just as I was about to join

13        the academy.  So Wayne County was hiring and I worked for

14        them.

15   Q    Okay.

16   A    I put myself through the police academy at night -- or,

17        I'm sorry, during the day and I worked all night long up

18        in the jails.

19   Q    Okay.  So you were assigned to the jail, in the Wayne

20        County Jail?

21   A    Yes.

22   Q    And no other positions within Wayne County?

23   A    Oh, no.  Once I got certified I did prisoner transport,

24        guarding prisoners at the hospital.

25   Q    Okay.
```

```
 1   A   Things like that.

 2   Q   Okay.  And then you joined DPD sometime in '92 or '93?

 3   A   Yeah.

 4   Q   Okay.  What position -- position or positions did you

 5       hold in -- with the Detroit Police Department?

 6   A   I was an officer.

 7   Q   Okay.

 8   A   I did a variety of different tasks, from bicycle patrol,

 9       mountain bike, I worked 30 series, which is the plain

10       clothes unit, the dive time and rappel team.

11   Q   Okay.  Okay.  Why did you leave Detroit Police

12       Department?

13   A   Honestly, my wife got tired of picking me up in the

14       emergency room, so ....

15   Q   Oh, okay.

16   A   When I started looking around for good departments,

17       Sterling Heights was highly recommended.

18   Q   Okay.  And other than what you testified to at the Wayne

19       County Sheriff, Detroit Police Department and Sterling

20       Heights Police Department, any other law enforcement

21       agencies that you've been employed by?

22   A   Unless you want to count the Bay County Reserves up in

23       Bay County.

24   Q   Okay.

25   A   I did a few years up there working with them while I was
```

Page 9

1        going to college.

2    Q   While you were going to college?

3    A   Yeah.  I would have to actually pull a resume to tell you

4        what years but ....

5    Q   Okay.  Was that a full-time position?

6    A   Oh, no, no, that was a volunteer.  That was a reserve

7        position up there.

8    Q   Okay.

9    A   Just seeing if that is the line of work I would like to

10       do.

11   Q   All right.  Very good.  Any discipline -- any discipline

12       taken against you while you've been an officer or

13       sergeant in the Sterling Heights Police Department?

14   A   No.

15   Q   Okay.  How about any prior disciplines while in the

16       Detroit Police Department or the Wayne County Sheriff's

17       Department?

18   A   None at all.

19   Q   Okay.

20                   MR. McQUEENEY:  You probably have

21       this, Marc.

22                   MR. KASZUBSKI:  I'm certain I have.

23   BY MR. McQUEENEY, CONTINUING:

24   Q   Sergeant, I'm handing you what is Plaintiff's Exhibit No.

25       1.  First of all, would you acknowledge that the exhibit

```
 1        contains seven pages?

 2   A    Yes, it does have seven pages.

 3   Q    Okay.  And this appears to be -- what is this, an

 4        incident report, a police report of some nature?

 5   A    Yes, sir.

 6   Q    Okay.  And the last page of the exhibit is a property

 7        record -- property report?

 8   A    Yes, sir.

 9   Q    Okay.  And it looks like there are three narrative

10        reports, one from yourself; right?  One from yourself as

11        Officer Burgess; correct?

12   A    Oh, yep.  I'm sorry, yep.

13   Q    And then there's corresponding reports with Officer Fett

14        and Sergeant Cattaneo?

15   A    Yes.

16   Q    Okay.  Do you recall being dispatched to an address on

17        Penny in Sterling Heights back on October 30th, 2007?

18   A    Yes.  Just to clarify, though, I just showed up.  I

19        overheard the run so I just made the -- I made it as a

20        backup officer.

21   Q    Okay.  What do you mean you overheard the run?

22   A    Well, when they broadcast it I wasn't too far away.  I

23        was waiting for DARE classes to start.  I was a DARE

24        officer at the time.

25   Q    Okay.
```

Page 11

1    A    And I made the run.

2    Q    Okay.  So nobody radioed to show up as backup, you just

3         heard the radio transmissions and responded because you

4         were in the area?

5    A    Yes, sir.

6    Q    Okay.  And do you know what time you arrived on that day?

7    A    I don't recall the exact time.

8    Q    If you need to refer to your report --

9    A    It says in here at approximately 0930 hours, 9:30 a.m.

10   Q    Okay.  And was this a private dwelling?

11   A    Yes, sir.

12   Q    Okay.  Was this -- well, describe the private dwelling.

13        Was it a ranch, colonial, bungalow?

14   A    Single story dwelling, partial brick.

15   Q    And when you arrived there was anybody else present?

16   A    Yes, sir.  Sergeant Cattaneo from the Sterling Heights

17        Police Department, Officer Antoinette Fett was there, and

18        a detective from the Clinton Township Police Department.

19   Q    Okay.  So you were the last one to arrive?

20   A    Yes, sir.

21   Q    Were you in a marked unit?

22   A    Yes, sir, I was.

23   Q    Were you in the -- I guess a police officer uniform at

24        the time like you are today?

25   A    Not in the -- this is the bike patrol uniform.

1   Q   Okay.

2   A   I was actually in a class A uniform.

3   Q   What's a class A uniform?

4   A   That's the polyester wool blend uniform, winter wear.

5       It's a tie.

6   Q   Okay.

7   A   Long sleeves.

8   Q   Right.  And were the other officers in this class A

9       uniform Sergeant Cattaneo and Officer Fett?

10  A   Yes, they were in uniform.

11  Q   And how about Detective Melise, was he in any uniform of

12      any nature?

13  A   No, plain clothes with a badge out.

14  Q   Okay.  And where was the badge, if you know?  Did you

15      notice?

16  A   If I recall correctly, I believe it was on his belt.

17  Q   On his belt?

18  A   I believe so, yes.

19  Q   Okay.  And how -- did you have any conversations with --

20      with Detective Melise or any of the officers from

21      Sterling Heights before you entered the residence?

22  A   I'm sorry, any --

23  Q   Did you have any discussion about why the other officers

24      were there?

25  A   Detective Melise was just explaining to Sergeant Cattaneo

1    that I could overhear that he was there on a fail to pay,

2    some something about food or something like that.

3  Q  Defrauding an innkeeper?

4  A  Something like that, yes.

5  Q  Okay.

6              MR. McQUEENEY:  That's 4.

7    BY MR. McQUEENEY, CONTINUING:

8  Q  Sergeant, I'm handing you Plaintiff's Exhibit 4.  First

9    of all, would you acknowledge it is three pages, sir?

10  A  Yes, I have a report with three pages.

11  Q  Okay.  Understanding that you didn't author this report,

12    at the very top of the first page does it say "defrauding

13    an innkeeper"?

14  A  Yes, it does.

15  Q  Okay.  Is that what you were talking about with Detective

16    Melise when you came up to the residence?

17  A  Yes, I believe so.

18  Q  Okay.  Did he describe anything other than a failure to

19    pay, anything other than that?

20  A  I don't recall anything else.

21  Q  Okay.  Did you have any background as to who lived in the

22    residence prior to your arrival there?

23  A  No, I did not know who lived there.

24  Q  Okay.  Did you contact dispatch to get -- to obtain any

25    information prior to going into the residence?

1    A    I don't believe I contacted dispatch, no.

2    Q    Do you know if Sergeant Cattaneo or Officer Fett made any

3         radio dispatch to ascertain who lived in the residence?

4    A    I know Sergeant -- I believe it was Sergeant Cattaneo --

5         I believe it was Sergeant Cattaneo, because dispatch had

6         advised that they were on the phone with a female caller

7         from inside.

8    Q    Okay.

9    A    And I believe -- I believe it was Sergeant Cattaneo that

10        said tell her to go ahead and hang up and we're out

11        front.

12   Q    Okay.  Do you know how long the two Sterling Heights

13        police officers and Melise were out there prior to your

14        arrival?

15   A    I do not.

16   Q    Okay.  And was there any discussion by Detective Melise

17        that he had tried to ascertain if somebody was in the

18        residence?

19   A    If I recall --

20   Q    If you recall.

21   A    -- correctly, he was looking for someone named Victor and

22        that --

23   Q    Okay.

24   A    -- person was not coming to the door or he had some

25        yelling or something.  A female inside was telling him to

1   go away.

2 Q Okay.  And did you do a search of the perimeter of the

3   house on Penny?

4 A Do you mean go in the backyard and stuff?

5 Q Go in the backyard around the whole house?

6 A No, we did not.

7 Q Okay.  When you arrived did you observe a video camera on

8   the outside of the house?

9 A No.

10 Q Did you later see it after at some point later when you

11   were involved in going into the home?

12 A During that particular time, no, sir, I did not.

13 Q Okay.  Other than the discussion about talking to

14   Detective Melise about this failure to pay for some

15   dinner or something like that, what other discussion was

16   going on at that time?

17 A I don't really recall any other discussions.

18 Q Okay.  At some point in time did you knock at the front

19   door or the back door to speak to the occupants of the

20   house?

21 A I did not knock on the doors.

22 Q Did anybody else that was present?

23 A Sergeant Cattaneo did approach the door and knock on the

24   door.

25 Q Okay.  When he approached the door and knocked on the

```
 1          door did somebody come to the front door?

 2   A      Yes, sir.

 3   Q      Was it a male or a female?

 4   A      Female.

 5   Q      Did she open the door or what did she do?  What was her

 6          response?

 7   A      Initially she was yelling and screaming.  I can't tell

 8          you exactly what it was.

 9   Q      Okay.

10   A      There was some profanities with it.  At some point the

11          door was opened.

12   Q      Okay.

13   A      And she continued to yell and scream.

14   Q      Okay.  And so you could hear her yell and scream, but the

15          door was closed, is that what you're saying?

16   A      Initially.

17   Q      Initially?

18   A      And then she did open the exterior door wall, the screen

19          door, I guess you would call it.

20   Q      Okay.  When Sergeant Cattaneo was -- you testified

21          knocked at the front door, where were you positioned?

22   A      I was in front of the house.  I was down the sidewalk.

23          It would be just to the north.

24   Q      Okay.

25   A      And I had Officer Fett between me and the porch or the
```

1         doorway and Sergeant Cattaneo was up on the porch.

2   Q   Is this porch where you step up steps to go to the porch

3         or is it level with the sidewalk or --

4   A   As I recall there's only one step up --

5   Q   Okay.

6   A   -- to get into the -- one step up onto the porch and one

7         stepped into the house.

8   Q   Is this a relatively large porch or small porch?  Do you

9         know the dimensions?

10   A   I don't know exactly -- I mean, it's an average porch,

11         like, step to get into the house.  Perhaps three feet

12         wide, perhaps.

13   Q   Okay.

14   A   Average for that particular neighborhood.

15   Q   All right.  And was anybody on the porch with Sergeant

16         Cattaneo at the time that he was at the front door?

17   A   No, sir.

18   Q   Okay.  Where was Detective Melise, if you recall?

19   A   I don't recall.  I -- somewhere off to my left or out in

20         the yard, perhaps, a little bit, but I can't tell you

21         exactly where.

22   Q   Okay.

23   A   I was focused on watching the door and the windows.

24   Q   Okay.  Did -- if you know did Detective Melise ask for

25         Sterling Heights' assistance with this matter, this

1       defrauding the innkeeper?

2   A   As I understood it, the homeowner, the female had called

3       our dispatch and wanted us out there.

4   Q   All right.  And you said Sergeant Cattaneo knocked, you

5       heard some -- initially you heard some women -- woman

6       making, I guess, screaming or yelling or something like

7       that, and then did Sergeant Cattaneo continue to knock

8       until she opened the front door?

9   A   Yes, sir, a couple -- I know he had to knock a couple

10      times.

11  Q   Okay.  And she opened the door?

12  A   Yes, sir.

13  Q   Okay.  Are there one -- is there one door, two doors?

14  A   Well, you have, like, the exterior -- I guess it would be

15      a glass screen door, and then you would have the interior

16      door wall itself.

17  Q   Okay.  And so she opened the main door, this female?

18  A   Yes, sir.

19  Q   Did she identify herself as to who she was?

20  A   No.

21  Q   Okay.

22  A   I don't recall that.

23  Q   All right.  And when she opened the main door did she

24      open the screen door?

25  A   Yes, sir.

1    Q    How did she open the screen door?

2    A    She was standing facing the door, and I guess it would be

3         her right hand would be on the door, kind of propped it

4         open a couple feet.

5    Q    A couple of feet?

6    A    Yeah.

7    Q    Okay.  When she propped the door open what were you

8         doing?

9    A    I was just standing on the sidewalk watching and trying

10        to make sure --

11   Q    Were you --

12   A    I'm sorry?

13   Q    Were you talking to this woman or did you ask her any

14        questions?

15   A    Oh, no, sir.  I was several feet away and I was acting as

16        a contact officer at that time.

17   Q    All right.  And what was -- if you could see, what was

18        Sergeant Cattaneo doing when the woman had propped her

19        arm and opened the door with her right arm about two

20        feet, was he talking to her?

21   A    Yes, sir.

22   Q    Could you hear the conversation?

23   A    Some of it, yes.  She was just doing a lot of screaming.

24   Q    Okay.  Did Detective Melise say he was going to tow her

25        vehicle away?

Page 20

1    A    At some point, yes.

2    Q    Okay.  Did he explain why he was going to tow the vehicle

3         away?

4    A    I don't recall if it was -- I know Detective Melise had

5         said something.  I don't know if it was Sergeant

6         Cattaneo, but somebody said you need to have Victor come

7         out and talk to the detective.  She kept denying that

8         Victor was in the home, and that's when Detective Melise

9         said, fine, I'll just tow the vehicle.

10   Q    Okay.

11   A    And that's -- I don't -- I didn't see him talking on the

12        mic, but I heard him say something about getting a tow

13        truck.

14   Q    When that woman came to the door and opened up the door,

15        did she have a phone in her hand, a mobile phone?

16   A    I don't recall that.

17   Q    Okay.

18   A    I don't remember.

19   Q    Do you recall at anytime during the whole -- this whole

20        incident that she had to use a walker or some type of

21        cane?

22   A    I did not -- during the entire incident?

23   Q    Correct.

24   A    After everything was done, that's when she said she

25        needed a walker, but she didn't have one at that

1        particular time.

2   Q    Okay.  Who -- do you recall who said she needed a walker?

3   A    Sir, I don't remember if it was her or eventually her son

4        that said she needed a walker.

5   Q    Okay.  Did -- what was -- well, first of all, did

6        Sergeant Cattaneo ever ascertain the name of this woman

7        at the front door prior to entering the residence?

8                        MR. KASZUBSKI:  Object to foundation.

9        He wasn't there the whole time.

10       BY MR. McQUEENEY, CONTINUING:

11  Q    If you know.

12                       MR. KASZUBSKI:  Only if you know.

13                       THE WITNESS:  I don't -- I don't

14       know.

15       BY MR. McQUEENEY, CONTINUING:

16  Q    Okay.  Did you eventually find out the name of the woman

17       at some point during this whole incident?

18  A    Personally, no, I didn't.

19  Q    Okay.  When -- when -- strike that.

20                       When Detective Melise suggested he

21       was going to get a wrecker to tow the vehicle, what was

22       the response?

23  A    Her -- her hostility escalated quite a bit.

24  Q    Okay.  What do you mean her hostility -- how was she

25       hostile that day, if you recall?

```
 1    A    Well, she was leaning out the -- out the front porch.

 2         She started yelling and screaming.  From my perspective

 3         it appeared that she had struck Sergeant Cattaneo and

 4         then they said they were going to impound the truck, and

 5         that's when she screamed, Get off my porch, I'm going to

 6         get my gun and shoot your asses.

 7    Q    Okay.

 8    A    And she was, I don't know, half, three-quarters of the

 9         way out the doorway at that point coming onto the porch.

10    Q    Let me --

11    A    I'm sorry?

12    Q    Let me stop you there.

13    A    Okay.

14    Q    You said she's halfway, three-quarters of the way out the

15         door, coming onto the porch.  Did she eventually come

16         onto the porch at all?

17    A    As far as completely?

18    Q    Physically, completely come out of the house onto the

19         porch?

20    A    There was a foot that came out and most of her body had

21         come out.

22    Q    Okay.

23    A    Out of the home.  She still had -- if I can recall

24         correctly, it appeared that she had a hand still on the

25         doorknob of the exterior door.
```

1   Q   Okay.

2   A   But she was, like, coming out this way and she was

3       vigorously pointing and shaking her hand into Sergeant

4       Cattaneo's face.

5   Q   Okay.  And you said that she had said, If you take my

6       vehicle I'm going to go get a gun and shoot your asses;

7       is that what you testified to a minute ago?

8   A   Yes, sir, that is what I heard.

9                       MR. KASZUBSKI:  Paraphrasing.

10      Objection.  That mischaracterizes.  I don't think he said

11      anything about if you're going to get my vehicle, I'm

12      going to shoot your asses.  I think he said I'm going to

13      get my gun and shoot your asses.

14                      MR. McQUEENEY:  Well, let's --

15      BY MR. McQUEENEY, CONTINUING:

16  Q   What did -- when there was a suggestion that they were

17      going to tow the vehicle, what did she say?

18  A   What I heard on that day was, I'm going to go get my gun

19      and I'm going to shoot your asses.

20  Q   Okay.  And did she point to who she -- who was she

21      directing that to, if you know?  Was that to all of you?

22  A   I believe it was to everybody.

23  Q   To everybody?

24  A   She was just on a rant.  She was yelling and screaming.

25  Q   Okay.  Did you draw your firearm at that time?

Page 24

1   A   I did not.

2   Q   Did any of the other officers or Detective Melise draw

3       their firearms at that time?

4   A   No.

5   Q   Okay.  Did -- did anybody, I guess, take any defensive

6       action and crouch down thinking she had a gun in her

7       hand?

8   A   No, because you could see her hands and there wasn't a

9       gun in her hand at that time.

10  Q   No gun in her hand, okay.

11  A   Right.

12  Q   And you had no knowledge at the time that you came to the

13      house that there were even any guns in the house; right?

14  A   No.

15  Q   Okay.  And to your knowledge, did any of the other

16      officers or detective have any knowledge that there were

17      weapons in the house when they arrived?

18  A   No one expressed any of those concerns to me.

19  Q   Okay.  Okay.  And how long did this colloquy last while

20      this woman was on the porch, I guess, gesturing or

21      pointing to Sergeant Cattaneo?  How long did that last?

22  A   Several moments.  A couple minutes, perhaps.

23  Q   Okay.  And when she suggested she was going to get a gun

24      and shoot your asses, how long from the time she made

25      that statement until everybody entered the residence?

Page 25

1       Was it --

2  A    That went pretty quick.

3  Q    Pretty quick?  A few seconds?

4  A    A few seconds, yeah, a few moments.

5  Q    Okay.  And she hadn't committed a crime up until that

6       point; correct?

7  A    Well, from where my position was it appeared that she had

8       already struck the sergeant.

9  Q    Okay.

10  A    So in my mind, yeah, we've already got a --

11  Q    Where did she strike the sergeant?

12  A    It appeared that the first time it was a shoulder towards

13       the face.

14  Q    Okay.  Was it with the right hand or the left hand?

15  A    I believe it would be the left.

16  Q    Okay.  And you could clearly see that he got struck about

17       the face?

18  A    That's what it looked from where I was down off the steps

19       and several feet, again, to the north.

20  Q    Okay.  Did he back up or explain that -- exclaim that he

21       had been struck by this woman?

22  A    He did not say that, no.

23  Q    Was he knocked down?

24  A    No, sir.

25  Q    Was he pushed at anytime during that incident?

```
 1   A   That's what it looked to me at that time.

 2   Q   So it was more of a push rather than a slap?

 3   A   Yeah, that's kind of what it looked like to me.

 4   Q   Okay.

 5   A   Again, the hand was up in his face and she was pointing

 6       and yelling at him.

 7   Q   Okay.  And did the -- did Officer Fett say anything that

 8       you had just struck Sergeant Cattaneo, to the woman?

 9   A   No, sir, she did not.

10   Q   Did you say anything?

11   A   I did not.

12   Q   Okay.  How about Sergeant -- excuse me, Detective Melise,

13       did he make any statements that he witnessed an assault

14       upon Sergeant Cattaneo?

15   A   No, sir, he did not.

16   Q   Okay.  And was this one push about the upper torso or was

17       there multiple?

18   A   Well, it looked like the first time I saw that it was --

19       it would have been on the left side up towards the

20       shoulder or the bottom of the jaw, something like that.

21   Q   Okay.  And what happened after Sergeant Cattaneo was

22       pushed on the upper left side torso?

23   A   Then she made the explanation -- or, she exclaimed, I'm

24       going to go get my gun and shoot your asses.  At that

25       point she turned to go back in, Sergeant Cattaneo -- and
```

Page 27

```
 1        I don't know the exact terminology he used -- said

 2        something about, well, slow down, don't go in there.

 3        Something like that.  And he grabbed the door to open the

 4        door and she turned around again and that's when she

 5        pushed him.

 6   Q    Okay.  So there would have been a second push?

 7   A    That's what it looked like to me from the vantage point

 8        that I had down below, and, again, several feet to the

 9        north.

10   Q    Okay.  And back to Exhibit 1 -- or, excuse me, 2, I'm

11        sorry.

12                      MR. KASZUBSKI:  Sorry, you didn't

13        have a pending question.  I was talking to my witness.

14   BY MR. McQUEENEY, CONTINUING:

15   Q    Back to Exhibit 2, that narrative report?

16   A    This one?

17   Q    Yes.  How long after the incident did you prepare your

18        narrative?

19   A    Oh, geez.  Honestly, I don't recall.  It wasn't that long

20        afterwards.

21   Q    An hour, couple hours?

22   A    Maybe an hour.

23   Q    Okay.

24   A    I think it was just before I started the DARE classes.

25   Q    Okay.
```

Page 28

1   A   I can't tell you exactly how long.

2   Q   Did you talk to any of the other officers about when you

3       were preparing the report about what they saw and what

4       they observed?

5   A   Oh, no, sir.

6   Q   Okay.  Did they create their reports independent of

7       yourself?

8   A   Yes, sir.

9   Q   Okay.  Back to -- now, you claim that you -- from what

10      you could see there may have been a second push, and

11      where was that second push?  Was that on the same

12      location?

13  A   Yes, sir.

14  Q   Okay.  And what did Sergeant Cattaneo say?  Did he say,

15      You're under arrest for assaulting me or did he make any

16      statements that I've been assaulted or --

17  A   He didn't make any statements about being assaulted.  I

18      don't recall exactly what he said.

19  Q   Okay.

20  A   She was yelling so loud I don't -- I couldn't tell you if

21      he said something to her.

22  Q   Okay.  And you said this was somewhere around 9:30, 10

23      a.m.; right?

24  A   Yes, sir.

25  Q   In that range.  Was anybody else out of their homes in

1       the neighborhood that you could observe when you pulled

2       up?

3  A    I do not recall seeing anyone else.

4  Q    Okay.  Had you ever been to this house on Penny prior to

5       this incident on October the 30th, 2007?

6  A    I don't recall being at that house, specifically.

7  Q    Okay.

8  A    But the neighbors next door, I believe that I had been

9       previously dispatched there as a backup officer and they

10      had complained about him next door.

11  Q    Okay.

12  A    But to give you any specifics, I can't give you any more

13      than that.

14  Q    All right.  Okay.  So you see this second push about the

15      same location, the upper left torso on Sergeant Cattaneo.

16      And how long after this supposed second push or this

17      second push did Sergeant Cattaneo enter the residence?

18  A    It was almost immediately, because she started to turn

19      and go into the home.

20  Q    Okay.

21  A    After making the threat of shooting us.

22  Q    Right.

23  A    So the door was open, Sergeant Cattaneo entered, Officer

24      Fett entered, I was behind shortly thereafter.

25  Q    Okay.  If I showed you a picture of the woman, would that

1       help you as to who that woman was?  Maybe not her name,

2       but --

3    A  I don't know.  It's a couple years ago.  Maybe.

4    Q  Okay.  I'm handing you Plaintiff's Exhibit 3.

5    A  Oh, it's an elbow, okay.

6    Q  Well, I'll take you through it.

7    A  All right.  Thanks.  I'm going, okay.  I'm sorry.

8                        MR. KASZUBSKI:  That was on the

9       record.

10                       THE WITNESS:  I'm sorry.

11                       MR. KASZUBSKI:  Everything you say is

12      being taken down.

13                       THE WITNESS:  Yes.  Yes, I'm sorry.

14   BY MR. McQUEENEY, CONTINUING:

15   Q  First of all, Sergeant, let's acknowledge that there are

16      eight pages to this exhibit.

17   A  Yes, eight pages.

18   Q  Okay.  And turn to the second page.  Does this look like

19      the woman that was at the front door?

20   A  Yes, it does.

21   Q  Okay.  And the third page, does it look like the same

22      woman?

23   A  Yes.

24   Q  Okay.  I understand that the pictures aren't a hundred

25      percent accurate or a hundred percent clear, but does

```
 1          this look like the woman that was at the front door?

 2    A     Yes, sir, it does.

 3    Q     Okay.  And was she a rather obese woman?

 4    A     She was a larger woman, yes.

 5    Q     Okay.  And did you observe any, I guess, handicaps or

 6          frailties at the time?

 7    A     She wasn't displaying any of that when she was sitting at

 8          that front porch yelling at us.

 9    Q     Okay.  And Sergeant Cattaneo testified during his

10          deposition that this woman that you saw in Exhibit 3 spun

11          around and made a break for the house.  Did you see her

12          spin around?

13    A     Oh, yeah.

14    Q     Was this rather obese woman able to spun around -- or,

15          spin around?  Was she is able to do that?

16    A     Apparently.  She did.

17    Q     Okay.  All right.  If she did this spin around, was this

18          like a one-eighty spin or something like that?

19    A     Let's see.  She was in the door, she turned back towards

20          Cattaneo to the right and then she turned again to the

21          left and started proceeding back into the house.

22    Q     Okay.  And I'm handing you Plaintiff's Exhibit 7.

23                    First of all, would you acknowledge

24          it's one page?

25    A     Yes, it is one page.
```

1            MR. KASZUBSKI:  I object that this

2      isn't a full document.  I don't even know what this is.

3            MR. McQUEENEY:  Okay.  Mr. Szubski,

4      it is --

5            MR. KASZUBSKI:  Kaszubski.  There's a

6      K-A in front of that.

7            MR. McQUEENEY:  Everybody in your

8      office mispronounces it.  It's not my fault.

9      BY MR. McQUEENEY, CONTINUING:

10  Q    Just for the record, this is a page taken out of Sergeant

11       Cattaneo's deposition transcript, so we know what we're

12       talking about here, Sergeant Burgess.

13  A    Okay.

14  Q    Okay.  Okay.  Look in the -- on page 42.

15  A    Okay.

16  Q    That's in the upper left-hand corner.  He testifies, I

17       believe that her telling me that and the way she spun

18       around quickly to make a break into the house led me to

19       believe that's what she was doing.

20                      Now, you testified that you thought

21       she could -- that in your observation she could spin

22       around.  Did she spin to the right or to the left?  How

23       did she spin around?

24            MR. KASZUBSKI:  Asked and answered.

25            MR. McQUEENEY:  No, that's not asked

Page 33

1    and answered.

2                         MR. KASZUBSKI:  He already put it on

3    the record.

4                         MR. McQUEENEY:  No, he did not.

5                         MR. KASZUBSKI:  You can have her read

6    it back, if you like.

7                         MR. McQUEENEY:  He's going to answer

8    it anyways.

9                         THE WITNESS:  Okay.

10                        MR. KASZUBSKI:  Go ahead.

11                        THE WITNESS:  She was in the doorway.

12   I'll try to be as descriptive as I can.

13   BY MR. McQUEENEY, CONTINUING:

14   Q   Sure.

15   A   She was in the doorway originally holding the door with

16       her right -- and leaning out with her left side of her

17       body and shaking her hand in Sergeant Cattaneo's face.

18       She went into -- took a step back in and turned to the

19       left to close the door.  When Sergeant Cattaneo grabbed

20       the doorknob before it closed and opened it, she turned

21       around again to the right and that's when I saw the hand

22       come out and what I believed was a push again to the

23       sergeant.

24   Q   Okay.

25   A   And then when he went to open the door further, she spun

Page 34

```
 1            again to the left and then proceeded into the home.

 2    Q     Okay.

 3    A     If that clears it up.

 4    Q     When she spun again to the left and proceeded into the

 5            home, who -- did Sergeant Cattaneo enter the home?

 6    A     Oh, yes.

 7    Q     Okay.  Was he the first one to enter?

 8    A     Yes, sir.

 9    Q     And who was the second police officer to enter?

10    A     Officer Fett.

11    Q     Okay.  And who was the third officer to enter?

12    A     I was.

13    Q     Okay.  And did Detective Melise enter at all?

14    A     You know, I don't recall.  I remember seeing his head

15            kind of sticking in the doorway.  I can't remember if he

16            came in all the way or not.

17    Q     Okay.  And so it was Sergeant Cattaneo, Fett and then

18            yourself?

19    A     Yes, sir.

20    Q     And what -- did you see what happened with this -- this

21            woman?

22    A     Let's see, when I first entered Sergeant Cattaneo was

23            kind of a little to the left.  She was kind of facing

24            into the living room originally.  Officer Fett was on

25            the -- coming around to the right side of her, I believe,
```

1     and was trying to put a handcuff on her.  And she just

2     dropped.  I mean, she was yelling and screaming and she

3     just dropped like -- I guess the only way to describe it

4     would be like when my two-year-old would throw a temper

5     tantrum and let his legs fall out.  She just fell to the

6     ground.

7   Q   Do you know if she just fell or if she lost her balance

8     or you don't know?

9   A   She just --

10  Q   Or her legs gave out on her?

11  A   She just dropped.

12  Q   Okay.

13  A   I mean, nobody -- we all just kind of looked at each

14     other like "what?", and then she started screaming.

15  Q   Okay.  Did she -- when she dropped was she -- how did she

16     land?  Was she facedown, on her back, on her side?

17  A   When she -- if I recall correctly, it was kind of on the

18     left hip.  As you go into the little vestibule area

19     before the step up into the living room, she was down and

20     kind of on her knees and her left hip and facing the

21     wall, which I guess would be the left side of the house.

22  Q   Okay.  And is she screaming while she's on the -- on the

23     floor?

24  A   Oh, yeah.  Oh, yeah.

25  Q   And where are you when she's on the floor?

```
 1   A   At that point I was making my way -- I was trying to find

 2       my way to get around her and get up into the living room

 3       area to act as more of a cover officer.

 4   Q   Okay.  Had you touched this woman at any point?

 5   A   I don't recall ever touching her, just trying to get past

 6       her.

 7   Q   Okay.  When you tried to get past her, what was the

 8       purpose for getting past her?

 9   A   We didn't know if anybody else was in the home and I

10       wanted to make sure that the contact officers were indeed

11       safe.

12                         (Mr. Peacock entered the room)

13                         MR. PEACOCK:  Sorry, Mr. McQueeney, I

14       didn't mean to interrupt.

15                         MR. McQUEENEY:  Of course you didn't.

16                         (Discussion held off the record)

17       BY MR. McQUEENEY, CONTINUING:

18   Q   Sergeant, did you do a sweep of the entire house?

19   A   Oh, no.

20   Q   Okay.  Did you do a sweep of the area where the woman was

21       to see if there was a weapon there?

22   A   Eventually, yeah.

23   Q   Okay.  When did you do that sweep?

24   A   Right after I heard the thudding coming down the hallway,

25       yelling.
```

Page 37

```
 1    Q    The thudding?
 2    A    Oh, yes.  We had a rather large man, the person who
 3         Detective Melise had originally been there looking for,
 4         who Maria said wasn't there, came thundering down the
 5         hallway.
 6    Q    Okay.
 7    A    In a pair of shorts, I believe.
 8    Q    Okay.
 9    A    Coming -- coming out.
10    Q    All right.  So -- so he came from what part of the house,
11         do you recall?
12    A    It would be the rear of the house, which would be, like,
13         the south -- southwest corner of the house, down a hall
14         -- from down a hallway.
15    Q    Okay.
16    A    Towards the living room area.
17    Q    And was he armed?
18    A    He was not armed.
19    Q    Okay.
20    A    Just a very big man.
21    Q    Was he as big as mama or --
22    A    Oh, he was bigger than mama.
23    Q    Okay.  Sergeant, I'm handing you Plaintiff's Exhibit No.
24         5.
25    A    Okay.
```

1   Q   First of all, would you acknowledge it's just one page?

2   A   Yes, sir, it's one page.

3   Q   The photograph, would you acknowledge that also?

4   A   Yes.  It appears to be the living room kind of as it

5       appeared the day we were there with the front door.  You

6       could see the little step down vestibule area.

7   Q   Okay.

8   A   A coffee table and -- I don't know if that's the couch or

9       they got different chairs here.

10  Q   Do you see it looks almost like an entertainment wall

11      unit with a television?  Do you see that?

12  A   Yes, sir.

13  Q   And almost like in the middle of the picture?

14  A   Yes, sir.

15  Q   Okay.  And off the left of that area is the door?

16  A   Yes, sir.

17  Q   Okay.  When this woman had gone to the floor whereabouts

18      was she in relationship to the door and this wall unit?

19  A   Well, it's tough to see from the picture here so I'll try

20      to be as descriptive as I can.

21  Q   Sure.

22  A   Do you see where it looks like carpet a little lighter

23      color there, coming almost off the corner of the

24      entertainment center?

25  Q   Yes.

1   A   And the darker area by the doorway there?  That's

2       actually like a -- I don't recall if it was wood or what

3       the material was.  It was darker surface, and she was

4       right down in there.  The door, as you see it there, was

5       opened all the way up against the door and she was -- she

6       was down right in that little area there.

7   Q   Okay.  Closer to the door or closer to that entertainment

8       unit or --

9   A   Like, in between.

10  Q   In between?

11  A   Yeah, almost in between, kind of leaning to the left, if

12      I recall correctly.

13  Q   Okay.  And when this -- this large man came around, did

14      he come out to the living room?

15  A   Oh, yeah.  Yeah, he --

16  Q   Okay.

17  A   He made it out to the living room.

18  Q   Okay.  And what was he doing when he came out to the

19      living room?

20  A   He was yelling and screaming and something about his mom

21      or something like that.

22  Q   What was he yelling and screaming, do you recall?

23  A   I don't -- again, I don't recall.  She was yelling and

24      screaming, he was yelling and screaming.  Then he said

25      something about her back.  And I was telling him to stop,

Page 40

```
 1         don't move, don't come any closer.

 2    Q    Uh-huh.

 3    A    And he had stopped -- in the picture, if you can see,

 4         like, where the coffee table is?

 5    Q    Sure.

 6    A    And you see that first door on the right-hand side of

 7         where the entertainment center is?

 8    Q    Right.

 9    A    Somewhere right about in the middle of there.

10    Q    Okay.  And you said he's unarmed.  Did he make any

11         threats to you or any of the other officers?

12    A    You know, I don't recall him making threats.  His fists

13         were balled up.

14    Q    Okay.

15    A    Like, you know, like balled up.

16    Q    All right.  And did he do anything to assist his mother

17         at anytime or -- well, first of all, did he identify

18         himself as being the son of this woman -- this woman on

19         the floor?

20    A    I don't recall at that time him saying that.

21    Q    Did you eventually learn that he was the son?

22    A    Yes.

23    Q    Okay.  Did the son ask what you were doing to his mother?

24         Or not you, but any of the officers present?

25    A    I don't recall exactly what it was.  He had said
```

1    something about, What are you doing.  And then he yelled

2    at his mom, Don't fight or stop fighting, or something

3    like that.

4  Q    Okay.  And you could hear this clearly?

5  A    Yeah, I --

6  Q    Okay.

7  A    At that point I had -- I was positioned, and again, if I

8    can refer to the photo, and it's tough to gauge, you

9    know, perspective on here, but where the coffee table is

10    and before the vestibule, I was standing, like, right

11    there.

12  Q    Okay.

13  A    I don't know.  If this isn't helping you, let me know and

14    I'll try to be more descriptive.

15                    But from where the entertainment

16    center is the wall there and right between there I

17    positioned myself in that position.

18  Q    So between the entertainment center and the wall where

19    the door is; is that what you're trying to describe?

20  A    Kind of but closer to the --

21  Q    Coffee table?

22  A    The coffee table, thank you, in the living room.

23  Q    Okay.  All right.  And you said that Vic -- well, did you

24    eventually learn that it was Victor Gojcaj?

25  A    Yes.

Page 42

1  Q  And you said that Victor made it close to the coffee
2     table?
3  A  Yes.  Again, if I could just kind of refer, like, to the
4     first door on the right-hand side if you're looking at
5     the photo, right underneath the television set.
6  Q  Okay.
7  A  Kind of right in front of there.
8  Q  All right.  And what was Officer Fett doing at the time
9     this woman was on the floor?
10 A  I believe, if I recall correctly, I know I heard her yell
11    a couple times, Stop, stop fighting, stop, stop fighting.
12 Q  Were you paying attention to what was going on or were
13    you more interested in what was going on with -- with
14    Victor?
15 A  I was looking both ways.  From the perspective that I
16    had, I had a nice forty-five degree angle.  I could keep
17    an eye on Victor and I could also see out of my
18    peripheral vision to my left at the doorway.
19 Q  Right.  And was -- what was Sergeant Cattaneo doing?
20 A  Sergeant Cattaneo was just telling her to relax.
21 Q  Telling her to relax?
22 A  I believe he -- words to that effect.  He was just
23    telling her to calm down.
24 Q  All right.  What was she -- what was this woman doing
25    while she was on the floor?

Page 43

1   A   Just sitting there.

2   Q   Just sitting there?

3   A   Yeah.

4   Q   Okay.  How long were you in the house the entire time

5       before you cleared the house?

6   A   Oh, geez.  Several minutes.

7   Q   Okay.

8   A   I wasn't in there a great deal of time.

9   Q   Less than a half an hour?

10  A   Oh, yes, yes.  Less than half an hour.

11  Q   Okay.  And after Victor came around, and you've already

12      described where he arrived in the living room, did he --

13      did he remain in the living room the whole time until you

14      cleared the residence?

15  A   No, after we made sure everything was okay, we allowed

16      him to get a glass of water for his mom.

17  Q   Okay.  Did anybody -- did you or any of the other

18      officers help his mother up?

19  A   Help her up?

20  Q   Yes.

21  A   No, I did not help her up.

22  Q   Okay.  Did Sergeant Cattaneo or Officer Fett?

23  A   I don't -- I don't recall that.

24  Q   Okay.

25  A   I don't know if that was the FD that showed up or how she

Page 44

```
 1        got up, I don't recall.

 2   Q    Fire department?

 3   A    Yes.  I'm sorry.

 4   Q    And who called the fire department, do you know?

 5   A    I don't remember if it was -- I don't remember if it was

 6        Sergeant Cattaneo or Officer Fett who called.  I don't

 7        know.

 8   Q    When Victor came around did you pull your service

 9        revolver?

10   A    No.  Originally I had my hand on my gun when I first went

11        into the home --

12   Q    Okay.

13   A    -- for fear that there might be a firearm.  When I

14        realized that there wasn't I pulled my Taser gun out when

15        I saw the size of Victor.

16   Q    Okay.  At the time that this incident occurred, could you

17        have contacted a SWAT team to enter the residence rather

18        than you, Sergeant Cattaneo and the remaining officers?

19   A    No, it was a very -- at that point it would have been --

20        well, one, the delay to have a SWAT team show up.  But we

21        had an immediate threat of someone, who, again, from my

22        perspective, looked like they assaulted a police officer,

23        and then stated that they were going to get a gun and

24        shoot the police, again making a threat.

25   Q    Okay.
```

| | | |
|---|---|---|
| 1 | A | And we could have immediately contained that person |
| 2 | | before they had access to a firearm. |
| 3 | Q | The assault of a police officer, this pushing, is a |
| 4 | | misdemeanor; right? |
| 5 | A | Resisting and obstructing police, felony, two-year |
| 6 | | felony. |
| 7 | Q | Well, if it was a push was that assault and battery? |
| 8 | A | I'm sure you could plead it down to that, but -- |
| 9 | Q | Well, why would it be a resisting and obstructing arrest |
| 10 | | if she hadn't committed a crime up until that time? |
| 11 | A | I don't know why -- again from my perspective, I can't |
| 12 | | tell you what she's doing. |
| 13 | Q | Okay. |
| 14 | A | But once you place hands on a police officer obviously |
| 15 | | you've committed a crime. |
| 16 | Q | Right.  So if I -- if I punch you in the nose right now |
| 17 | | I've -- |
| 18 | | MR. PEACOCK:  Good luck.  I'm sorry, |
| 19 | | Mr. McQueeney. |
| 20 | | MR. McQUEENEY:  Thank you, Mr. |
| 21 | | Peacock. |
| 22 | | BY MR. McQUEENEY, CONTINUING: |
| 23 | Q | If I punch you in the nose right now, I have committed a |
| 24 | | battery; right? |
| 25 | A | Yes, sir, you would have. |

Page 46

1    Q    And that's a misdemeanor; right?

2    A    That can be a misdemeanor, yes.

3    Q    All right.  That's not a resisting and obstructing

4         arrest, because there's nothing you can arrest me for up

5         until that point; right?

6    A    Well, I guess what we would have to look at is are you

7         interfering with a police officer in the performance of

8         their duties.  You know, there's a whole different

9         perspective we take on there.

10   Q    Okay.  But we're just sitting talking and I don't like

11        what you say and I punch you in the nose, that's a simple

12        assault and battery; right?

13                       MR. KASZUBSKI:  In this scenario?

14        Meaning your scenario, punching him in the nose for no

15        reason?

16                       MR. McQUEENEY:  Yes.

17                       MR. KASZUBSKI:  Objection, calls for

18        speculation and legal conclusion.  It's a hypothetical.

19        All right.  Answer it if you can.

20                       THE WITNESS:  You know, on something

21        like that, I would probably refer you off to the

22        prosecutor's office.  But I'm going to arrest you for the

23        felony and we'll let them plead it down to the

24        misdemeanor later on.  As a police officer in uniform on

25        duty, you're not going to be placing hands on me.

Page 47

```
 1         BY MR. McQUEENEY, CONTINUING:

 2    Q    I understand.  But how do you arrive at a resisting and

 3         obstructing arrest if there's been no crime committed?

 4    A    Again, we're talking about on the porch --

 5    Q    Yes.

 6    A    -- while we're interviewing her and she makes her threat

 7         to go get a weapon?

 8    Q    Right.

 9    A    A felony against a police officer.  And then she puts her

10         hands on the police officer.

11    Q    She only made a threat, which is not a crime; correct?

12    A    No, it's a crime.  You can't do that.  You can't --

13    Q    A threat is a crime?  Under what penal code section does

14         a threat arrive -- become a crime?

15    A    You know, I don't have my law book with me.

16    Q    Okay.

17    A    I'll be -- that would -- I would have to do a little

18         research on that one for you.  But if you tell us you're

19         going to get a gun and you put your hands on us, it's a

20         crime.

21    Q    Okay.  Sergeant, if I say I'm going to shoot you in the

22         head and I want to kill you, have I committed a crime?

23    A    Yes, sir, you have.

24    Q    What crime have I committed?

25    A    The threats, assault and battery -- not a battery, I'm
```

```
 1        sorry.
 2                         MR. PEACOCK:  Simple assault.
 3                         MR. KASZUBSKI:  Simple assault.
 4                         THE WITNESS:  Thank you.  That's what
 5        I'm looking for.
 6                         MR. PEACOCK:  I guess my objection --
 7        let me --
 8                         MR. McQUEENEY:  If you guys are going
 9        to coach the witness --
10                         MR. PEACOCK:  I'm going to put an
11        objection on the record.  If this is going to be a law
12        school quiz on crimes one, let's make it that.  Let's let
13        the officer know that.  But you're going through a bunch
14        of scenarios that have nothing to do with this lawsuit,
15        so I mean, if you want to test his knowledge on crimes,
16        let's make it a test, let's do that.  But that's my
17        objection.
18                         MR. McQUEENEY:  What's your
19        objection?
20                         MR. PEACOCK:  Completely irrelevant
21        to this lawsuit, badgering the witness.
22                         MR. McQUEENEY:  I don't think so.
23                         MR. PEACOCK:  It is.
24                         MR. McQUEENEY:  What's the objection?
25                         MR. PEACOCK:  I just said it.
```

Page 49

1           MR. KASZUBSKI:   I'll join.

2           MR. McQUEENEY:   What a surprise.

3    BY MR. McQUEENEY, CONTINUING:

4    Q    If I say I'm going to shoot you, have I committed a

5         crime?

6    A    Again, are we talking about this particular dynamic

7         situation that we're confronted with?

8    Q    I'm just talking about I -- you know, Sergeant, I --

9    A    Simple assault.

10   Q    I'm going to shoot you.

11   A    Simple assault, yes.  You can actually look it up and you

12        can find it on there for simple assault.

13   Q    But I haven't done any actions to -- I haven't put my

14        hands in the pocket like I'm going to pull out a gun.  I

15        haven't done -- all I made is a statement; is that a

16        crime?

17   A    So we're talking about a hypothetical situation that

18        you're discussing right now.  If I just say it and I

19        don't do anything to carry it out or anything like that?

20   Q    Right?

21   A    It's not going to go anywhere, if that's what you're

22        looking at.

23   Q    Right.

24   A    No.

25   Q    That's not a crime.  A simple statement without any

```
 1      action is not a crime.  You may not like the statement

 2      because it's offensive and I'm going to say I don't like

 3      you, I'm going to shoot you, you may not like it, but

 4      it's not a crime; right?

 5                          MR. KASZUBSKI:  Objection.  Hold on.

 6      Objection.  It calls for a legal conclusion.  That's not

 7      true and you're trying to mislead this witness.  I'm not

 8      liking that.  You need to -- let's stick with the

 9      situation at hand in this case.

10                          MR. McQUEENEY:  His testimony is what

11      it is, Marc.

12                          MR. KASZUBSKI:  It's irrelevant.

13      BY MR. McQUEENEY, CONTINUING:

14  Q   Did anybody obtain any arrest warrant or search warrant

15      to enter the residence?

16  A   No, sir.

17  Q   Okay.  Is that why the residence wasn't searched in its

18      entirety to locate a firearm?

19                          MR. KASZUBSKI:  Objection,

20      foundation.

21      BY MR. McQUEENEY, CONTINUING:

22  Q   Do you understand the question?

23                          MR. KASZUBSKI:  If you know.  If you

24      know the answer to the question.

25                          THE WITNESS:  I'm sorry, repeat that,
```

Page 51

```
 1        please.
 2        BY MR. McQUEENEY, CONTINUING:
 3    Q   Yes.  There was no arrest warrant or search warrant to
 4        enter the residence; correct?  You've already testified
 5        to that.  So is that why there was no sweep of the entire
 6        premises, was because you didn't have a search warrant to
 7        search the residence?
 8    A   All we did was search the immediate area to make sure
 9        there was no weapons and --
10    Q   Okay.
11    A   I don't know if that's answering your question, I'm
12        sorry.
13    Q   All right.  Well, actually, it doesn't answer my
14        question.  Why wasn't there a further search of the
15        residence, an extensive search, rather than just this
16        cursory search?
17    A   Honestly, I can't answer that one for you, sir.
18    Q   Okay.
19    A   The wing span of control was safe for us.
20    Q   Okay.
21    A   The situation deescalated considerably once Victor made
22        himself known to the detective.
23    Q   Okay.
24    A   And, therefore, we just didn't continue further with it.
25    Q   You said when Victor -- the situation deescalated when
```

Page 52

```
 1        Victor made himself known to the detective.  Was the
 2        detective in the residence at that point?
 3    A   Again, sir, I can't -- I don't recall exactly if he came
 4        into the residence.  I remember seeing his head in the
 5        doorway.  I don't recall whether he physically came all
 6        the way in.
 7    Q   Okay.  When -- when Ms. -- well, when the woman -- the
 8        large woman had suggested she was going to get a gun, you
 9        don't necessarily have to enter the residence.  You could
10        have taken a position outside the residence; correct?
11    A   Not in that particular situation.
12    Q   Aren't you putting yourself in harm's way by going into a
13        residence if you don't know where a gun is located in the
14        residence?
15    A   I believe that I would have put myself in greater danger
16        by retreating versus putting hands on the person
17        immediately who was right there.
18    Q   But you don't know where the gun is in the residence so
19        how do you know if you're putting yourself in greater
20        danger by retreating and staying outside the home?
21    A   In this particular situation she was right there.  We
22        could see both hands.
23    Q   Right.
24    A   And she was still right in the doorway there, so
25        therefore --
```

Page 53

```
 1   Q   You didn't see her bend down to reach for a gun or
 2       anything; correct?
 3   A   I'm sorry, sir?
 4   Q   You didn't see her bend down to reach for anything;
 5       correct?
 6   A   No, sir.
 7   Q   She just turned and walked into the residence; correct?
 8   A   She spun and started going into the residence.
 9   Q   And she -- she didn't look like she could run a sprint to
10       get into the home; right?  She's a large woman.
11   A   I can't speculate.  Again, I mean, she -- if you had been
12       there to see how she was responding out in that doorway
13       that day, very irrational, not the typical residents that
14       we run into.
15   Q   Okay.
16   A   I can't tell you what she was capable of or what she
17       wasn't capable of, physically.
18   Q   You heard of a flash bang device; right?
19   A   Yes, sir.
20   Q   Does Sterling Heights Police Department use flash bangs?
21   A   That I don't know, sir.  I'm not on the SRT team.  I
22       don't know.
23   Q   Okay.
24                    MR. KASZUBSKI:  Objection, relevance.
25       BY MR. McQUEENEY, CONTINUING:
```

1   Q   Would that have been a device that could have been used

2        in disorienting this person that's in the residence?

3   A   Patrol officers, sir, certainly not DARE officers, carry

4        flash bangs or percussion grenades.

5   Q   I understand, but there were two patrol officers,

6        including yourself, there; correct?

7   A   Yes, sir.

8   Q   Okay.  They could have used that device to enter the

9        residence; correct?

10   A   We don't carry those, sir.  Those are special -- those

11        are kept special in the armory and they're used by

12        specially trained officers.

13   Q   Okay.

14   A   On the tactical teams.

15   Q   All right.

16                 (Discussion held off the record)

17        BY MR. McQUEENEY, CONTINUING:

18   Q   I'm giving you Plaintiff's Exhibit 6.

19              MR. PEACOCK:  For the record I'm

20        going to place the same objection relative to this

21        transcript that I placed on the other records also.

22              MR. KASZUBSKI:  I join as well.  This

23        is just a transcript of somebody who transcribed a video

24        and, in fact, doesn't identify the officers that are

25        saying anything.  The statements are incomplete that was

Page 55

1       in the transcript themselves.  It's not characteristic of

2       what's actually heard on the tape, so I join in Mr.

3       Peacock's objection.

4                       MR. McQUEENEY:  For the record this

5       is a transcript done by Hansen Court Reporting Services

6       at my request, which was a transcription of the audio

7       portion of the videotape, which we will view later.  That

8       has been tendered and admitted in each of the prior

9       depositions.  First of all --

10                      MR. KASZUBSKI:  It's been tendered.

11      I don't think it's ever been admitted as anything.

12                      MR. McQUEENEY:  Whatever.

13      BY MR. McQUEENEY, CONTINUING:

14   Q  First of all, would you acknowledge that there's eighteen

15      pages to the exhibit, Sergeant?

16   A  Yes, sir, eighteen pages.

17                      MR. PEACOCK:  Mr. McQueeney, will you

18      give me a continuing objection to any questions relative

19      to this transcript?

20                      MR. McQUEENEY:  Yeah, it would be

21      easier.

22                      MR. PEACOCK:  Thank you.

23                      MR. KASZUBSKI:  Can I join in that as

24      well, please?

25                      MR. McQUEENEY:  That would be easier

1     as well, Marc.

2                MR. KASZUBSKI:  Thank you.

3     BY MR. McQUEENEY, CONTINUING:

4    Q   Okay.  Sergeant, I'd ask that you turn to page six of the

5       exhibit.

6    A   Yes, sir.

7    Q   And starting at lines nine through -- or, starting at

8       lines nine, where it says -- see where it says, male

9       officer number 2?

10   A   Yes, sir.

11   Q   Read that nine through thirteen to yourself.

12   A   Okay.  (Witness complying).  Yes, sir.

13   Q   Okay.  And it starts out, Watch it.  Do you see that?

14   A   Yes, sir.

15   Q   Okay.  Is that -- is that you talking at this point?

16   A   That sounds like me.

17   Q   Okay.  I will Taser you?

18   A   Yes, sir.

19   Q   Keep your hands on top of your head?

20   A   Uh-huh.

21   Q   Is that a yes?

22   A   I'm sorry, yes.

23   Q   If I don't get you to say yes, she's going to say

24      something to me.

25   A   I know, and I apologize.  I'm just -- I actually sound

```
 1        good here.

 2    Q   Further down the page, lines fifteen through sixteen, do

 3        you see where it says, male officer 2?

 4    A   Yes, sir.

 5    Q   Okay.  Could you read that to yourself again, please?

 6    A   (Witness complying).

 7    Q   All right.  And it says, Put your hands over your head

 8        again, don't move.  Is that your statements?

 9    A   Yes, sir.

10    Q   Okay.  And further down on the page where it again says,

11        male officer 2 in two other locations, don't move, is

12        there anybody else in the house, is this your statement?

13    A   That sounds like something I was saying then, yes.

14    Q   Okay.  And again, I'll explain everything in a second, do

15        not move; is that your statement?

16    A   Again, it sounds like something I was saying at the time,

17        yes.

18    Q   Okay.  Sergeant, I'd ask that you turn to page four,

19        please.

20    A   Page four?

21    Q   Right.

22    A   All right.

23    Q   Okay.  Before I ask you questions about this page, other

24        than yourself, Sergeant Cattaneo, Officer Fett, that

25        large woman and Victor, was there anybody else in the
```

1   home on that day?

2 A I don't recall anyone else.

3 Q And you don't know whether Detective Melise made it into

4   the home or not, he may have peeked his head in.  But of

5   those five that you know were in the house, there was

6   nobody else in the house on that particular day; correct,

7   while you were there?

8 A Yes, sir.

9 Q Okay.  And nobody else came into the home until I guess

10   the fire department later came in?

11 A Yes, sir.

12 Q Okay.  And was this after Victor had gotten his mother a

13   glass of water?

14 A Yes, I believe so.

15 Q Okay.  All right.  Page four, I'd ask that you read lines

16   three through -- three through eight.

17 A (Witness complying).  All right.

18 Q Okay.  And was this, if you know, the woman that was

19   talking at the time at the front door?

20 A It could have been, sir.  Again, I was down on the

21   sidewalk and several feet away and she was -- she was

22   still doing some yelling.

23 Q Okay.  And I'd ask that you continue over to page five.

24 A All right.

25 Q And read lines three through four to yourself, three and

Page 59

```
 1         four to yourself.

 2   A     (Witness complying).   Okay.

 3   Q     And do you see where it says, You touch my vehicle?

 4   A     Yes, sir.

 5   Q     Okay.  And then it says there's a male officer 1.

 6   A     Okay.

 7   Q     That's not you; correct?

 8   A     No, sir, I don't believe it was.  I wasn't talking at

 9         this point.

10   Q     You weren't talking until you got into the residence;

11         right?

12   A     That's correct, sir.

13   Q     And I would ask that you read lines six through ten.

14   A     Okay.  (Witness complying).

15   Q     Okay?

16   A     Okay.

17   Q     Have you read it all?

18   A     Yes, sir, I have.

19   Q     Do you see where it says, I'm going to get my freaking

20         gun and get you off my premises?

21   A     Yes, sir, I see that.

22   Q     Is that something different than what you put in your

23         report?

24   A     Yes, sir, that is -- that is different than what I put in

25         my report.
```

Page 60

1    Q    Okay.   Sergeant, I'm handing you Plaintiff's Exhibit No.

2         1.

3    A    Okay.

4                         MR. PEACOCK:   Which is what, Mr.

5         McQueeney?

6                         MR. McQUEENEY:   That is the

7         sergeant's answers to interrogatories.

8                         MR. PEACOCK:   Thank you.

9                         MR. McQUEENEY:   Sure.

10                        MR. PEACOCK:   This is Exhibit 1?

11                        MR. McQUEENEY:   Correct.

12        BY MR. McQUEENEY, CONTINUING:

13   Q    Okay.   Sergeant, first of all, before we get started

14        asking a few questions, first acknowledge there's twelve

15        pages to the exhibit.

16   A    Yes, sir, twelve pages.

17   Q    Okay.   And the last page, does that contain your

18        signature, page 12?

19   A    Yes, sir, it does, up at the right top right-hand corner.

20   Q    Okay.   Look at paragraph number eight on page eight.

21   A    Page eight?   Okay.   I'm sorry.   And that was number

22        eight, sir?

23   Q    Correct.

24   A    Okay.

25   Q    You see the question -- you don't have to read the

1 question.  As to this answer did you review this answer

2 prior to signing your answers?  Well, let me rephrase

3 that question.  I apologize.

4 A Okay.

5 Q Did you review all the answers to all the questions prior

6 to signing the signature page, number 12?

7 A Yes, I did.

8 Q Okay.  Did you review it on a computer or was it printed

9 out for you?  How did you review it, if you recall?

10 A If I recall it was printed out for me.

11 Q Okay.  And let's go back to paragraph number eight.  It

12 says here -- and I'm not going to read the entire answer.

13 There's an objection and then it said related to the

14 entry into the home after Ms. Perovich

15 announced/threatened to get her and pushed Officer

16 Cattaneo in an apparent effort to carry out her threat.

17     There's no reference in that answer

18 about that she was going to shoot anybody; correct?

19     MR. KASZUBSKI:  Objection.  That's

20 not his answer.  That's actually my objection to which I

21 assigned to.  That's part of the objection, Mr.

22 McQueeney.

23     MR. McQUEENEY:  Okay.

24     MR. KASZUBSKI:  Without waiving this

25 objection, please see the attached training records

Page 62

```
 1          pertaining to various training courses attended by this
 2          defendant.
 3          BY MR. McQUEENEY, CONTINUING:
 4    Q     But there's no reference -- do you understand my question
 5          there's no reference to anybody being shot with a gun in
 6          that answer; correct, or the objection?
 7    A     Yeah.  Yes, sir.
 8    Q     Okay.  Turn to paragraph eleven on page nine.  Do you see
 9          where it says, When you entered the residence with other
10          defendants was Ms. Perovich at her front door?
11    A     Yes, sir.
12    Q     Okay.  The answer, Ms. Perovich had turned back to
13          proceed into the home where she claimed she would
14          retrieve her gun.
15                         That answer is devoid of any
16          reference where she'd retrieve a gun and shoot anybody;
17          correct?
18    A     Yes, sir.
19    Q     Okay.
20                         MR. KASZUBSKI:  Objection, that's not
21          what the question asked or what the answer states.
22                         MR. McQUEENEY:  What?  The question
23          was --
24                         MR. KASZUBSKI:  The question was when
25          you entered the residence --
```

Page 63

1                              MR. McQUEENEY:  When you entered the

2       residence -- don't talk over me.

3                              MR. KASZUBSKI:  I'm actually reading

4       the question.

5                              MR. McQUEENEY:  I read the question.

6                              MR. KASZUBSKI:  You didn't read the

7       question out loud to him.

8       BY MR. McQUEENEY, CONTINUING:

9   Q   You want to read the question out loud?  Does that help

10      you, Sergeant?  When you entered the residence with the

11      other defendants was Ms. Perovich at her front door?  Do

12      you see that question?

13  A   Yes, sir, I do.

14  Q   Your answer is Ms. Perovich had turned to proceed into

15      the home where she claimed she would retrieve her gun;

16      right?  That's your answer?

17  A   Yes, sir.

18  Q   And there's nothing in there that suggests that she was

19      going to shoot anybody; right?

20  A   On this particular answer, yes.

21  Q   Thank you, sir.

22                             MR. McQUEENEY:  Does that help you,

23      Marc?

24                             MR. KASZUBSKI:  Absolutely.

25      Especially since the question wasn't whether or not she

```
 1      threatened them -- to shoot them.  The question was where
 2      she.
 3                      MR. McQUEENEY:  Look, you're not
 4      testifying --
 5                      MR. KASZUBSKI:  Does that help you,
 6      Mr. McQueeney?
 7                      MR. McQUEENEY:  You're not testifying
 8      here.
 9                      MR. KASZUBSKI:  Lawyer tricks don't
10      make a case.
11                      MR. McQUEENEY:  Strike that.  Never
12      mind, keep it in.  I'm going to bring a motion to strike.
13                      MR. KASZUBSKI:  Withdraw.  Please
14      strike it.  I'll agree to the strike.
15                      MR. McQUEENEY:  No, I don't agree.
16      Keep it in.  It's my deposition.  You want to remove it,
17      file your motion.
18                      MR. KASZUBSKI:  Keep it in.  You're
19      the one that wants to remove it.
20      BY MR. McQUEENEY, CONTINUING:
21   Q  After the -- after the fire department arrived, as you
22      testified earlier, did anybody retrieve a videotape in
23      the residence?
24   A  I did not see that.
25   Q  You did not see that, okay.  What did you do at the scene
```

1        other than, I guess, safeguard the other officers and

2        then I guess stop Victor when he came into the living

3        room?  Did you do anything else other than that and make

4        that cursory sweep of the living room?

5  A    Nothing else, sir.  That was my job for the day.

6  Q    Okay.  Did Ms. Perovich complain of any injuries at that

7        time?

8  A    The only thing that she had claimed was that she had

9        prior back problems.

10  Q    She did complain of prior back problem.

11  A    Yes.

12  Q    Was Sergeant Cattaneo kneeling on her back when he was

13        trying to handcuff her?

14  A    I never saw that.

15  Q    You weren't looking at her at all times; correct?

16  A    I was -- again, as I stated earlier, I had Victor -- I

17        saw everything on there and then once I entered the

18        living room and Victor came in, from my perspective I

19        could keep an eye on Victor and I could also on my

20        peripheral vision see the doorway.  And I never observed

21        Sergeant Cattaneo ever put any -- or, any part of his

22        body onto -- what's her -- Perovich, is that how you

23        pronounce the last name?

24  Q    Correct.

25  A    Yes, sir.

1   Q   Did -- well, then who put the handcuffs on her?  Was it

2       Sergeant -- or, Officer Fett?

3   A   I believe it was Officer Fett.

4   Q   Okay.  Was she on the floor with Mrs. Perovich, Ms.

5       Perovich?

6   A   What I saw with Officer Fett was that she had made her

7       way a little to the right and she was bending over off to

8       one side and had grabbed her right wrist, and that was

9       all I saw.

10  Q   I'm going to take break for a minute and then I'm going

11      to play a videotape.

12                          (Recess from 5:50 p.m. to 5:57 p.m.)

13                          MR. McQUEENEY:  We are viewing a

14      videotape.

15                          (Discussion held off the record)

16      BY MR. McQUEENEY, CONTINUING:

17  Q   Sergeant, is that Detective Melise?

18  A   Yeah.  Yes, I believe so.

19                          MR. KASZUBSKI:  In plain clothes,

20      identified with glasses on?

21                          THE WITNESS:  Uh-huh.  I'm sorry,

22      yes.

23      BY MR. McQUEENEY, CONTINUING:

24  Q   Right.  Is that --

25  A   That's me.

Page 67

1    Q    That was you?

2    A    Uh-huh.

3                         THE COURT REPORTER:  Is that yes?

4                         THE WITNESS:  I'm sorry, yes.

5    BY MR. McQUEENEY, CONTINUING:

6    Q    Is that Sergeant Cattaneo?

7    A    Yes, that is Sergeant Cattaneo.

8    Q    And we can't see Officer Fett; correct?

9    A    No, sir, you cannot see Officer Fett.

10   Q    Is that Sergeant Cattaneo in front?

11   A    Yes, sir.

12   Q    Okay.  Sergeant, could you see the video?

13   A    Yes, sir, I could.

14   Q    Nothing -- nothing impeded your view in the video?

15   A    No, sir, I could see.

16   Q    I didn't see a push there.  Did you see a push on that

17        videotape?

18   A    Upon looking at it from this angle, sir, I did not.  On

19        that particular day from the perspective I had down and

20        over, it did appear to be a push.

21   Q    Okay.  And did you hear what the woman said, I'm going to

22        get your gun -- get my gun and chase you off my premises.

23        Did you hear her say that?

24   A    That's what I heard here today on the television, yes,

25        sir.

1   Q   And that would be different than what you've put in your
2       report in Exhibit No. 2; correct?

3   A   Yes, sir, it would be different.

4   Q   Okay.  And did you see that Detective Melise also went
5       in?

6   A   I did, yes.

7   Q   And you followed him in?

8   A   Yes, sir.

9   Q   Okay.  And so Sergeant Cattaneo, Officer Fett, Melise and
10      then yourself, all four of you went into the residence;
11      correct?

12  A   Yes, after looking at the videotape.

13  Q   Okay.  And I could see a hand gesturing, but -- did you
14      see that on the video?

15  A   Yes, sir, I did.

16  Q   Okay.  But I didn't see anything up near the upper
17      left-hand torso, as you testified earlier.  Did you see
18      that on the video?

19  A   I did.  And again, from the time that we were there,
20      that's -- it did appear that there was a hand out and did
21      make contact with Sergeant Cattaneo.

22  Q   That's what it appeared off to the side, but on the video
23      it doesn't show that there was a push or contact with the
24      upper left-hand torso of Sergeant Cattaneo; right?

25  A   No, sir, on the videotape it does not look like that.

Page 69

```
 1                        MR. KASZUBSKI:  Talking about the
 2        first push; correct, Mr. McQueeney?
 3                        MR. McQUEENEY:  Well, he's testified
 4        to two pushes, so I don't --
 5        BY MR. McQUEENEY, CONTINUING:
 6    Q   Did you see any pushes on the video?
 7    A   No, sir, I did not, not on the video.
 8    Q   All right.  Okay.  And then you hear after there's an
 9        entry into the residence the woman screaming?
10    A   Yes, sir.
11    Q   Okay.  There's no other threats or anything while she's
12        on the floor or anything; correct?
13    A   No, sir.
14    Q   Okay.  When you went in and you said you saw the woman
15        drop to the floor were the other officers in front of
16        you?
17    A   Sergeant Cattaneo would have been up to the left, and
18        again, Officer Fett would have been around to the right.
19    Q   Okay.  Where was Detective Melise, or you just don't
20        recall?
21    A   Sir, I'm sorry.  Again, until I reviewed the video, I
22        didn't remember him going in.
23    Q   Okay.
24    A   I was focused on getting in and clearing the living room.
25    Q   Has there ever been a time where you've gone to a private
```

1      residence and an elderly woman's suggested she's going to

2      pull a gun on you, on you personally?

3  A   Sir, over twenty-one years I've had kids as young as

4      twelve and as old as my grandparents threaten to kill me.

5      If you're asking for specifics --

6  Q   Okay.

7  A   -- it would take a lot to get you the case numbers and

8      the dates and the times.  But I can tell you that, yes,

9      over the course of my career I've had a lot of different

10     people from all kinds of walks of life make those

11     threats.

12  Q   Let's just keep it to the elderly woman type scenario.

13  A   Uh-huh.

14  Q   Is that a yes?

15  A   You know, yes, sir, it would be.

16  Q   And has that happened before?

17  A   Yes, sir, it has.

18  Q   And have you automatically gone into the residence on

19     these prior occasions?

20  A   Every situation is different, sir.

21  Q   I understand.

22  A   This situation is absolutely different from any other

23     scenario that I would have had, uh-huh.

24  Q   Yes?

25  A   Yes.

Page 71

1  Q  Has there been times where you've not entered a residence

2     where somebody has threatened to kill you, an elderly

3     woman?

4  A  I'm sure of it.  I don't recall at this time, but I'm

5     just not ....

6  Q  Okay.  Sergeant Cattaneo testified during his

7     deposition -- and I apologize you weren't there, but he

8     testified that he would have needed a search warrant to

9     search the house after he had detained Ms. Perovich.  Is

10    that because she had not committed a crime at that time?

11                   MR. KASZUBSKI:  Objection, calls for

12    speculation.  It's what Mr. -- or, Officer Cattaneo --

13    or, Sergeant Cattaneo was thinking at the time.

14                   MR. McQUEENEY:  Sergeant.

15                   MR. KASZUBSKI:  With respect -- and

16    also asks for a legal conclusion.  So only if you can

17    answer as to that question.  I don't know if you can.

18                   THE WITNESS:  Once the scene is

19    locked down we would be getting a search warrant.  I

20    guess I don't know what else you could compare it to,

21    perhaps a domestic violence situation.  If you're looking

22    for any other fruits of crimes or something like that,

23    then to safeguard yourself to look further you would get

24    a search warrant.

25    BY MR. McQUEENEY, CONTINUING:

Page 72

1   Q   Well, you testified -- I just want to do some follow-up

2       questions.  Earlier you testified that Mrs. Perovich had

3       committed a resisting and obstructing arrest felony;

4       correct?

5   A   Yes, sir.

6   Q   Okay.  And at that point she's being placed under arrest

7       by Sergeant Cattaneo and/or Officer Fett; correct?

8   A   Correct.

9   Q   Okay.  Since she's being placed under arrest you could

10      certainly search the house -- search incident to a lawful

11      arrest; right?

12  A   You wouldn't search the entire house for that, sir.

13  Q   Okay.

14  A   And again, I would have to pull up my manual on search

15      and seizure and everything for search warrants.  But

16      you're certainly within the legal bounds to do a

17      protective sweep for the officers' safety, arm span of

18      control.  She stated that there was a weapon and you

19      could certainly look for that.  Beyond that, for lawful

20      purpose -- for lack of a better term -- you would want to

21      get a search warrant before engaging the rest of the

22      home.

23  Q   Was there any other means to taking Ms. Perovich into

24      custody at a later date without entering the residence?

25      Could a letter have been sent to her to have herself turn

Page 73

1       herself in?

2    A   Based on the circumstances of this particular event, that

3       wasn't an alternative.

4    Q   Okay.  Sergeant, take up the exhibit with the pictures?

5    A   Of Mrs. --

6    Q   Perovich.  Here we go.  All right.  You have that in

7       front of you, sir?

8    A   Yes, sir, I do.

9    Q   Okay.  And I'd ask that you turn to the fourth picture,

10      where it says "right arm" underneath the picture.

11   A   Yes, sir.

12   Q   Okay.  Did Ms. Perovich ever complain of any injuries to

13      her right arm at the time that she was apprehended?

14   A   Not to me, I did not overhear her say anything like that.

15   Q   Okay.  Could she have made the complaint to the other

16      officers and you didn't hear it?

17   A   Again, sir, I did not hear it.

18   Q   Okay.  Turn to page five of the pictures, or the fifth

19      picture, excuse me.  See where it says "left hand"?

20   A   Okay.  Yes, sir.

21   Q   Did she make any complaints about her left hand?

22   A   She -- I did not overhear her make any complaints of her

23      extremities at all.

24   Q   And you said she complained about the back.  Was she --

25      did she complain of any heart problems or shortness of

Page 74

```
 1         breath or any other maladies at that time?

 2    A    No, sir.  The only -- the only thing that was ever

 3         brought up by her and her son was that she had back

 4         problems or back surgery or something like that.

 5    Q    And did you talk to any of the officers prior to your

 6         testimony today?

 7    A    No, sir, I have not.

 8    Q    You never talked to them about this case?

 9    A    No, sir.  Just I think the only thing was when's the

10         depositions.  That's all.  I never talked about the case.

11         Never shared information.

12    Q    Okay.  And that was the first time you saw that

13         videotape?

14    A    No, sir, I saw it once before.

15    Q    Okay.

16                        MR. McQUEENEY:  No other questions.

17                        MR. PEACOCK:  I have no questions,

18         Sergeant.  Thank you.

19                        MR. KASZUBSKI:  Have a nice day.  No

20         questions.

21                        THE WITNESS:  Thank you, guys.  I

22         appreciate it.

23                        (Deposition concluded at 6:15 p.m.)

24                    -    -    -

25
```