UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF MARIA PEROVICH,
VICTOR GOJCAJ,

        Plaintiffs,           Case No.: 2:09-CV-12192
                                    HON: Patrick Duggan

- vs -

STERLING HEIGHTS POLICE OFFICER
ANTOINETTE FETT, STERLING HEIGHTS POLICE
SERGEANT DAVID CATTANEO, STERLING HEIGHTS
POLICE OFFICER AARON BURGESS AND CLINTON
TOWNSHIP POLICE DETECTIVE LEO MELISE,

        Defendants,

_____/

### DEPOSITION OF DAVID M. CATTANEO

The deposition of DAVID M. CATTANEO taken before JANICE J.

FLYNN, Notary Public and Court Reporter, CER 5416, in and for

the County of Macomb, State of Michigan, held on Wednesday,

May 12, 2010 at 12900 Hall Road, Suite 350, Sterling Heights,

Michigan, 48313 commencing at 1:10 p.m.

APPEARANCES:           LAW OFFICES OF PATRICK J. MCQUEENEY
                    BY: PATRICK J. MCQUEENEY, ESQ.
                    Attorney for Plaintiff
                    33830 Harper Avenue
                    Clinton Township, Michigan 48035

                    O'REILLY RANCILIO, PC.
                    BY: MARC D. KASZUBSKI, ESQ.
                    Attorney for Defendants Cattaneo Burgess
                    and Fett
                    12900 Hall Road, Suite 350
                    Sterling Heights, Michigan 48313
                    PLUNKETT COONEY
                    BY: PETER W. PEACOCK, ESQ.
                    Attorney for Defendant Leo Melise
                    10 South Main Street, Suite 400
                    Mt. Clemens, Michigan 48043

ALSO APPEARING:       VICTOR GOJCAJ

INDEX

Witness:                                        Page:


DAVID M. CATTANEO


     Examination by Mr. McQueeney            3


Exhibits:                                       Marked:


     Plaintiff's Exhibit One                6


     Plaintiff's Exhibit Two                34


     Plaintiff's Exhibit Three              51


     Plaintiff's Exhibit Four               56


     Plaintiff's Exhibit Five               63

Page 3

1          Sterling Heights, Michigan

2          Wednesday, May 12, 2010

3              At about 1:10 p.m.

4                      *

5      D A V I D   M.   C A T T A N E O

6      Having been first duly sworn by the Notary Public to

7      tell the truth, the whole truth and nothing but the

8      truth, testified upon his oath as follows:

9              MR. MCQUEENEY: Let the record reflect this is

10      the deposition of -- Is it sergeant or detective?

11              THE WITNESS: Sergeant.

12              MR. MCQUEENEY: Sergeant David Cattaneo.

13              THE WITNESS: Cattaneo.

14              MR. MCQUEENEY: Cattaneo.  I apologize.

15              THE WITNESS: That's pretty good.

16              MR. MCQUEENEY: I'm trying.  This deposition

17      is being taken pursuant to the Federal Rules of

18      Evidence and the Federal Rules of Civil Procedure.

19                      EXAMINATION

20   BY MR. MCQUEENEY:

21   Q   Sergeant Cattaneo, I'm Patrick McQueeney.  I

22      represent Mr. Victor Gojcaj.  I'm going to be asking

23      you a series of questions.  I ask that you clearly

24      annunciate all of your answers.  No shrugging of the

25      shoulders, nodding of the head.  The court reporter

```
 1        is going to take down everything you say.  If you

 2        answer the question, I'll presume you understood the

 3        question.  If you need me to rephrase or repeat the

 4        question, please advise me and I will do so.  Please

 5        state your full name and spell your last name for

 6        the record, please.

 7   A    My name is David Mark Cattaneo, C-a-t-t-a-n-e-o.

 8   Q    And how far did you go in school?

 9   A    Approximately, three years of college.

10   Q    Where did you go to college?

11   A    Wayne State University.

12   Q    And you didn't obtain a degree from Wayne State?

13   A    No, sir, I did not.

14   Q    Okay.  Any other education, other than high school

15        and the college stated as Wayne State University?

16   A    Formal education, no.

17   Q    Okay.  You're currently employed by the Sterling

18        Heights Police Department.

19   A    Yes.

20   Q    And you said you're a sergeant.

21   A    Yes, sir.

22   Q    How long have you been a sergeant?

23   A    It will be thirteen years this month.

24   Q    And how long have you been with the Sterling Heights

25        Police Department?
```

Page 5

1  A      A little over twenty years.

2  Q      Any other law enforcement training?

3  A      Approximately, two years with Harper Woods Police

4         Department and I worked for the City of Detroit for

5         two years.

6  Q      In the abundance of discovery your attorney, Mr.

7         Kaszubski, was gracious enough to provide me --

8                 MR. KASZUBSKI: Kaszubski.

9                 MR. MCQUEENEY: Sorry.

10                MR. KASZUBSKI: That's fine.  Just call me

11        Marc.

12                MR. MCQUEENEY: Marc.

13 BY MR. MCQUEENEY:

14 Q      It says that you left Detroit at some point.  Why

15        did you leave Detroit?

16 A      I think it was a long term family plan.  What I was

17        most concerned with -- Realizing at the time that we

18        had to live in the city of Detroit, I was concerned

19        about raising a family in Detroit.  So I think

20        ultimately my game plan was to leave there.

21 Q      And that's when you took a position at Harper Woods?

22 A      Yes, sir.

23 Q      You said you were at Harper Woods for two years.

24        What was your position at Harper Woods Police

25        Department?

Page 6

```
 1    A      I was a police officer.

 2    Q      Okay.  Road patrol?

 3    A      Yes, sir.

 4    Q      And why did you leave Harper Woods to come to

 5           Sterling Heights?

 6    A      Probably to work for one of the best departments

 7           around.  Harper Woods is very small, 2.2 square

 8           miles, and I saw coming out to Sterling Heights that

 9           there was a lot more opportunities for me.

10    Q      Okay.  In the discovery that was provided it says

11           you have not been disciplined in any fashion as a

12           law enforcement officer for the Sterling Heights

13           Police Department.  Is that accurate?

14    A      Yes, sir.

15    Q      Have you ever been disciplined as a law enforcement

16           officer for Harper Woods?

17    A      No, sir.

18    Q      How about for the city of Detroit?

19    A      No, sir.

20                (Whereupon, Plaintiff's Deposition Exhibit

21           Number One was marked for identification.)

22    BY MR. MCQUEENEY:

23    Q      Okay.  Sergeant, I'm handing you Plaintiff's Exhibit

24           Number One.  First of all, before I ask you any

25           questions from it, do you acknowledge that there are
```

```
 1          seven pages contained within the exhibit?

 2    A     That's correct, sir.  There is seven pages.

 3    Q     And do you recall the date of going to Mr. Gojcaj's

 4          home to investigate an incident?

 5    A     It would be on October 30, 2007.

 6    Q     All right.  And on that date were you a sergeant

 7          with the Sterling Heights Police Department?

 8    A     Yes, sir.

 9    Q     Okay.  And what time did you arrive there?

10    A     Approximately, at 9:50 in the morning.

11    Q     Okay.  And is that the -- What's the address of the

12          residence you went to?

13    A     The address was 43153 Penny.

14    Q     Okay.  Is that a single family dwelling or a

15          multiple family dwelling?

16    A     Single family dwelling.

17    Q     And were you in a marked unit?

18    A     I believe I was in a semi-marked unit.

19    Q     What's a semi-marked unit?

20    A     Usually the lights are not on the top.  The city of

21          Sterling Heights police markings are on the side.

22          Lights are on the front and the back.

23    Q     Okay.

24    A     The supervisors normally drive those cars.

25    Q     All right.  And was anybody else assigned to the
```

```
 1           unit other than yourself?

 2    A      Assigned to the unit?

 3    Q      To that unit or the police unit -- the police

 4           cruiser.

 5    A      No.

 6    Q      Okay.  And when you arrived at this address on

 7           Penny, was anybody else present?

 8    A      Upon my arrival I was greeted by a detective from

 9           Clinton Township.

10    Q      What was his name?

11    A      It was Detective Melise.

12    Q      Okay.  Did you talk to Mr. Melise prior to your

13           arrival?

14    A      No, sir.

15    Q      Okay.  Were you already out on the roadway and was

16           dispatched to this location?

17    A      Yes.

18    Q      Okay.  And did any other Sterling Heights police

19           officers, other than yourself, come to the

20           residence?

21    A      Officer Fett and Officer Burgess.

22    Q      Okay.  When you arrived was Officer Fett and/or

23           Officer Burgess were they present or either one of

24           them present?

25    A      I believe I was the first one on the scene.
```

1   Q    Okay.  And you said Detective Melise was already

2          present.

3   A    Correct.

4   Q    Okay.  Did you have a conversation with Detective

5          Melise?

6   A    I did.

7   Q    Okay.  Did you have any conversation with dispatch

8          as to why you were being dispatched to this

9          location?

10  A    I did.

11  Q    What were you told was going on there?

12  A    The original information that I got came from the

13         resident that lived at the Penny address.  She

14         called our dispatch indicating that a strange man

15         was knocking on her door and she didn't know who it

16         was.

17  Q    Okay.  And did you determine that the strange man

18         was Detective Melise?

19  A    Correct.  Then we had the second call into our

20         dispatch and it was him calling our dispatch

21         advising us why he was there.

22  Q    Okay.  So I can get a timeline, there was a call

23         from the residence saying a strange man was there,

24         to dispatch, and you were dispatched out to

25         investigate the estranged person?

1   A    Correct.

2   Q    And then Detective Melise then called dispatch and

3         said he was at the residence?

4   A    Yes, sir.

5   Q    Okay.  To your knowledge, was there any other

6         communication between the Clinton Township Police

7         Department and your department that Detective Melise

8         would be out at that residence at that time in the

9         morning?

10  A    Not that I'm aware of.

11  Q    Okay.  And what did you learn from Detective Melise?

12        Why he was there.

13  A    Detective Melise responded to the address to

14        investigate defrauding an innkeeper complaint.

15  Q    Okay.

16  A    Apparently, they got a suspect and a suspect

17        vehicle.  The vehicle had been parked in the

18        driveway and they believe that Mr. Gojcaj, Victor

19        Gojcaj, was the responsible one that ran out on the

20        bill.

21  Q    Okay.  And so where did Detective Melise say this

22        purported defrauding an innkeeper occur?  Did it

23        occur in Sterling Heights or?

24  A    It would have been in Clinton Township and I don't

25        remember the specific place.

1   Q    Okay.  And did he give you any other particulars,

2         other than the name of the person that he was

3         investigating?  Any other information.

4   A    No, not that I remember.  No.

5   Q    Okay.  Did you have any information about that

6         residence or the occupants of that residence prior

7         to your arrival?

8   A    No, sir.

9   Q    Okay.  What did you do after you talked to Detective

10        Melise?

11  A    I went up to the residence and tried knocking on the

12        door.

13  Q    Okay.  And why did you do that?

14  A    To make contact with the homeowner.  The resident

15        there.

16  Q    Okay.

17  A    And advise them of why Detective Melise was there.

18  Q    Okay.  And was there an immediate response?

19  A    No, there was not.

20  Q    Okay.  What did you do after you knocked on the door

21        and announce your presence?

22  A    I continued to knock on the door and then finally

23        Ms. Gojcaj -- Gojcaj is it?  Ms. Perovich.  I'm

24        sorry.  She was later identified as Maria Perovich.

25        She was at the door.  She opened up the door a

Page 12

```
 1              little bit.  She was still on the phone with our
 2              dispatch and I was trying to tell her to come out
 3              and talk with me and at one point in time I got my
 4              dispatch on the radio and said could you have her
 5              hang up the phone with you.  I'm here.  Please have
 6              her come out and talk with me.
 7   Q          Okay.  So you said she was still on the phone, but
 8              she was at the front door.
 9   A          Correct.
10   Q          So did she have a portable phone or what type of
11              phone did she have?  Could you see?
12   A          I really don't recall what she had.  I'm assuming it
13              was portable because she was in the vestibule right
14              there.
15   Q          Okay.  And you said she was at the front door.  Are
16              there one door or two doors at the front entryway?
17   A          There were two doors.  A screen door and another
18              door.
19   Q          Okay.
20   A          Like this door.
21   Q          Okay.  And was either of the doors open when you saw
22              her on the cell phone?
23   A          Gosh, I don't remember.  At one point in time she
24              opened the wooden door just partially.  It was
25              partially opened.
```

Page 13

```
 1   Q    The main door?

 2   A    Yes, not the screen door, but the main door, yes.

 3   Q    Okay.  And you told her to hang up the phone?

 4   A    Yes.

 5   Q    Okay.  When you first knocked at the door before you

 6        saw her on the phone and everything and you

 7        announced your presence, who was present?  Was it

 8        yourself, Detective Melise and the other two

 9        officers, Fett and Burgess?

10   A    Yeah, I'm not sure when Officer Burgess showed up.

11        I know Officer Fett was there at the door with me.

12   Q    Okay.  And is there a porch to this single family

13        residence?

14   A    Yes, there was.

15   Q    Okay.  Do you step up on steps to get onto the porch

16        or how was it, do you recall?

17   A    No, I really don't.

18   Q    Okay.  Is it a large porch?

19   A    No, not very large.  I -- By standards are we

20        looking for feet or --

21             MR. KASZUBSKI: I don't want you to guess at

22        it, but if you can give him a rough estimate.

23             THE WITNESS: It was relatively small.

24   BY MR. MCQUEENEY:

25   Q    Relatively small.
```

```
 1   A    Sure.

 2   Q    Okay.  So when you're on the porch, was the

 3        remaining other officers -- I know you say you don't

 4        know if Officer Burgess was there yet.

 5   A    Correct.

 6   Q    Was Officer Fett and Detective Melise on the porch

 7        with you also?

 8   A    No.

 9   Q    Okay.  Who was on the porch, other than yourself?

10   A    Just me --

11   Q    Okay.

12   A    -- on the porch.

13   Q    Where was Officer Fett?

14   A    Somewhere to my rear behind me.

15   Q    Okay.  Did you glance around to see where she was?

16   A    I don't really recall specifically where she was.

17        She was behind me.  I was more dealing with

18        everything in front of me.

19   Q    Okay.  And where was Detective Melise?

20   A    He was also behind me.  Somewhere to my rear.

21   Q    Okay.  And so you testified that Ms. Perovich opened

22        the door, this wooden door, partially.  Did she

23        eventually open it all the way?

24   A    She did.

25   Q    Okay.  When did she eventually open it all the way?
```

```
 1   A      I'm not sure what you're asking me.  When she did
 2          it?  I mean when I started to initiate a
 3          conversation with her, she opened up the wooden door
 4          all the way.
 5   Q      Okay.
 6   A      And then at one point in time she opened up the
 7          screen door and was standing.
 8   Q      Okay.  I'll get to the screen door --
 9   A      To talk to me.
10   Q      -- in a second.
11   A      Yeah.
12   Q      You said she opened it partially.  How long after
13          you started conversing with her did she open the
14          door all the way?
15   A      Oh, it was less than a minute.
16   Q      Okay.  And when she opened that wooden door, was she
17          still in possession of the phone, if you recall?
18   A      Gosh, I don't remember.  I really don't.  I think
19          she might have been, but I'm not positive.
20   Q      Okay.  And when she opened the wooden door and you
21          were on the porch, did you notice if Officer Burgess
22          had yet arrived?
23   A      No, I don't remember when he got there.
24   Q      At some point he did arrive.
25   A      Right.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  And when she opened the door all the way, the |
| 2 | | wooden door, then eventually she opened the screen |
| 3 | | door. |
| 4 | A | Uh-huh. |
| 5 | Q | How much longer after she had opened that wooden |
| 6 | | door all the way to open the screen door? |
| 7 | A | Again, it was a relatively short period of time. |
| 8 | Q | Okay.  Thirty seconds?  A minute?  Ten seconds? |
| 9 | A | I couldn't put a time frame on it.  It wasn't very |
| 10 | | long though. |
| 11 | Q | All right.  When she opened that screen door, what |
| 12 | | arm or hand did she use to open it up with? |
| 13 | A | I'm pretty sure that would have been her right hand. |
| 14 | Q | Okay.  And did she come all the way out onto the |
| 15 | | porch? |
| 16 | A | She was standing in the threshold of the door. |
| 17 | Q | Okay.  What do you mean by that, please? |
| 18 | A | Well, probably if the door closed, it would have |
| 19 | | been right where the door was. |
| 20 | Q | Okay.  So at or near the door jam? |
| 21 | A | Yes. |
| 22 | Q | Okay.  So was she partially on the porch and |
| 23 | | partially in the home, if you recall? |
| 24 | A | At that time she was right in the threshold by the |
| 25 | | door jam. |

1   Q    Okay.  And was there a conversation at that point?

2   A    Yes.

3   Q    And what was the nature of the conversation?

4   A    We were explaining to her the nature of our visit.

5         I was advising her of who Detective Melise was.

6         That he was here to investigate a complaint and he

7         was looking for her son, Victor.

8   Q    Okay.  And did you hear Detective Melise suggest

9         that he was going to tow a vehicle?

10  A    Yes.

11  Q    What vehicle did he say he was going to tow?

12  A    It was the vehicle that was in the driveway.  I

13        believe the plate matched the suspect description in

14        the crime in Clinton Township.

15  Q    Okay.  You didn't have anything involving this

16        investigation, other than you were there at the

17        request of dispatch.  Clinton Township didn't ask

18        you to get involved in the investigation of this

19        defrauding an innkeeper, did they?

20  A    Well, my initial response to the run was to assist

21        the resident there, Maria Perovich.  It was to help

22        her out.

23  Q    Okay.

24  A    'Cause she was the one calling for our assistance.

25        I was there to help her.  Our first notice that

 1          Clinton Township was involved was when he called

 2          dispatch and I received the information that there

 3          was also a detective from Clinton Township out

 4          there.  So that was the first time that we had

 5          understood why we were going there.

 6     Q    Okay.  So at some point you said you had a

 7          conversation with Detective Melise before he knocked

 8          at the door and he told you that he was

 9          investigating defrauding an innkeeper.  Did he ask

10          you -- or request your assistance in this

11          investigation?

12     A    Yes, he asked me to go up to the residence and

13          explain why we were there.  I mean we had a

14          conversation why he was there.

15     Q    Okay.

16     A    So I mean I was kind of there to assist both of them

17          I guess.

18     Q    What's the protocol for the Sterling Heights Police

19          Department in investigating an incident that does

20          not occur -- that did not occur in your

21          jurisdiction?

22     A    Um.

23     Q    Let me rephrase that.  What's the protocol for the

24          Sterling Heights Police Department in investigating

25          a purported criminal incident that did not occur in

```
 1         Sterling Heights' jurisdiction?

 2    A    I'm not sure what our protocols are, you know, as

 3         far as the detectives going out.  I mean I've

 4         initiated complaints in other cities and I would

 5         respond to the addresses.

 6    Q    Okay.

 7    A    And I think we are leading to this.  I may or may

 8         not let the department know why I'm coming there.  I

 9         mean it wouldn't be uncommon for Clinton Township to

10         say hey, this is why I'm going there, but a lot of

11         times the detectives don't do that.  If it's

12         something that's being investigated like in a hot

13         pursuit kind of deal, like we're going right there -

14         -

15    Q    Sure.

16    A    -- or maybe a major felony, we'll definitely let the

17         city know that we're responding to it.

18    Q    Okay.

19    A    I can say, as a matter of principle, they don't

20         always notify us.

21    Q    Okay.  This wasn't a hot pursuit type of situation,

22         correct?

23    A    Correct.

24    Q    And there was no description that you received from

25         dispatch or from Detective Melise that a felony had
```

```
 1        been committed, correct?

 2   A    Correct.

 3   Q    Okay.  And so getting back to the door, you said

 4        that Ms. Perovich opened the door partially, the

 5        screen door, with her right hand.  What was she

 6        doing with her left hand?

 7   A    I don't remember.

 8   Q    Okay.  And as you said -- or as you testified, you

 9        heard Detective Melise say he was going to tow the

10        vehicle.

11   A    Yes.

12   Q    What was Ms. Perovich's response?

13   A    She got extremely irate over that.

14   Q    Okay.  Do you recall what she said?

15   A    She began yelling at us a lot, and at one point in

16        time, that had gotten her so upset that she said she

17        was going to go in the house and get her friggin gun

18        and she was going to shoot our ass.

19   Q    Okay.

20   A    Or something to that effect.

21   Q    All right.  And that's what your recall is?

22   A    Yes, she said she was going to go in the house and

23        get a gun and shoot us.

24   Q    Okay.  Now, you prepared a report with respect to

25        this incident, correct?
```

```
 1   A      Uh-huh.  Correct.

 2   Q      Okay.  And how long after you showed up at the

 3          house, how long later in the shift did you complete

 4          your report?

 5   A      Relatively soon.  Probably within the next hour,

 6          hour and a half, or so.

 7   Q      Okay.  Your report contains -- Your portion of

 8          Exhibit One contains three pages, correct?

 9   A      Yes, sir.

10   Q      Okay.  And on the first page it says -- at the very

11          top of the page it says Incident Prosecution Report

12          I think.  It might be slightly blacked out.

13   A      Sure, that's what it says.

14   Q      Okay.

15   A      That's what it should say.

16   Q      Okay.  Then the next page it looks like some type of

17          a witness list, correct?

18   A      Correct.

19   Q      Okay.  And then on the third page it's your

20          narrative report, right?

21   A      Correct, sir.

22   Q      Okay.  And prior to becoming a police officer at the

23          Sterling Heights Police Department, you went through

24          an academy, correct?

25   A      I did.
```

```
1   Q    You learned report writing?

2   A    Correct.

3   Q    You learned how to use a firearm?

4   A    Yes, sir.

5   Q    You learned how to adhere to certain laws and rules

6        and regulations as to search and seizures, correct?

7   A    Correct.

8   Q    Okay.  And when you learned your report writing, you

9        were told to prepare complete and accurate reports,

10       correct?

11  A    Correct.

12  Q    Because that could be used in criminal prosecutions

13       at some point, correct?

14  A    Most definitely.

15  Q    Okay.  And in your report it says -- if you go to

16       the third full paragraph, it says I knocked on the

17       door and received no response.  Do you see that,

18       Sergeant?

19  A    Yes, sir.

20  Q    At the very bottom of that paragraph it says Maria

21       stated.  Do you see that?

22  A    Uh-huh.

23  Q    Is that a yes?

24  A    Yes, sir.

25  Q    Okay.  And there's a series of quotation marks at
```

```
 1          the beginning of where it says I'm going and at the

 2          end where it says my property, correct?

 3    A     Yes, sir.

 4    Q     Because it's in quotation marks, is that what you're

 5          indicating what Maria stated?

 6    A     It was my recollection of what she had stated to me,

 7          yes.

 8    Q     Okay.  Can you read that into the record what Maria

 9          stated in those quotation marks.

10    A     Yes, sir.  Maria stated I'm going to go in the house

11          and get my friggin gun and shoot you if you don't

12          get off my property.

13    Q     Okay.  And that was, like you say, your recollection

14          within an hour or so after you cleared the

15          residence, correct?

16    A     Yes, sir.

17    Q     Okay.  And when you met Maria Perovich, was she an

18          elderly woman?

19    A     She was in her late fifties.

20    Q     Late fifties.  Okay.

21               MR. PEACOCK: A young woman.

22               THE WITNESS: By standards I hope that's not

23          elderly.

24               MR. MCQUEENEY: A young woman.

25               MR. PEACOCK: Yes.
```

```
 1                    MR. MCQUEENEY: Okay.  I'm sorry, Mr. Peacock.

 2                    MR. PEACOCK: Just remember that.  In her

 3          fifties she's a young woman.

 4                    MR. MCQUEENEY: All right.

 5                    MR. PEACOCK: And that's on the record.

 6    BY MR. MCQUEENEY:

 7    Q     And did she have a walker with her?

 8    A     Not that I recall.

 9    Q     Not that you recall.  Okay.  Did she -- Was she a

10          large woman?

11    A     She looked to be a little bit overweight, yes.

12    Q     Okay.  And could you tell if she had any physical

13          infirmities or any problem walking or?

14    A     No.  Not at that time, no.

15    Q     Okay.  Did there appear to be any like language

16          barrier between you and Ms. Perovich?

17    A     No, she spoke with a heavy accent, but I understood

18          everything she was telling me.

19    Q     Okay.  When she stated, according to your report,

20          I'm going to go in -- to go in the house and get my

21          friggin gun and shoot you if you don't get off my

22          property --

23    A     Right.

24    Q     -- she didn't show you a gun, right?

25    A     No, sir.
```

1   Q      Okay.  At any time during this whole incident from

2          the start until ultimately you left and went back to

3          give your report, you didn't have a search warrant,

4          right?

5   A      Correct.

6   Q      You didn't have an arrest warrant, correct?

7   A      Correct.

8   Q      Neither did any of the other officers have either of

9          those warrants, if you know?

10  A      Correct.

11  Q      Okay.  And after -- When she made that statement I'm

12         going to go into the house and get my friggin gun,

13         was she still at that door jam or was she out on the

14         porch?

15  A      She was still in the door jam.

16  Q      Had she ever come out onto the porch?

17  A      I believe she -- At that time no, not really.  I

18         mean maybe a step at most.

19  Q      Well, can you go back to that paragraph we just went

20         over a minute ago and where it says -- it starts off

21         I knocked on the door and received no response.

22  A      I knocked on the door.  Yes.  That paragraph there.

23  Q      All right.  Look at the line -- it would be starting

24         at line ten, I was advising her of the nature.  Do

25         you see that?  It starts at line ten.

```
 1    A    Yes.

 2    Q    Okay.  I was advising her of the nature of Clinton

 3         Township's investigation when she came out onto the

 4         porch.

 5    A    Okay.

 6    Q    Did she come out onto the porch?

 7    A    Maybe by a step.

 8    Q    Okay.

 9    A    It was the most she had gotten out.

10    Q    Okay.  I don't understand by a step.

11    A    I guess if the answer is either yes or no, then I

12         guess yes, she did step out onto the porch.

13    Q    Okay.  And is that when she made the statement I'm

14         going to go into the house and get my gun?

15    A    Well, I mean she kind of had one foot out.  I guess

16         yeah, she would have been out on the porch or in the

17         door jam.  To me I mean the location was so close

18         that being out on the porch or in the door jam was

19         all part of the same thing.

20    Q    All right.

21    A    So was she out on the porch.  Maybe by a step at

22         most.  Maybe she had one foot out.

23    Q    Okay.  And she hadn't committed a criminal act up

24         until that point in your presence, correct?

25    A    Up until what point?
```

1   Q   Up until the point when she was out on the porch.

2   A   When she says she's going to go in the house and get

3       her gun and she's going to shoot me, at that point I

4       took that as a very unlawful threat.  I thought she

5       had the ability to carry that out and as far as I

6       was concerned that was a crime.

7   Q   Well, if she says I'm going to go into the house and

8       get a gun and shoot you --

9   A   Yes.

10  Q   -- is that a crime?

11  A   Yeah, she has the apparent means to carry that out,

12      and if it's possible for her to do that, yes, it is.

13  Q   Okay.  But she didn't have a gun in her hands,

14      correct?

15  A   Correct.

16  Q   A sweep of the house was done and nobody found a

17      firearm, correct?

18  A   After the fact?

19  Q   After the fact.

20  A   Yes, sir.

21  Q   Okay.  And --

22  A   In the general vicinity where we looked.  We didn't

23      conduct a search of the house.  We conducted, you

24      know, within the reach of her grasp and in the area

25      where we had under control and the living room and

Page 28

```
 1        stuff to make sure that the scene was safe, but we

 2        didn't conduct a search of the house to make sure

 3        that there wasn't a gun.

 4   Q    Okay.  Why not if you feared that she was going to

 5        shoot you?  Why not search for a firearm?

 6   A    At that time we would have needed a search warrant

 7        to conduct that search.

 8   Q    Okay.  But you came into the house anyways, correct?

 9   A    Eventually, yes.

10   Q    Okay.  And a threat in and of itself is not a crime,

11        correct?

12   A    Correct.

13   Q    If I say Sergeant Cattaneo, I've got a gun right

14        here, I'm going to shoot you, that's not a -- that's

15        not a crime.

16             MR. KASZUBSKI: Objection.  It calls for a

17        legal conclusion.  You can answer if you know.

18             THE WITNESS: I don't believe that's a -- If

19        she had the apparent means to carry that out, then

20        it would be a crime.

21   BY MR. MCQUEENEY:

22   Q    No, I'm talking about myself.  If I say I'm going to

23        shoot you or I mean --

24   A    If you said right now I'm going to shoot you?  I'm

25        going to kill you?
```

1   Q   Yeah.

2   A   No.

3   Q   Okay.  Now, if I reach into my pocket and I point my

4       finger like that and I say I'm going to shoot you --

5       shoot you in the head, that's a crime, right?

6   A   I would agree.

7   Q   Okay.  Ms. Perovich never made any motions to

8       suggest she had a firearm with her, correct?

9   A   I would disagree with that from the simple

10      standpoint that when she pushed me aside, assaulted

11      me, and made a break to go back in towards the

12      house, I was a firm believer that there was a weapon

13      and that's what she was going to do.

14  Q   Okay.  But you didn't know anything about her prior

15      to going to the house, correct?

16  A   Correct.

17  Q   So aren't you just speculating that she had a gun

18      and she's going to go in and get it and shoot you?

19  A   Well, I think I based my opinions based on several

20      observations of her character and her attitude at

21      the time.  I realized that she was not a very

22      rational person, and the more irrational that she

23      got, I believed that she was very capable of going

24      inside that house and getting a gun.  So I assessed

25      -- I made my assessments of her character and her

1        personality that yes, she was very capable of going

2        into the house and getting a gun and -- I mean a

3        very sane person would not sit there and tell a

4        police officer she's going to go in the house and

5        get a gun and shoot them.  So --

6    Q   Are you suggesting she was insane?

7    A   I was saying she was not rational.

8    Q   Okay.  What's the protocol for handling a situation

9        where a person's not acting rational?  What's the

10       protocol for the Sterling Heights Police Department?

11   A   It would depend on the circumstances.

12   Q   In your discovery your attorney has graciously

13       provided it appears that you've received some swat

14       team training, correct?

15   A   Correct.

16   Q   And, in fact, you've received an abundance of swat

17       team training, correct?

18   A   Seven years.

19   Q   Okay.  And are you the head of the swat team unit

20       for the Sterling Heights Police Department?

21   A   No, sir.

22   Q   Who's the head of the unit?

23   A   It would be Glen French, Sergeant.

24   Q   Okay.  You could call upon the swat team in

25       emergency situations, correct?

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And you didn't do that in this situation, correct? |
| 3 | A | No, sir. |
| 4 | Q | Okay. You could have also left the area, correct? |
| 5 | A | No, sir, I disagree with that. |
| 6 | Q | Well, she didn't have the gun right there, correct? |
| 7 | A | She could have had it very well within her reach. I |
| 8 | | mean she was in the door jam. I didn't have a clear |
| 9 | | view of everything inside the house. |
| 10 | Q | Okay. |
| 11 | A | She had made a threat to use a gun on me. There |
| 12 | | could have been one right around the corner where I |
| 13 | | couldn't see. I mean she could have reached right |
| 14 | | down and grabbed a gun. I felt us backing up and |
| 15 | | walking away from that situation was more dangerous |
| 16 | | for me. It was more dangerous for her. |
| 17 | Q | Well, you came into the home and she's made a threat |
| 18 | | and you felt it was a credible threat, aren't you |
| 19 | | putting yourself in harm's way? |
| 20 | A | I believe I was making that situation safer for |
| 21 | | myself and for her. |
| 22 | Q | Safe for her? |
| 23 | A | Sure. |
| 24 | Q | How is it safe for her? |
| 25 | A | Because if she comes up with a gun, she's going to |

Page 32

```
 1        have to get shot.

 2   Q    You didn't have your firearm drawn, correct?

 3   A    At that point, no.

 4   Q    Did you ever draw your firearm that day?

 5   A    No, I don't believe so.

 6   Q    Okay.  So you couldn't have felt in that much of a

 7        danger if you didn't draw your firearm, right?

 8             MR. KASZUBSKI: Object to form.  Go ahead.

 9             THE WITNESS: Pardon me.

10             MR. KASZUBSKI: You can answer.  Go ahead.

11             THE WITNESS: I did feel threatened, but just

12        because I felt threatened didn't mean I didn't have

13        to have my firearm out.

14   BY MR. MCQUEENEY:

15   Q    Well, you've been threatened to be shot --

16   A    Uh-huh.

17   Q    Is that a yes?

18   A    Yes, sir.

19   Q    I'm just doing that -- I'm not trying to give you a

20        hard time.

21   A    No, I'm good.

22   Q    She's just taking down everything.  You're

23        threatened to be shot, you carry your firearm,

24        correct?

25   A    Yes, sir.
```

1   Q   You carry a taser, correct?

2   A   Yes, sir.

3   Q   Okay.  And you didn't pull either of them out,

4       right?

5   A   Correct.

6   Q   Okay.  Now, you suggest that Ms. Perovich pushed

7       you, correct?

8   A   Yes, sir.

9   Q   Okay.  What arm did she use to push you?

10  A   I believe it was her right arm.

11  Q   Okay.  So would she have been all the way out on the

12      porch now and the door -- the screen door was closed

13      or how does that work?

14  A   Well, she was holding over the screen door with her

15      right hand.

16  Q   Okay.

17  A   I was standing just outside of that.  Not exactly

18      propping the screen door open with my body, but

19      definitely in the way if it would have closed.

20  Q   Okay.

21  A   So at one point in time she decides to turn around

22      and make a break for the house.  I attempted to

23      detain her.  I believe I put -- I was trying to

24      figure out the way we did this and I ascertain that

25      I grabbed -- put my hand on her arm to detain her

```
 1          and she pushed me away.

 2   Q      She pushed you away.

 3   A      Yes.

 4   Q      Did you fall down?

 5   A      No, sir.

 6   Q      Okay.  And you've described her as a large woman.

 7   A      Yes, sir.

 8   Q      Okay.  And you felt that she was going to be able to

 9          turn and in a moment's notice be able to get into

10          the house and get a gun?

11   A      Absolutely.

12   Q      Okay.

13              (Whereupon, Plaintiff's Deposition Exhibit

14          Number Two was marked for identification.)

15   BY MR. MCQUEENEY:

16   Q      Sergeant, I'm handing you Plaintiff's Exhibit Number

17          Two.  First of all before we start going over the

18          exhibit, would you acknowledge it's fourteen pages.

19   A      Yes, sir.  Fourteen pages.

20   Q      Okay.  And on the fourteenth page it contains a

21          signature line for your signature.  Is that your

22          signature, sir?

23   A      Yes, sir.

24   Q      Okay.  And you swore to the statements contained

25          within this exhibit, correct?
```

```
 1   A     Yes.

 2   Q     Okay.  Sergeant, please turn to page eight,

 3         paragraph ten.

 4   A     Question ten?

 5   Q     Yeah, I'm sorry.  Question ten, correct.  Do you see

 6         that?

 7   A     Yes, sir.

 8   Q     Okay.  And you see the answer below.  This defendant

 9         objects to this request.  Do you see that?

10   A     Yes.

11   Q     Okay.  And read the entire answer to yourself and

12         I'm going to ask you a couple of questions as to

13         your answer, okay.

14   A     Sure.  Okay, sir.

15   Q     Okay.  Prior to -- You didn't type this out,

16         correct?

17   A     No, sir.

18   Q     Okay.  Prior to --

19              MR. KASZUBSKI: For the record, Patrick, this

20         was obviously prepared with my assistance.  I don't

21         think Sergeant Cattaneo would even know what the

22         objections were about or what these objections are

23         and I don't think he probably wrote this.

24              MR. MCQUEENEY: I don't know if he would, but

25         thank you for your assistance, Mr. Kaszubski.
```

```
 1                    MR. KASZUBSKI: Kaszubski.

 2   BY MR. MCQUEENEY:

 3   Q    But, anyways, prior to you signing page fourteen,

 4        like you said that your signature's on that, you

 5        reviewed all your answers, right?

 6   A    I did.

 7   Q    Okay.  And on the answer to question ten it says

 8        related to entry into the home after Ms. Perovich

 9        announced she was going to get her gun and assaulted

10        a police officer.  Do you see that?   Do you see

11        that answer?  I know I'm not reading the entire

12        answer, but do you see that statement?

13   A    Without waiving said objection where it continues

14        there?

15   Q    Yes.

16   A    Yes.

17   Q    That line before.

18   A    The line before it?

19   Q    Yes, Ms. Perovich announced she was going to get her

20        gun.

21   A    Yes.

22   Q    Okay.  You would agree there's nothing contained

23        within your answer that references that she's going

24        to get her gun and shoot you, right?

25   A    I'm not sure what you're asking me.
```

```
 1                    MR. KASZUBSKI: Again, Patrick, if you

 2          remember, as I said, I signed that as to the

 3          objections and that's part of the objection.

 4                    MR. MCQUEENEY: Okay.

 5   BY MR. MCQUEENEY:

 6   Q      Well, in your police report on page three of your

 7          report, we've already gone over this, you've got it

 8          in quotes, I'm going to the -- going to go into the

 9          house and get my friggin gun and shoot you if you

10          don't get off my property.  You've attributed that

11          statement to Ms. Perovich and I'm asking you in

12          here, in your answer, you said related to entry in

13          the home after Ms. Perovich announced she was going

14          to get her gun and assaulted a police officer.

15   A      Uh-huh.

16   Q      There's nothing referenced that she was going to get

17          the gun and shoot you in that answer, correct?

18                    THE WITNESS: I'm sorry, Marc.  I'm not

19          understanding his question at all.

20   BY MR. MCQUEENEY:

21   Q      Is there anything in that answer to question number

22          ten that references that Ms. Perovich was going to

23          shoot anybody?

24   A      I see what you're saying.  This was a paraphrase of

25          the police report, okay.  Is there anything that
```

1      says in here that she's going to shoot me in that

2      statement?

3   Q   Right.

4   A   Oh, okay.  I understand.  No.

5   Q   Okay.

6   A   Okay.

7   Q   All right.  Thank you.  And then continuing on

8      paragraph eleven and twelve starting on page eight

9      and page nine of the exhibit, could you read your

10      answers to question number eleven and question

11      number twelve to yourself and then I'm going to ask

12      you a couple of questions, please.

13          MR. KASZUBSKI: And while you're reading, I'll

14      just place the objection.  Again, those are my

15      objections that were prepared by counsel as

16      indicated in the answers to discovery at the very

17      beginning and weren't signed as per the objections.

18      Mr. McQueeney, you're asking him a question saying

19      are those his answers.  Well, that was part of my

20      objections.  But, whatever, you've got my objection.

21          MR. MCQUEENEY: All right.  I understand.

22      Thank you.

23          THE WITNESS: Okay, sir.

24   BY MR. MCQUEENEY:

25   Q   Okay.  You've read both the answer to question

1         eleven and question twelve?

2   A    Correct.

3   Q    Okay.  Thank you.  Same sets of questions.  In the

4         answer to question eleven there's no reference that

5         Ms. Perovich announced she threatened to get her gun

6         and then shoot you, right?

7   A    That's correct.  These are paraphrases summarized by

8         my attorney in this preparation to my responses to

9         your request for information, so.

10  Q    Okay.

11  A    So it was done through Marc.

12  Q    Right, I understand that and I'm certainly not going

13        to ask you what Marc told you or anything like that,

14        but you did say -- and I know we covered this, but

15        you did say you signed your answers to

16        interrogatories.

17  A    Yes.

18  Q    So you had an opportunity to read them, right?

19  A    I did.

20  Q    Did you instruct anybody to put in there that Ms.

21        Perovich said she was going to go in the house, get

22        my friggin gun and shoot you if you don't get off my

23        property?

24  A    Did I instruct him to put that in there?

25  Q    Yes.  Did you tell your attorney to put that in

1        there?

2        MR. PEACOCK: Well, hang on a minute.  That's

3        attorney/client privilege.

4        MR. KASZUBSKI: Yeah, that's attorney/client

5        privilege, number one.

6        MR. MCQUEENEY: I don't know if that's --

7        MR. KASZUBSKI: Are you asking him to say what

8        he told me?

9        MR. MCQUEENEY: Yeah.

10       MR. KASZUBSKI: It's attorney/client

11       privilege.

12       MR. MCQUEENEY: I don't believe it is, but.

13       MR. KASZUBSKI: I'm going to instruct you not

14       to answer that question for sure.

15       MR. MCQUEENEY: Okay.

16       MR. KASZUBSKI: And I'd also refer you to

17       question fifteen where the question of what exactly

18       occurred happens and it refers you to the police

19       report.

20       MR. MCQUEENEY: Okay.

21       MR. KASZUBSKI: So I mean the questions you're

22       asking is there a policy in place.  Those questions

23       are dealing with that type of issue, Patrick.

24       MR. MCQUEENEY: I understand.

25       MR. KASZUBSKI: Not dealing with what happened

1         that night.  So if you look at paragraph fifteen,

2         which is that question that you are --

3    BY MR. MCQUEENEY:

4    Q    But there's no reference in these answers to eleven

5         or twelve about any shooting of yourself or anybody

6         else, right?

7    A    Correct.

8    Q    Okay.  Sergeant, same exhibit and turn to page ten,

9         paragraph sixteen.  Please read the questions and

10        your answer also.

11   A    Okay, sir.

12   Q    Okay.  You've read the answer and it says Ms.

13        Perovich -- Do you see where it says Ms. Perovich

14        threatened to get her gun and assaulted me slash --

15        I guess it's slash pushed me in what appeared to be

16        an attempt to carry out her threat?  Do you see that

17        statement?

18   A    Yes, sir.

19   Q    Okay.  There's no reference to getting a gun and

20        shooting you in this answer, correct?

21   A    Correct.

22   Q    Okay.  In your answer it says what appeared to be an

23        attempt to carry out her threat.  Again, this is

24        pure speculation on your part as to what appears in

25        front of you, correct?

1          MR. KASZUBSKI: Objection to the form of the

2     question.  I don't know what you mean by that.  I

3     mean can you answer that?  Do you know what he meant

4     by that?

5          THE WITNESS: I don't like his word

6     speculation.  Again, stating from my training as a

7     police officer and my dealing with people,

8     speculation, I didn't like that word being used

9     because again my assessment of her mental capacities

10    at that time was her irrational state, the fact that

11    she made a threat to a police officer.  I took a

12    whole bunch of things into consideration that led a

13    little far beyond speculation.  I mean it was her --

14    her irrational behavior towards threatening a police

15    officer.  I mean normal people don't do that, say

16    they're going to go get a gun and shoot a police

17    officer.  So to speculate I think takes the doubt in

18    that, and when she's doing that, it went beyond

19    speculation for somebody to say that.  I really

20    believe that her telling me that and the way she

21    spun around quickly to make a break into the house

22    led me to believe that that's what she was doing.  I

23    mean it was beyond speculation.  I had reason to

24    believe that's exactly what was going on.

25  BY MR. MCQUEENEY:

```
 1   Q    Okay.  I just picked up on something you said.  You

 2        said she spun around and went back into the house.

 3   A    Yes.

 4   Q    Okay.  So when she spins around and went back into

 5        the house, is she clearly on the porch at this

 6        point, if you know?

 7   A    Again, you keep getting into this whether she was on

 8        the porch.  I mean one foot may have been out front.

 9        She was in the threshold.  It was the general area

10        of the threshold and the first half of step onto the

11        porch.

12   Q    Okay.

13   A    Specifically, exactly, you know, I thought she was

14        out onto the porch, but when she takes a step back

15        and starts making the break to go back into the

16        house, I believed it was a legitimate threat, a

17        legitimate opportunity for her to go in the house

18        and I tried to prevent her from doing that.  I

19        believe there was negligent circumstance that

20        allowed me to go into that house and prevent that

21        from happening.

22   Q    Okay.  Negligent circumstance 'cause she committed a

23        crime at that point?

24   A    She had committed a crime.

25   Q    Okay.  'Cause she pushed you?
```

Page 44

```
 1   A      Two crimes.

 2   Q      Two crimes.  Okay.

 3   A      She had threatened me to go in the house, get a gun

 4          to shoot me and I believe she had a reasonable

 5          opportunity to carry that threat out.

 6   Q      Okay.  But there were four officers out there,

 7          correct?

 8   A      Yes, sir.

 9   Q      Three from your department and one from another

10          department, correct?

11   A      Correct.

12   Q      And you felt threatened by her that she's gonna spin

13          around and run into the house?

14                 MR. PEACOCK: I'm just going to place an

15          objection.  This is argumentative of this witness.

16                 MR. KASZUBSKI: I'll join that.

17                 MR. PEACOCK: It's asked and answered.

18   BY MR. MCQUEENEY:

19   Q      You felt threatened that she was going to spin

20          around and run into the house and get a gun and

21          shoot you?

22   A      Spin around and reach out to a table right inside

23          the door that I couldn't see.  She made an overt

24          action to go into that house and turn around, and,

25          yes, I believe she was going to carry out her
```

Page 45

1          threat.

2     Q    Okay.  There's a video camera.  You later discovered

3          a video that faced out to the front of the house,

4          correct?

5     A    Correct, I knew there was a camera out there.

6     Q    Okay.

7     A    And I later found a videotape.

8     Q    Had you seen that before you entered the residence

9          or after you cleared the residence?

10    A    I saw it up there.

11    Q    Saw it up there when you came up to the home?

12    A    Uh-huh.

13    Q    Okay.  Is that a yes?

14    A    Yes, sir.

15    Q    Okay.  And you took the videotape, correct?

16    A    I did.

17    Q    Why did you take the videotape?

18    A    As evidence.

19    Q    As evidence as to what?

20    A    A possible crime.  To see what it had recorded.

21         There was a crime that had been committed and there

22         was a videotape of the incident.

23             MR. MCQUEENEY: Let's go off the record.

24             (Whereupon, there was a brief pause in the

25         proceedings.)

1          MR. MCQUEENEY: Before we get started let the

2          record reflect that the deposition is continued of

3          Sergeant Cattaneo.  My client, Victor Gojcaj, has

4          left and has asked that I continue the deposition,

5          which I will do so in his absence.

6     BY MR. MCQUEENEY:

7     Q    Sergeant, we're going to play a videotape.  The

8          videotape, I believe, which was seized by yourself

9          and I will be asking questions from it.

10          (Whereupon, Mr. McQueeney plays the

11          videotape.)

12    BY MR. MCQUEENEY:

13    Q    Sergeant, was that you that had the sunglasses on?

14    A    That's me.  The good looking fellow.

15    Q    And then is that Detective Melise behind you?

16    A    Yes, sir.

17    Q    Okay.  Is that Detective Melise talking?

18    A    I couldn't hear it.  That's me right there.

19    Q    You're on the porch right now, even though you can't

20          see -- see you?

21    A    Yes.

22    Q    Okay.  Is Melise on the porch, Detective Melise, if

23          you know?

24    A    I couldn't tell you.

25    Q    Who's walking up this way?  It looks like a

Page 47

1          uniformed officer.  Can you tell?

2    A     No, not really.  That's Aaron.

3    Q     Aaron.

4    A     Burgess.  Officer Burgess.  Now Sergeant Burgess.

5    Q     Now Sergeant Burgess.  Okay.  Is that you, Sergeant?

6    A     Yes, sir.

7    Q     Did you just open the screen door, if you know?

8    A     I don't remember.  That's Officer Fett.

9                   (Whereupon, Mr. McQueeney stops the

10         videotape.)

11   BY MR. MCQUEENEY:

12   Q     When you saw the hand gesturing, do you know what

13         hand that was?  Was that the right hand or left hand

14         of Ms. Perovich?

15   A     I believe it was the right.  If you could play it

16         again, I'll take another look.

17   Q     Okay.  Were you still on the porch at that time?

18   A     I believe so.

19   Q     Anybody else --

20                  (Whereupon, Mr. McQueeney plays the

21         videotape.)

22                  THE WITNESS: Yeah, that's the right hand.

23                  (Whereupon, Mr. McQueeney stops the

24         videotape.)

25   BY MR. MCQUEENEY:

1   Q      Okay.  Sergeant, I didn't see a push.  When did the

2          push occur?

3   A      Well, what happened there was she started yelling at

4          me.  She's yelling and screaming at me, and, boom,

5          she cuts off the conversation.

6   Q      Okay.

7   A      Makes the turn to go back into the house and with

8          her threat and her going to get that gun, the way

9          she abruptly ended that conversation, in my mind she

10         had had enough, she was going in the house, she was

11         going to grab that gun and I wasn't going to let her

12         do that.  So when she turned around to walk back

13         into the house, I put one arm -- hand on her arm to

14         try and detain her and she pushed me away.

15  Q      She pushed you away with what arm?

16  A      I believe it would have been her right hand.

17  Q      You're not certain of that?

18  A      I'm not 100 percent positive, but I believe that's

19         the way it went.

20  Q      So are you suggesting that the push occurred after

21         she turned and walked into the residence?

22  A      Correct.

23  Q      Okay.

24  A      I mean I'm still in the door jam.  I hadn't made

25         entry into the house.

```
 1              (Whereupon, Mr. McQueeney plays the videotape

 2         and stops it.)

 3   BY MR. MCQUEENEY:

 4   Q    Sergeant, could you hear the statements by Ms.

 5        Perovich?

 6   A    Yes.

 7   Q    Could you hear that she said I'm going to go get my

 8        gun and shoot you?

 9   A    No.

10   Q    Okay.  And you're still standing there after she

11        made that statement, correct?

12   A    Correct.

13   Q    Okay.

14              (Whereupon, Mr. McQueeney plays the

15        videotape.)

16   BY MR. MCQUEENEY:

17   Q    It doesn't look like you're in any hurry to get in

18        the residence, correct?

19   A    At that point, no.  I was moving slow.

20              (Whereupon, Mr. McQueeney stops the

21        videotape.)

22   BY MR. MCQUEENEY:

23   Q    What's that?

24   A    I said I was moving pretty slow.  I mean at a

25        reasonable pace.
```

Page 50

```
 1   Q    Okay.  And you're following her immediately into the
 2        residence, correct?
 3   A    Yes.
 4   Q    Okay.  At that point you could have left, correct?
 5   A    No, sir.
 6   Q    No.  You're on the front porch.  She's not in the
 7        home.  She's out on the porch.  You could have left
 8        the residence.  She hadn't done anything wrong at
 9        that point, correct?
10   A    I disagree.
11   Q    You disagree.
12   A    I would say I had been verbally threatened and she
13        was going to carry out that threat when she turned
14        to go inside the house, and then once I got pushed,
15        there was an assault that had taken place and at
16        that point in time I was going to take her into
17        custody.
18   Q    She was never convicted of the assault, correct?
19   A    I don't remember what --
20             MR. PEACOCK: Objection to foundation.
21             THE WITNESS: -- what the final court
22        disposition was.  I know she pled guilty or no
23        contest to charges --
24   BY MR. MCQUEENEY:
25   Q    Okay.  Do you recall?
```

Page 51

```
 1   A     No.

 2   Q     Look at paragraph -- Look at question sixteen and

 3         the answer to that on page ten of Exhibit Number Two

 4         again, please.

 5   A     Okay, sir.

 6   Q     Okay.  And does it refresh your recollection as to

 7         what she pled -- struck a deal with and pled guilty

 8         to?

 9   A     She pled no contest to a lesser included offense of

10         attempting and resisting and obstructing a police

11         officer.

12   Q     She didn't plead to an assault, correct?

13   A     Correct.

14   Q     Okay.

15   A     And the only thing I want to say about that for the

16         record is that what the prosecutor ultimately lets

17         her plead to it's what she was charged with at the

18         time that she had committed that felony.  I had

19         probable cause to believe she had committed that

20         felony and that's what she was arrested for.

21   Q     Okay.  But she wasn't convicted of a felony, right?

22   A     Correct.

23   Q     Okay.

24              (Whereupon, Plaintiff's Deposition Exhibit

25         Number Three was marked for identification.)
```

```
 1   BY MR. MCQUEENEY:

 2   Q     Sergeant, I've handed you Plaintiff's Exhibit Three.

 3         First of all before we ask questions of this

 4         exhibit, would you please acknowledge that there are

 5         eighteen pages contained within the exhibit.

 6   A     Eighteen pages, sir.

 7   Q     Thank you, sir.  Sergeant, understanding you've

 8         probably never seen this before, turn to page five

 9         of the exhibit.

10               MR. PEACOCK: Just for the record, can you

11         tell me what this is.

12               MR. MCQUEENEY: This, for the record, Mr.

13         Peacock, is a transcription that I ordered at the

14         last deposition of Officer Fett of the verbal

15         transcription of what's on the videotape created by

16         Hanson Court Reporting.

17               MR. PEACOCK: Is there an affidavit with this?

18               MR. MCQUEENEY: I'm sorry.

19               MR. KASZURSKI: My objection is this is an

20         incomplete transcript.  It has multiple locations

21         where it says indecipherable.  Indecipherable voice

22         female.  Human voice in the background.  Human voice

23         indecipherable.  This is not a true and accurate

24         representation of the transcription of what was on

25         that video.  That's my objection to that.
```

1        MR. MCQUEENEY: I beg to differ.  I mean it is

2    what she deciphered from the videotape.  The

3    videotape has been admitted into evidence in Officer

4    Fett's deposition and --

5        MR. KASZUBSKI: Then we sure don't need the

6    transcript because the transcript isn't full.  This

7    says indecipherable voices in background.  What do

8    they say?

9        MR. MCQUEENEY: The transcript is what she

10    took off the videotape.

11        MR. KASZUBSKI: Well, then I guess we can take

12    her deposition, sure.

13        MR. MCQUEENEY: I don't have time to debate

14    it.  I'm not going to debate it.

15        MR. KASZUBSKI: All right.  Well, it's

16    incomplete so I object to it.

17        MR. MCQUEENEY: Good.

18        MR. KASZUBSKI: I mean are we going to have a

19    continuing objection of that I assume.

20        MR. MCQUEENEY: Sure.

21        MR. KASZUBSKI: Great.

22        MR. MCQUEENEY: You want one too, Pete?

23        MR. PEACOCK: Well, I do.  I'm just trying to

24    find out, and, again, I don't know the exact

25    protocol for this, but I thought there was -- isn't

1        there an affidavit the court reporter gives when

2        they transcribe it?

3              THE COURT REPORTER: It's not certified

4        because she didn't take it.  It's a transcription.

5              MR. KASZUBSKI: Based on what she could hear

6        at the time, sure.  So it's based on her subjective

7        hearing.  Gotcha.

8              MR. PEACOCK: I'll join the objections.  Go

9        ahead, Pat.

10             MR. MCQUEENEY: Whatever.

11   BY MR. MCQUEENEY:

12   Q    Okay.  Back to page five, Sergeant, and I understand

13        you've never seen this before.  Could you read to

14        yourself pages six through ten.

15   A    Sure.

16             MR. KASZUBSKI: Lines six through ten.

17   BY MR. MCQUEENEY:

18   Q    I apologize.  Lines six through ten.

19   A    I'm sorry.  What page is that?

20   Q    Page five, lines six through ten.

21   A    Okay.

22   Q    Have you read it?

23   A    Yes, sir.

24   Q    Okay.  And you've heard what was stated on the tape.

25        I'm going to get my friggin gun and get you off my

```
 1              premises.

 2    A         Yes, sir.

 3    Q         Okay.  And that's what's contained on this

 4              transcript?

 5    A         I believe so.

 6    Q         What you've just read.

 7    A         To the best of my recollection, yes.

 8    Q         Okay.  And where is it that you heard -- You put in

 9              your police report that I'm going to get my friggin

10              gun and shoot you.  Where is this that you heard

11              that?

12    A         Well, when I was out there at the scene and I was

13              speaking with Ms. Perovich when she uttered the

14              words that she did, that's exactly what I believed

15              her to be saying.  In my mind that's what I had

16              heard her say and that's what I wrote down exactly

17              in my police report.  Now, to go back in hindsight

18              reviewing the videotape, to review it over and over

19              again, because even after I heard it for the first

20              time, it sounded like I'm going to get my gun and

21              shoot your ass.  That's exactly what I thought she

22              said, but she was saying premises.

23    Q         Okay.

24    A         So in her broken English at the time I understood

25              her to say what I had written down in my police
```

```
 1            report.  Now, to go back and review a videotape, is
 2            it completely as accurate as my report, it's not,
 3            but it was my state of mind to what I heard her say
 4            at the time.
 5    Q       Okay.  So your report may not be accurate then.  Is
 6            that what you're trying to tell me?
 7    A       It is a reflection of my recollection of the
 8            incident shortly after writing the report and
 9            shortly after the incident when I wrote the report.
10    Q       But my question is is it an inaccurate or accurate
11            report?  I know what your reflection is.
12    A       It is a reflection of my recollection of the
13            incident shortly after writing the report.
14                    (Whereupon, Plaintiff's Deposition Exhibit
15            Number Four was marked for identification.)
16    BY MR. MCQUEENEY:
17    Q       Sergeant, I'm handing you Plaintiff's Exhibit Four
18            understanding we had copied.  Does this look like
19            the entryway into the Perovich residence?
20    A       I believe so, yes.
21    Q       Okay.  Do you see that front -- Do you see the door
22            to the left side of the picture, the photograph?
23    A       Yes, sir.
24    Q       Okay.  Is that a wood door, if you know?
25    A       I don't know.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  And if you recall the front of the house, the |
| 2 | | door -- obviously, the door opens in.  Does that |
| 3 | | porch, is that level with the floor or do you have |
| 4 | | to step up or step down? |
| 5 | A | I don't recall.  I went -- No, I'd be guessing. |
| 6 | Q | Okay.  And when you were looking -- When you were at |
| 7 | | the front door and you're looking in, could you see |
| 8 | | what was in this picture?  I guess the television or |
| 9 | | stereo unit along the wall.  Could you see that? |
| 10 | A | No, I don't believe so. |
| 11 | Q | All right.  Could you see around the corner of the |
| 12 | | door? |
| 13 | A | To the right or to -- |
| 14 | Q | To the right. |
| 15 | A | No. |
| 16 | Q | Okay.  Now, when you went into the residence, who |
| 17 | | was the first one in? |
| 18 | A | I was. |
| 19 | Q | Okay.  Who was the officer that went in after you |
| 20 | | did? |
| 21 | A | I believe Officer Fett was behind me. |
| 22 | Q | Okay.  And did Officer Burgess enter the residence |
| 23 | | also? |
| 24 | A | At some point in time he did, yes. |
| 25 | Q | How about Detective Melise? |

1    A    I don't remember really when he went in.

2    Q    If I show you the video, would that help you?

3    A    Yeah, sure.

4    Q    Okay.

5            (Whereupon, Mr. McQueeney plays the

6        videotape.)

7            THE WITNESS: Here it comes.  Detective Melise

8        looks like he's the third one in.  Now Officer

9        Burgess is coming in.

10            MR. KASZUBSKI: Are you guessing whether he

11        went in?  Did you see it?

12            THE WITNESS: Yeah, I mean I'm assuming.  I'm

13        making an assumption and I probably shouldn't do

14        that, but.

15            (Whereupon, Mr. McQueeney stops the

16        videotape.)

17    BY MR. MCQUEENEY:

18    Q    Do you have any reason to believe he didn't go into

19        the residence?

20    A    And, again, I don't have any reason to believe that

21        he did.  I mean according to the tape it looks like

22        a probability that he did, but could I say that he

23        did or not, I don't know.

24    Q    Well, you said it was a relatively small porch.  Did

25        he step off the porch when you went into the

1       residence?

2   A   You know, I don't know.  My mind was focused on Ms.

3       Perovich and --

4   Q   Okay.

5   A   -- like I say, that's why I wasn't sure when anybody

6       came in the house.

7   Q   And what happened when you went into the residence?

8       Did you attempt to arrest Ms. Perovich?

9   A   I did.

10  Q   Okay.  What did you do?

11  A   I placed one hand on her.  She pushed me away.  She

12      tried to continue going straight into the house and

13      she threw herself down on the ground.

14  Q   Okay.  What do you mean she threw herself down on

15      the ground?  Describe that for me.

16  A   She literally went limp on her body and just went

17      down to the ground.  I mean nobody touched her.

18      Nobody pushed her.  She didn't trip.  That's why I

19      said man, this lady's gotta be crazy.  I mean she

20      just threw herself down.

21  Q   Okay.  When she threw herself -- Well, are you

22      certain she threw herself down or could she have

23      lost her balance?  You don't know, right?

24  A   It looked to me like she just threw herself down to

25      the ground.

```
 1   Q    Okay.  When she -- All right.

 2   A    I mean I was shocked.  That's why you heard me say

 3        this lady's gotta be crazy.  She just throws herself

 4        down.

 5   Q    Okay.  She threw herself down.  Did she throw

 6        herself face down and land face first onto the

 7        carpet or how did she land?

 8   A    I really don't remember.  She was going forward so

 9        she kind of went face down.

10   Q    Okay.  So she went face down.  Did she use her hands

11        to break her fall?

12             MR. KASZUBSKI: I don't want you to speculate.

13             THE WITNESS: Yeah.

14             MR. KASZUBSKI: If you don't remember how she

15        went down, then say that.

16             THE WITNESS: Yeah, you know, I really don't

17        remember how she went down.  I don't remember if she

18        used her hands to break her fall.

19   BY MR. MCQUEENEY:

20   Q    Okay.

21   A    And this was two and a half years ago.

22   Q    I understand.

23   A    So I'm doing the best I can.

24   Q    Okay.  And how far did she get into the house when

25        she threw herself down on the floor?
```

| | | |
|---|---|---|
| 1 | A | She was probably even with the entertainment center |
| 2 | | there. |
| 3 | Q | Okay. |
| 4 | A | Because we were confined in a very tight space |
| 5 | | there. |
| 6 | Q | Okay.  So she hadn't made it too far into the home, |
| 7 | | correct? |
| 8 | A | Correct. |
| 9 | Q | What did you do when she threw herself to the floor |
| 10 | | near the front door?  What did you do? |
| 11 | A | Officer Fett and I attempted to place her into |
| 12 | | custody and put handcuffs on her. |
| 13 | Q | Okay.  And understanding you don't recall whether |
| 14 | | she fell face forward or where she landed, when she |
| 15 | | was on the floor and you're trying to cuff her, was |
| 16 | | she face down, on her side, or on her back? |
| 17 | A | I really don't remember. |
| 18 | Q | Okay.  And what was Officer Fett doing when she was |
| 19 | | trying to cover, or, well, when you were both trying |
| 20 | | to cover? |
| 21 | A | She was trying to assist me in getting her hands |
| 22 | | behind her back. |
| 23 | Q | Okay.  And did she have her knee on her head?  Did |
| 24 | | Officer Fett have her knee on Ms. Perovich's head? |
| 25 | A | No. |

Page 62

1    Q    Did you have your knee in Ms. Perovich's back?

2    A    No.

3    Q    What were you doing, other than trying to handcuff

4         her?

5    A    That was it.

6    Q    How long were you in the residence before you

7         finally cleared the residence?

8    A    How long were we in there before we cleared?

9    Q    Correct.

10   A    I have no idea.

11   Q    Okay.

12   A    Time wise, I don't know.

13   Q    Okay.  And what was Officer Burgess doing while you

14        were in the residence?

15   A    At some point in time Victor had come around the

16        corner and he was standing in the living room and

17        Officer Burgess took control of him.

18   Q    Okay.  Did Officer Burgess draw his firearm?

19   A    No, I don't believe so.

20   Q    Did he draw his taser?

21   A    I believe he did.

22             MR. PEACOCK: Mr. McQueeney, just for the

23        record, this is not a complete transcript of the

24        tape, this transcription.

25             MR. MCQUEENEY: I don't know.  I believe it

1        is.

2                MR. PEACOCK: You think it is?

3                MR. MCQUEENEY: I believe it is.

4                MR. PEACOCK: Because it doesn't say here on

5        that last page end of tape or anything like that.

6        It doesn't identify it's the end of the tape.

7                MR. MCQUEENEY: I don't know.  If you want to

8        depose her, go ahead.

9                MR. PEACOCK: No, I'm just trying to find out

10       what the length of this thing is.

11               MR. MCQUEENEY: I trust that it's a complete

12       what she understood was on the tape.

13               (Whereupon, Plaintiff's Deposition Exhibit

14       Number Five was marked for identification.)

15   BY MR. MCQUEENEY:

16   Q    Sergeant, I'm handing you what's been marked as

17        Plaintiff's Exhibit Five.  Okay.  First of all,

18        would you acknowledge there's eight pages to the

19        exhibit.

20   A    Yes, there are eight pages.

21   Q    Okay.  And they seem to be -- Well, does this look

22        like -- I know some of the pictures are fuzzy.  Does

23        this look like Ms. Perovich?

24   A    Yes.

25   Q    Okay.  And, as you testified, she's a relatively

```
 1            large woman.

 2    A       Yes.

 3    Q       Obese.

 4    A       Large.

 5    Q       Okay.  And this first page shows her holding up an

 6            arm, correct?

 7    A       Yes, sir.

 8    Q       Would that be her right arm?

 9    A       Yes, sir.

10    Q       Does it show -- It looks like there's a circle

11            around her elbow.

12                    MR. KASZUBSKI: In ink.

13                    THE WITNESS: That's the elbow?

14    BY MR. MCQUEENEY:

15    Q       I think so.

16    A       Oh, I thought that was -- Okay.

17    Q       I don't know.

18    A       I'm not sure.

19    Q       Is it an elbow or --

20    A       I couldn't tell if that was a tricep or an elbow.

21    Q       Okay.  Do you see the circle around the arm,

22            somewhere on the arm?

23    A       I do.

24    Q       Okay.  I guess it's an ink circle or something.

25    A       Yes, sir.
```

Page 65

1    Q      Did she complain of injuries to her right arm?

2    A      No, sir.

3    Q      Would you turn to the second page of the exhibit.

4              MR. PEACOCK: Mr. McQueeney, I'm just going to

5           place an objection to these photographs 'cause I

6           don't -- For foundational purposes because it

7           appears that on the bottom right on the page there's

8           a date of 3/4/2008.  This incident occurred in

9           October of '07.  So I'm just -- That's my objection.

10             MR. KASZUBSKI: I'll join in that objection.

11             MR. MCQUEENEY: Sure.

12   BY MR. MCQUEENEY:

13   Q      On page two did you see the picture of Ms. Perovich?

14   A      I did.

15   Q      Okay.  And do you see her lifting her right arm

16          again?

17   A      Yes.

18   Q      Do you see some faint bruises on that arm?

19   A      Yeah, possible.

20   Q      Okay.  Did you grab her around the arm?  You said

21          you had grabbed her around the arm, correct?

22   A      Yes, sir.  Yeah, that would be probably the spot

23          that I grabbed her from.

24   Q      Okay.

25   A      Yeah, that would probably be the one where she was

```
 1          going into the house where I grabbed her.

 2    Q     All right.  And then turn to the next page where it

 3          says right hand.

 4    A     Yes, sir.

 5    Q     Okay.  And did she complain that there was injuries

 6          to her right hand?

 7    A     No, sir.

 8    Q     All right.  Continue on to the next page where it

 9          says right arm.

10    A     Yes, sir.

11    Q     Okay.  Do you see the bruising on the arm?

12    A     Yes, sir.

13    Q     Is that about where you grabbed her on the arm, if

14          you know?

15    A     I'd hate to speculate.  I'm having trouble what arm

16          that is and exactly where on that arm is the bruise.

17          I mean it looks like a bruise on part of her body.

18    Q     Did she complain of injuries to her back?

19    A     Yes.

20    Q     And who called the EMT's?

21    A     I believe it was me.

22    Q     Okay.  And at that time you decided that you weren't

23          going to continue with the arrest of Ms. Perovich,

24          correct?

25    A     Correct.
```

1   Q   Okay.  And other than complaining of the injuries to

2        her back, did she complain of any other injuries?

3   A   Not at that time.

4   Q   Not at that time.  What did she complain of later?

5   A   Nothing that I'm aware of.

6   Q   Okay.

7   A   The only thing I heard her complain about was her

8        back.  No complaint of injuries later from these

9        pictures.  I was unaware.

10  Q   Okay.  Did you help her off the floor?

11  A   I don't -- I don't remember.  I remember at some

12       point in time she -- we ended up sitting her on the

13       couch.  She was okay to get up.  She sat on the

14       couch and we got her a glass of water.

15  Q   All right.  Did the EMT officers come into the home

16       or did she leave the residence under her own power?

17  A   I believe they came inside.

18  Q   Okay.  And was she transported to an ambulance, if

19       you recall?

20  A   I don't recall.

21  Q   Okay.

22  A   Let me see what my report says.  Maria is conveyed

23       to the Henry Ford Medical Center on 19 Mile for

24       examination.

25  Q   You said she's on the floor and you and Officer Fett

```
 1          are trying to handcuff her.  How long was she on the
 2          floor?
 3    A     Not very long.  It was a very brief period of time.
 4    Q     Okay.  What did you review in advance of your
 5          testimony today?
 6    A     Police reports.
 7    Q     Okay.  Anything else?
 8    A     My police report, specifically, and the previous
 9          interrogatories.  We reviewed the videotape.
10    Q     Okay.  When did you review the videotape?
11    A     A couple of months ago.
12              MR. KASZUBSKI: You're the one that cancelled
13          the last dep.
14              MR. MCQUEENEY: Yeah, things come up.
15              MR. KASZUBSKI: I'm just saying.
16    BY MR. MCQUEENEY:
17    Q     That's the only stuff you reviewed in anticipation
18          of your testimony today?
19    A     The interrogatories we went over.  My police report.
20    Q     Okay.  Did you --
21    A     The tape.
22    Q     -- review Officer Fett's police report?
23    A     I think we had that at the last meeting when we did
24          the interrogatories the last time we met.  I'm
25          trying to remember.  I don't remember if I did or
```

```
 1          not.  I know I didn't today.

 2     Q    How about Officer Burgess's report, did you review

 3          it?

 4     A    I don't recall if I did or not.

 5     Q    Okay.

 6     A    Back then.

 7     Q    Can you turn to his report in Exhibit Two.  Officer

 8          Burgess's report.  I think it's the second to the

 9          last page.

10     A    Yes, sir.

11     Q    Okay.  Now, I understand that you didn't complete

12          the report.  Read the third full paragraph.  Well,

13          he's only got one page.  Officer Burgess's.  So it

14          would be the second to the last page of the exhibit.

15          Sergeant, read the third full paragraph.  I think it

16          starts at line twelve or thirteen.  Read that to

17          yourself.

18     A    Okay.

19     Q    Do you see where in lines fifteen and sixteen

20          Sergeant Cattaneo took hold of Perovich's arm; she

21          fell to the floor and began to scream?  Do you see

22          that statement in Burgess's report?

23     A    The last sentence?

24     Q    Yes.

25     A    Yes, sir.
```

```
 1   Q    The last sentence of the third paragraph.

 2   A    Yes, sir.

 3   Q    Okay.  Did you talk to him about that statement?

 4   A    No, sir.

 5   Q    Okay.  Did you talk to him about your testimony

 6        today?

 7   A    No, sir.

 8   Q    Have you talked to Officer Fett about your testimony

 9        at any time?

10   A    No, sir.

11   Q    You never talked about the case at all?

12   A    No, sir.

13   Q    Okay.

14   A    The only thing I said to Officer Fett I asked her

15        how it went and she said it was fine.  How her

16        deposition went.  I think that was the extent of my

17        conversation with her.

18   Q    Okay.

19   A    She said you were tough, but it went well.

20   Q    I'm a good guy.  You didn't go with Ms. Perovich to

21        the hospital, correct?

22   A    Correct.

23   Q    Did you go after that back to the police department

24        and create your report?

25   A    I did.
```

```
 1   Q    When you were attempting to handcuff Ms. Perovich
 2        with Officer Fett, what were you doing?  Were you
 3        holding her down?
 4   A    No, we were just trying to get a handcuff on her
 5        hand.  We got one cuff onto I believe it was her
 6        right hand and she started complaining of back pain.
 7        So then I didn't want to aggravate any possible
 8        injuries to her so we stopped at that point and took
 9        the handcuffs off her.
10   Q    Okay.  Who took the handcuffs off of her?
11   A    I don't remember.
12   Q    Okay.  And she's charged with resisting arrest,
13        correct?  Resisting and obstructing arrest.
14   A    Correct.
15   Q    Okay.  What was she doing to resist and obstruct
16        arrest?
17   A    She pushed and assaulted me and tried to get back
18        into the house.
19   Q    Okay.  That's the extent of her resisting and
20        obstructing arrest?
21   A    She pulled away, threw herself down onto the ground
22        and she was advised to place her hands behind her
23        back and she wouldn't do it.
24   Q    Okay.  Are you certain she heard those commands?
25        You're not certain of that, right?
```

Page 72

```
 1   A   I guess that would be up to her to answer whether
 2       she heard the commands or not.
 3   Q   She can't.  She's dead.
 4   A   Obviously.
 5   Q   Right.  She's screaming all this time, correct?
 6   A   Yes.
 7   Q   You heard that on the videotape, correct, that's
 8       she's screaming quite loudly, right?
 9   A   Sure.
10   Q   Okay.  So you don't know whether she heard those
11       commands, correct?
12   A   No, that would be up to her to answer.
13   Q   Okay.  Let me backup.  We talked about this briefly.
14       You said you're involved with the swat team unit and
15       Sterling Heights has a swat team, right?
16   A   Yes, and just for clarification, I was a member of
17       the Macomb County Sheriff's swat team.
18   Q   Okay.  Does Sterling Heights have its own swat team?
19   A   Just within the past two/three months, yes.
20   Q   Okay.  So if you called the swat team out on October
21       30 of 2007, you'd have to call the Macomb County
22       Sheriff's swat team?
23   A   Correct.
24   Q   Okay.  You could have done that because you're a
25       member of the team, right?
```

1   A   I don't believe I was a member at that time.

2   Q   When were you a member of the Macomb County swat

3       team?

4   A   I think I've been off the team for probably about

5       six/seven years by now.  So going back then we're

6       talking maybe three years I was off the team by

7       then.

8   Q   Okay.

9   A   But I would certainly know the protocols to initiate

10      that if that's what you're asking me.

11  Q   Right, you know the protocols to contact the swat

12      team.

13  A   Correct.

14  Q   Okay.  You could have used that microphone to

15      contact them?

16  A   Yeah, I would have contacted our dispatch to

17      organize a swat team if I needed it, yes.

18  Q   Okay.  And that wasn't done here.

19  A   No, sir.

20  Q   At any time when you were -- Well, actually, let me

21      rephrase that.  You said that Ms. Perovich was on

22      the floor when you and Officer Fett were trying to

23      handcuff her.  Were you on the floor with Ms.

24      Perovich and Officer Fett at the same time?  Did you

25      get down on the floor with them?

Page 74

```
1    A    I don't know that on the floor is the correct
2         statement to use.  I was attempting --
3    Q    I wasn't there.  What was going on when you were
4         trying to arrest her?
5    A    She was down on the ground when we tried -- we got
6         one handcuff onto her.
7    Q    Okay.
8    A    She started screaming in pain that her back hurt
9         her.  So we stopped trying to get her other hand
10        behind her back.
11   Q    Well, did you have to get on the floor to effectuate
12        the arrest?  You didn't stand up and try to reach
13        down and handcuff her, right?
14   A    I bent over.  It depends what you're talking about.
15        To me on the floor I'm wondering if we're talking
16        about the same thing.  I mean I didn't get down like
17        this and try to handcuff her.
18   Q    Okay.
19             MR. KASZUBSKI: For the record, the officer
20        was in a crouching position originally and now is
21        showing himself on the ground, knees on the ground
22        on the floor as a difference, to clarify.
23             MR. MCQUEENEY: Okay.
24   BY MR. MCQUEENEY:
25   Q    I mean you got down.  You lowered yourself close --
```

```
 1    A      Bent over.

 2    Q      Bent over.  Okay.  And did you see a walker on the

 3           floor at all?

 4    A      I don't remember a walker being there.

 5    Q      I don't have anything else.

 6                 MR. PEACOCK: I have no questions of the

 7           Sergeant.  Thank you.

 8                 MR. KASZUBSKI: Nothing for me, Sergeant.

 9           Thank you.

10                 THE WITNESS: Okay, sir.

11                 (Whereupon, the deposition was concluded at

12           about 3:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```